UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in Compliance with D.N.J. LBR 9004-1**

**PORZIO, BROMBERG & NEWMAN, P.C.**
100 Southgate Parkway
P.O. Box 1997
Morristown, New Jersey 07962
(973) 538-4006
(973) 538-5146 Facsimile
Warren J. Martin Jr., Esq. (wjmartin@pbnlaw.com)
Rachel A. Parisi, Esq. (raparisi@pbnlaw.com)
Christopher P. Mazza, Esq. (cpmazza@pbnlaw.com)
Rachel H. Ginzburg, Esq. (rhginzburg@pbnlaw.com)

| | |
|---|---|
| In Re:<br><br>EZ MAILING SERVICES INC., D/B/A EZ WORLDWIDE EXPRESS AND UNITED BUSINESS EXPRESS,[1]<br><br>            Debtor-in-Possession. | Case No.: 19-17900 (SLM)<br><br>Chapter: 11<br><br>Judge: Hon. Stacey L. Meisel, U.S.B.J. |
| UNITED BUSINESS FREIGHT FORWARDERS, LLC,<br><br>            Debtor-in-Possession. | Case No.: 19-17906 (SLM)<br><br>Chapter: 11<br><br>Judge: Hon. Stacey L. Meisel, U.S.B.J.<br>Hearing Date:  May 21, 2019, 2:00 P.M. |

**OBJECTION OF PLAN ADMINISTRATOR TO DEBTORS' JOINT MOTION FOR (I) ORDER (A) APPROVING TERM SHEET BETWEEN THE DEBTORS AND QX LOGISTICS LLC, (B) APPROVING BIDDING PROCEDURES FOR THE SALE OF THE DEBTORS' ASSETS RELATED TO THEIR VERNON, CALIFORNIA AND AMAZON OPERATIONS, AND (C) SCHEDULING FINAL SALE HEARING**

Edward Bond, Plan Administrator of the Debtors, by and through his attorneys, Porzio, Bromberg & Newman, hereby submits this objection (the "Objection") to the Debtors' Joint Motion For (I) Order (A) Approving Term Sheet Between The Debtors And QX Logistics LLC, (B) Approving Bidding Procedures For The Sale Of The Debtors' Assets Related To Their

---

[1] The Debtors in these chapter 11 cases and the last four digits of their taxpayer identification numbers are (i) E Z Mailing Services, Inc. d/b/a E Z Worldwide Express and United Business Xpress ("EZ") (0072), and (ii) United Business Freight Forwarders Limited Liability Company ("UBFF") (0577).  The Debtors are also referred to herein as the "Company."

Vernon, California And Amazon Operations, And (C) Scheduling Final Sale Hearing [Docket No. 48] (the "Motion").  In support of the Objection, the Plan Administrator respectfully states as follows:

## I.    PRELIMINARY STATEMENT

1.    Case law holds that credit bidding under section 363(k) of the Bankruptcy Code should be denied to a secured creditor in the Court's discretion "for cause," such as where the bidder engages in inequitable conduct for its own benefit and to the detriment of a debtor's estate. As described herein, Chris Carey, the disclosed Chief Executive Officer ("CEO") of the proposed bidder and an insider/affiliate of his joint venture partners Azadian Group, LLC ("Azadian") and Change Capital Holdings I, LLC ("Change Capital") (Azadian and Change Capital being affiliates who share the same CEO) has engaged in inequitable self-dealing conduct that has ultimately depressed the value of the Debtors.   While such conduct has wide-reaching implications, for purposes of this Objection, such conduct precludes Chris Carey, Azadian, Change Capital, and QX Logistics, LLC ("QX Logistics") from credit bidding pursuant to section 363(k) of the Bankruptcy Code.  To the extent that the term sheet includes a credit of $100,000 of debt as a portion of QX Logistics' purchase price, as well as the allowance of any other later credit bidding at auction, it should not be approved.[2]

## II.    RELEVANT BACKGROUND

2.    The Plan Administrator was appointed pursuant to the Plan of Reorganization (the "Plan") confirmed by this Court on December 9, 2016 (the "Confirmation Date").  *See* Docket No. 740 in Case No. 16-10615.  Pursuant to the Plan, the Plan Administrator was charged with,

---

[2] The inequitable conduct requiring denial of credit bidding will also prevent any "good faith" finding pursuant to 363(m) at the ultimate sale hearing. Similarly, the proposed sale order contains impermissible third party releases which the Plan Administrator will be objecting to at the appropriate time.

4211803

*inter alia*, collecting and distributing funds due and owing to Porzio, Bromberg & Newman, P.C., Bederson LLP, Lowenstein Sandler LLP, EisnerAmper, and Genova Burns LLC (the "Professionals"), all Chapter 11 professionals whose fee awards (all voluntarily discounted in the first place) were approved by Orders of this Court dated March 20, 2017 [Docket Nos. 808, 809, 810, 811 in Case No. 16-10615].[3] Currently, the Professionals are owed some $1.1 million, consisting of $870,000 owed to Porzio, Bromberg & Newman, and approximately $230,000 owed to other Professionals.

3.      Prior to Confirmation, the Plan Administrator, Ed Bond, served as the Debtors' Chief Restructuring Officer ("CRO").  As of the effective date of the Plan, all priority tax claims were fully up to date insofar as the CRO/now Plan Administrator made certain of that as part of the regular exercise of his duties.  Further, upon exiting bankruptcy, upon information and belief, the Debtors stayed current with their fiduciary obligations to the United States throughout all of 2017, i.e., for a full year, and further initially met their obligations to administrative and unsecured creditors.  Indeed, as of the Confirmation Date, the Plan Administrator was charged with collecting, on behalf of the Professionals, some $1.6 million, which was paid down to $1.1 million during 2017.

4.      Shortly after confirmation, the Debtors hired Christopher Carey, first as an undefined officer of the Company, but later, pursuant to an August 2017 employment agreement (the "Employment Agreement") annexed hereto as **Exhibit A**, as the Company's CEO. Carey served as CEO of the Company for at least 15 months (it is not known at this time how long he

---

[3] Insofar as Bederson was retained as Crisis Manager and to provide the Debtors a CRO (Ed Bond) pursuant to section 363(b) of the Bankruptcy Code, the Debtors were required to pay Bederson a weekly CRO fee of $6,250, and with respect to Crisis Management Services, Bederson was only required to file monthly fee statements, none of which have been objected to on this Court's docket. Bederson was not required to file any interim or final fee applications.

3

served in this specific capacity before execution of the Employment Agreement) until he was terminated by the Debtors on November 10, 2018.

5.      Pursuant to the Employment Agreement, Carey was charged with "the day-to-day management and operations of the Company." Employment Agreement, at ¶ 2.1. His "primary goal[]" was to "improve Company performance and cash flow to meet the cash requirements of the reorganization plan." *Id.* One of the "additional goals" was to "improve efficiency of Company operations." *Id.* The Employment Agreement provided for the payment of almost $500,000 annually for Carey's salary and bonus, and awarded him an annual profit share, for a commitment of three days of work per week. *Id.* at ¶¶ 4.1, 4.2, 4.3. Upon information and belief, on a per diem basis, he was by far the single highest paid employee at the Company.

6.      As stated above, as Carey entrenched himself in the role of CEO moving into calendar year 2018, payments to administrative and unsecured creditors ceased, as did payments of fiduciary payroll taxes. Upon information and belief, in 2018, under Carey's executive control, unpaid payroll taxes ballooned to approximately $3 million, paying salaries to employees without turning amounts withheld from those employees pay to the government. Carey was not succeeding at his contract's expressed "primary goal" to "improve company performance." Indeed, under Carey's control, the company failed to pay critical vendors such as equipment lessors and rent.

7.      Meanwhile, as he shepherded the Company back into the insolvency it had corrected via its 2016 chapter 11, Carey brought at least two loose-knit "offers" to purchase the Company. One such expression of interest was from "Valterra" and a copy of it is annexed hereto as **Exhibit B.**  Based on discussions with Carey, the Valterra concept envisioned the owners,

4211803

Vijay and Ajay Aggarwal being removed from the Company, and Carey serving as CEO of the buyer..

8.      The latest of these offers was the offer from Azadian and Change Capital. Upon information and belief, Carey initially introduced both Azadian and Change Capital to the Debtors as lenders (extremely high interest-rate subprime lenders).  It is unknown whether or not Carey earned a commission on introducing these lenders to the Debtors.

9.      As was also envisioned in the Valterra discussions, it is unsurprising that the Debtors' Motion, at paragraph 13 reports that "Chris Carey is the Chief Executive Officer" of QX Logistics, the entity formed by Azadian to serve as proposed purchaser of the Debtors' California operations.

10.      Upon information and belief, during his tenure as CEO of the Debtors, Carey failed to act in the best interest of the Debtors as is required by a fiduciary officer, and instead embarked on a plan to foster his own takeover of the Debtors at a low purchase price.  While he was being paid some $500,000/year for three days of work deepening EZ's insolvency, he presided over the Debtors' financial ruin, rather than continuing the progress that had been made through the chapter 11.  Funds wasted on payments to Carey could have been used to discharge, in large part, the chapter 11 Professional fee claimants who are represented by the Plan Administrator, and to make required distributions to unsecured creditors.

11.      As described further herein, this proposed transaction must be subject to heightened scrutiny (not reduced, emergent, and expedited scrutiny) given Chris Carey's divided loyalties, his long-time insider status with the Debtors, his position as CEO of both seller and buyer, his links with Azadian and Change Capital, having brought them to the table as hard

money lenders to the Debtors, and his failure to cause the Debtors to pay nearly $3,000,000 of payroll taxes during 2018.

### III.    OBJECTION

12.    "[T]he right to credit bid is not absolute." *In re Philadelphia Newspapers, LLC*, 599 F.3d 298, 315 (3d Cir. 2010). The court may, "for cause," order that a secured lender does not have the right to credit bid. *See id.*; *see also* 11 U.S.C. § 363(k). "A court may deny a lender the right to credit bid in the interest of any policy advanced by the Code, such as to ensure the success of the reorganization or to foster a competitive bidding environment." *Id.* The decision of whether to deny credit bidding for cause is within the discretion of the Court. *In re Aeropostale, Inc.*, 555 BR. 369, 415 (Bankr. S.D.N.Y. 2016). "Courts will deny a secured creditor's right to credit bid due to inequitable conduct." *Id.* at 415 (citing *In re Free Lance—Star Publishing*, 512 B.R. 798, 804-06 (Bankr. E.D. Va. 2014)).

13.    For example, in *In re Aloha Airlines, Inc.*, 2009 WL 1371950 (Bankr. D. Haw. May 14, 2009), a secured creditor was "denied the right to credit bid because of its undisclosed sponsorship of a third party's acquisition of the debtor's assets through that bid." *Aeropostale*, 555 B.R. at 415 (discussing *Aloha Airlines* at *8).

> Prior to the Petition Date, the third party, Mesa Air Group ("Mesa") had entered into the Hawaii air market with the intention of forcing the debtor out of business through the misuse of information obtained through confidential agreements with the debtor and others. In subsequent litigation regarding the issue, Mesa made sworn misstatements to cover the truth regarding its dishonesty and destroyed records. The debtor was subsequently forced to file bankruptcy. During the bankruptcy process, the credit bidder had reached an agreement, initially undisclosed to the court, to grant a license in the debtor's intellectual property to Mesa. When the agreement was made public, the court denied the secured creditor's right to credit bid.

*Aeropostale*, 555 B.R. at 415 (discussing *Aloha Airlines* at *4-9) (internal citations omitted).

4211803

14.    In *Free Lance*, the debtors urged the Court to find that cause existed to limit the secured creditor's ("DSP") credit bid rights.  512 B.R. at 805. The debtors advanced multiple arguments, namely: (1) DSP did not have a lien on all of the Company's assets; (2) DSP had "engaged in inequitable conduct that damped interest in the auction and depressed the potential sales price the Debtors' otherwise might have realized from the sale of the business;" and (3) limiting the amount of the credit bid in that case would "restore enthusiasm for the sale and foster a robust bidding process."  *Id.*  The Court noted that "[m]aximizing the value debtors might be able to realize from the sale of their assets is an important policy advanced by the Bankruptcy Code." *Id.*

15.    The Court found that, from the moment DSP bought the loan, it had pressed the debtors "to walk hand in hand with it through an expedited bankruptcy sales process."  *Id.* at 806. The Court called it a "classic loan-to-own scenario," noting that DSP made "no secret of the fact that it acquired the Loan in order to purchase the Company."  *Id.*

16.    The Court ultimately held that DSP did engage in inequitable conduct. *Id.* The Court found that the credit mechanism "does not always function properly when a party has bought the secured debt in a loan-to-own strategy in order to acquire the target company." *Id.* In that type of situation, "the secured party may attempt to depress rather than to enhance market value."  *Id.* The Court found that DSP "tried to depress the sales price of the Debtors' assets, not to maximize the value of those assets. A depressed value would benefit only DSP, and it would do so at the expense of the estate's other creditors."  *Id.*  The Court concluded that "[t]he deployment of DSP's loan-to-own strategy . . . depressed enthusiasm for the bankruptcy sale in the marketplace." *Id.*

17.     Chris Carey, upon information and belief, while ostensibly serving as, and being paid to serve as, the Debtors' CEO, set the Debtors up for the "loan to own" situation described in *Free Lance*.  Carey, upon information and belief, introduced the Debtors to subprime lenders, Azadian and Change, ultimately leading to critical cash flow issues as the Debtors were obligated to pay extremely high rates of interest to Azadian and Change Capital.  Rather than working to remedy the situation at hand, Mr. Carey allowed over $3 million in tax obligations to accrue, on top of other accruing obligations (including those to the Plan Administrator) thereby burying the Debtors in debt and nearly ensuring that the Petitioning Creditors (Azadian, Change Capital, and Carey), through QX Logistics, would be the successful purchasers in a very depressed sale.

18.     This Court should provide careful scrutiny to all aspects of the proposed sale, and at the least, disallow credit bidding.

### IV.     CONCLUSION

WHEREFORE, for all of the foregoing reasons, the Plan Administrator respectfully requests at this time that the Debtors' Motion to approve the term sheet as currently drafted be denied.  Specifically, to the extent that the term sheet includes a credit of $100,000 of Azadian/Change Capital debt as a portion of QX's purchase price, as well as the allowance of any other later credit bidding procedures at auction, it should not be approved

Dated: May 21, 2019

        **PORZIO, BROMBERG & NEWMAN, P.C.**
        **Attorneys for the Plan Administrator, Ed Bond**

        By:    */s/ Warren J. Martin Jr.*
                Warren J. Martin Jr.

# EXHIBIT A

| | |
|---|---|
| **Subject:** | FINAL AGREEMENT - 8-17-17- EZ Worldwide Executive Employment Agreement w C. Carey |
| **Attachments:** | FINAL AGREEMENT - 8-17-17- EZ Worldwide Executive Employment Agreement w C. Carey.DOC |

**From:** Chris Carey [mailto:ccarey@chriscareyadvisors.com]
**Sent:** Thursday, August 17, 2017 5:47 PM
**To:** Vijay K. Aggarwal; Ajay Aggarwal
**Subject:** FINAL AGREEMENT - 8-17-17- EZ Worldwide Executive Employment Agreement w C. Carey

I have attached the final agreement with the changes agreed to with Ajay tonight.  Basically, we show a total due on past work of $17,500 and no legal bill reimbursement.

Please sign and return to me and I will return fully executed.

Chris

## Employment Agreement

This Employment Agreement (the "**Agreement**") is made and entered into as of August ___, 2017, by and between Christopher Carey (the "**Executive**") and EZ Mailing Services, Inc., d/b/a EZ Worldwide Express, a New Jersey Corporation and United Business Freight Forwarders, LLC, a New Jersey Corporation (the "**Company**").

WHEREAS, the Company desires to employ the Executive on the terms and conditions set forth herein; and

WHEREAS, the Executive desires to be employed by the Company on such terms and conditions.

NOW, THEREFORE, in consideration of the mutual covenants, promises, and obligations set forth herein, the parties agree as follows:

1. <u>Term</u>.   The Executive's employment hereunder shall be effective as of January 1, 2017 (the "**Effective Date**") and shall continue until the third anniversary thereof, unless terminated earlier by either the Executive or the Company, pursuant to <u>Section 5</u> of this Agreement.   The period during which the Executive is employed by the Company hereunder is hereinafter referred to as the "**Employment Term.**"

2. <u>Position and Duties.</u>

    2.1. <u>Position, Duties and Goals</u>.   During the Employment Term, the Executive shall serve as the Chief Executive Officer of the Company, reporting to the Company's Board of Directors. The Executive shall have such duties, authority, and responsibility as shall be determined from time to time by the Board of Directors, which duties, authority, and responsibility shall be consistent with the Executive's position, and shall include but not be limited to (a) the day-to-day management and operations of the Company; (b) advising the Board of Directors on general financial conditions of the Company; and (c) the hiring, termination and salary administration of personnel of the Company reporting to the Executive.

    Subject to the foregoing, the Executive's primary goals shall be to improve Company performance and cash flow to meet the cash requirements of the reorganization plan. The Executive's additional goals during his Employment Term shall be to (1) improve efficiency of Company operations, (2) improve financial and performance reporting, (3) reduce borrowing costs, including assisting the company to replace the North Mill Capital loan with a less expensive asset based loan if possible, and where possible refinancing other Company debt on terms more favorable than those currently in place, and (4) grow the business by increasing revenue from existing clients and developing new client opportunities.

    2.2. <u>Commitment</u>.   During the Employment Term, the Executive shall devote such of his business time and attention required to perform the Executive's duties enumerated in <u>Section 2.1</u> above, with an estimated average time commitment of three days or approximately twenty-five hours per week at the Place of Performance identified in <u>Section 3</u> of this Agreement, less any holidays, illness time and vacation time as set forth in <u>Section 4.7</u> below. During the Employment Term, Executive will not provide services (for compensation or otherwise) to any

of the Company's Competitors. For purposes of this Agreement, the Company's "Competitors" are defined as companies providing services in the Company's markets to the same clients or active prospects for store delivery services, express small parcel delivery services, including Amazon Logistic Services.

3.  Place of Performance. The principal place of Executive's employment shall be the Company's principal executive office currently located at 669 Division Street, Elizabeth, New Jersey; provided that, the Executive may be required to travel on Company business during the Employment Term.

4.  Compensation. All compensation set forth herein is intended to comply with Section 409A of the Internal Revenue Code of 1986, as amended (the "**Code**"); the Company will use best efforts to deliver all such amounts in compliance with the Code and subject to Section 23 below.

    4.1. Base Salary. The Company shall pay the Executive a base salary at an annual rate of $360,000 in periodic installments in accordance with the Company's customary payroll practices and applicable wage payment laws, but no less frequently than monthly. The Executive's annual base salary, as in effect from time to time, is hereinafter referred to as "**Base Salary**". If at any point in time the Company's cash flow is insufficient to pay "total compensation" to both of Vijay K. Aggarwal and Ajay Aggarwal an amount equal to the Executive's Base Salary, then the Board of Directors shall decrease the Executive's Base Salary by the amount by which Vijay K. Aggarwal's and Ajay Aggarwal's total compensation is reduced below the Executive's Base Salary due to the Company's insufficient cash flow; see Exhibit A. "**Total compensation**" to the Aggarwals includes all payments to the Aggarwals such as salary, bonus, and reimbursements for past loans, or distributions of any kind, other than reimbursement of *bona fide* expenses accruing after the date of this Agreement.

    4.2. Accrued Bonus.

    (a)  For each calendar year of the Employment Term, the Executive shall receive an annual bonus of $120,000 (the "**Accrued Bonus**"), which shall accrue without interest at the rate of $10,000 per month.

    (b)  The Accrued Bonus for each calendar year will be paid in twelve equal, consecutive monthly installments, beginning on January 31 of the calendar year following the calendar year in which the Accrued Bonus accrued. If cash flow permits, the Company may elect, in its sole and absolute discretion, to pay any or all parts of the Accrued Bonus on accelerated basis.

    4.3. Annual Profit Share.

    (a)  For each calendar year of the Employment Term, the Executive shall receive an annual profit share equal to 10% of that portion of the Company's net profits that exceed $250,000.00 per annum (the "**Annual Profit Share**").

    (b)  The Annual Profit Share, if any, will be paid not later than the next following calendar year upon the earlier of (i) the date that the Company has declared any annual profits and (ii) September 30 of the following calendar year.

    4.4. Strategic Transaction Award. The Company may in its sole and absolute discretion instruct the

Executive to find a buyer to purchase equity or assets of the Company (a "**Strategic Transaction**").  In the event that the Company makes such a request, the Executive may present the Company with a possible Strategic Transaction.  If the Executive presents the Company with a possible Strategic Transaction, the Company shall have 90 days (the "**Consideration Period**") to determine whether to proceed with the Strategic Transaction or reject the Strategic Transaction.  The Aggarwals agree to cooperate with the process and provide support for drafting the information memorandum and all financial statements as required.  At all times, Vijay K. Aggarwal and Ajay Aggarwal shall retain sole and exclusive discretion to sell or decline to sell the Company.

(a)   If the Executive is instructed to find a Strategic Transaction on or after January 1, 2018, the Executive shall be paid (each, a "**Strategic Transaction Award**") as follows:

   (i)    If the Executive presents and the Company complete the Strategic Transaction, the Executive shall be paid a Strategic Transaction Award equal to the greater of (i) $50,000 or (ii) 15% of the "sale price" for the Company.  The Strategic Transaction Award shall be paid to the Executive in the same manner and tenor and at the same time as paid to Messrs. Vijay Aggarwal and Ajay Aggarwal.  "**Sale price**" means the enterprise value of the Company, determined by dividing the gross proceeds to the shareholders by the percentage of the Company to be sold.

   (ii)   If the Executive presents a Strategic Transaction that is a "**Qualified Transaction**", and the Strategic Transaction is not completed, the Executive shall be paid, as applicable, the greater of (i) $50,000 or (ii) 15% of (1) the offered price for the Company, in the case of a rejected offer, or (2) the enterprise value of the Company calculated as the greater of 5 times EBITDA from the previous year minus debt plus cash.  This amount shall be paid to the Executive in twenty equal, consecutive quarterly installments, with the first such payment commencing on last day of the calendar quarter in which offer is declined or the Strategic Transaction discussions terminate.  A "**Qualified Transaction**" is an offer to purchase a majority of the shares or assets of the Company, at an enterprise valuation equal to or greater than 5 times the Company's prior year EBITDA, minus debt plus cash.

   (iii)  If the Executive is (i) is not instructed to find a Strategic Transaction or (ii) is unable to present a Strategic Transaction that is a Qualified Transaction to the Company within 120 days after he is instructed to do so, the Executive shall be paid an amount equal to the greater of (i) $50,000 or (ii) 15% of the enterprise value of the Company calculated as 5 times EBITDA from the previous year minus debt plus cash.  This amount shall be paid to the Executive in twenty equal, consecutive quarterly payments over the course of the five-year period beginning, as applicable (i) as of the end of the Employment Term or (ii) 30 days after the consideration period ends.

(b)   If the Executive's Termination Date occurs on or before December 31, 2017, and he is not instructed to find a Strategic Transaction, he shall be paid a Strategic Transaction Award equal to $50,000, payable in five equal monthly installments commencing on the first business day of the month following the Termination Date.

(c)   The payment obligations in this Section 4.4 accrue regardless of whether the Executive is

employed by the Company at the time the Strategic Transaction is presented, accepted, rejected or completed.

(d) If the Company instructs the Executive to solicit a Strategic Transaction and the Executive continues performing duties outline in <u>Section 2.1</u>, it shall continue to compensate the Executive as outlined in <u>Sections 4.1</u> and <u>4.2</u> until the end of the solicitation and consideration period.  If this period extends past 6 months of the calendar year, the Executive will be entitled to additional compensation as set forth in <u>Section 4.3</u>.

4.5. <u>Valuation Determinations.</u>

(a) Any calculations of earnings for purposes of calculating the Annual Profit Share or Strategic Transaction Award under this Agreement will assume annual compensation of $1,000,000.00 in the aggregate to Messrs. Vijay K. Aggarwal and Ajay Aggarwal and their family and affiliates.  Notwithstanding the foregoing Annual Profit Share and Strategic Transaction Award calculation basis, Messrs. Vijay K. Aggarwal and Ajay Aggarwal and their family and affiliates may pay themselves aggregate compensation not to exceed $1,000,000.00 in 2017, $1,500,000.00 in 2018, and $2,000,000.00 in 2019.  Other than the stated $1,000,000.00 of assumed annual compensation of Messrs. Vijay K. Aggarwal and Ajay Aggarwal, any additional amounts paid or distributed to Messrs. Vijay K. Aggarwal and Ajay Aggarwal or their family or affiliates, shall be added back to earnings when making said enterprise value, equity, and profit calculations.

(b) For purposes of this Agreement, enterprise value, equity, and profit valuations of the Company shall be subject to <u>Section 4.5(a)</u> of this Agreement and otherwise calculated in accordance with standard accounting practices and principles by an accountant(s) chosen by the Company.

(c) The Executive and the Company recognize and agree that Messrs. Vijay K. Aggarwal and Ajay Aggarwal may engage in an e-commerce business, by the name of "Nite Express," that is and shall remain a distinct entity that is separate and apart from the Company.  All expenses incurred and cash required for operations will by borne by Nite Express and its owners.  Any expenses incurred on behalf of Nite Express by the Company incur a 20% administrative fee payable to the Company, will be identified and paid separately by Nite Express, or as in the case of rent, will be apportioned and billed as the Nite Express share of those expenses.  Accordingly, the Executive and the Company recognize and agree that any and all provisions of this Agreement shall not apply to Nite Express, and for purposes of this Agreement Nite Express shall be excluded from the definition of "Company."

(d) In no event shall any owner(s), officer(s), director(s), employee(s), or agent(s) of the Company, or any other individual be personally responsible or be required to issue a personal note with respect to the amounts to be provided to the Executive under this Agreement.

4.6. <u>Employee Benefits</u>.  During the Employment Term, the Executive shall be entitled to participate in all employee benefit plans, practices, and programs maintained by the Company, including healthcare (medical, dental, vision) and retirement plans, as in effect from time to time (collectively, "**Employee Benefit Plans**"), on a basis which is no less favorable than is provided

to other similarly situated executives of the Company, to the extent consistent with applicable law and the terms of the applicable Employee Benefit Plans. Healthcare benefits will be provided to the Executive without any offset or deduction from Executive's compensation and without any contribution from the Executive. The Company reserves the right to amend or cancel any Employee Benefit Plans at any time in its sole discretion, subject to the terms of such Employee Benefit Plan and applicable law. If Company healthcare benefits are terminated, the Company will reimburse the Executive for similar healthcare coverage secured from other sources. In addition, during the Employment Term, the Executive will be entitled to receive at least twelve days of paid vacation per year and will receive an amount of illness time equivalent to 60% of the amount of illness time provided to full-time executives.

4.7. <u>Business Expenses; Reimbursement</u>. The Executive shall be entitled to reimbursement, within fifteen (15) days of submission, for all reasonable and necessary documented out-of-pocket expenses incurred by the Executive in connection with the performance of the Executive's duties hereunder as otherwise in accordance with the Company's expense reimbursement policies and procedures. In addition, the Executive shall be entitled to a monthly allowance of five hundred dollars ($500.00) toward a company car.

The Company and the Executive have reconciled the balance due of $17,500 that is due to the Executive for the Company's 2016 engagement of the Executive as a Logistics Consultant. The aforementioned balance will be paid in two installments, one for $10,000 by August 30, 2017 one for $7,500 by September 15, 2017.

4.8. <u>Indemnification</u>.

(a)    In the event that the Executive is made a party or threatened to be made a party to any action, suit, or proceeding, whether civil, criminal, administrative, or investigative (a "**Proceeding**"), other than those exclusions promulgated in <u>Section 4.9(b)</u> of this Agreement, by reason of the fact that the Executive is or was serving in any office of, or otherwise representing or acting for or on behalf of the Company (within the scope of his authority), the Company shall indemnify and hold the Executive harmless to the fullest extent applicable to any other officer or director of the Company and to the maximum extent permitted under applicable law and the Company's bylaws, from and against any liabilities, costs, claims, and expenses, including all costs and expenses incurred in defense of any Proceeding (including attorneys' fees). However, the Company shall indemnify and hold the Executive harmless with respect to attorneys' fees incurred in defense of any Proceeding, other than those exclusions promulgated in <u>Section 4.9(b)</u> of this Agreement, only: (i) to the extent provided by an applicable liability insurance policy maintained by the Company, and (ii) to the extent that the Company approves of and provides the attorney(s) to defend the Executive in any such Proceeding.

(b)    The Executive shall not be indemnified and held harmless by the Company, as otherwise provided in <u>Section 4.9(a)</u> of this Agreement, with respect to (i) any Proceeding initiated by the Executive or the Company related to any contest or dispute between the Executive and the Company or any of its affiliates with respect to this Agreement or the Executive's employment hereunder, (ii) any Proceeding in which a judgment or other final adjudication adverse to the Executive establishes that (A) the Executive's acts were committed in bad faith or were the result of active and deliberate dishonesty and were material to the cause of

action so adjudicated, or (B) that the Executive intentionally and knowingly personally gained in fact a financial profit or other advantage to which he was not legally entitled.

(c)    The Company shall be required to use good faith and best efforts to purchase and maintain throughout the Employment Term, at its own expense, directors' and officers' liability insurance providing coverage to the Executive.

5.    <u>Termination of Employment</u>.    The Employment Term and the Executive's employment hereunder may be terminated by either the Company or the Executive at any time and for any reason; provided that, unless otherwise provided herein, either party shall be required to give the other party at least 7 days' advance written notice of any termination of the Executive's employment.    The effective date of the termination shall be referred to as the "**Termination Date**".

5.1.    <u>Payments Upon Any Termination</u>.    Upon the termination of the Executive's employment during the Employment Term by either party and for any reason.    The Company shall make payments as set forth below, subject in all cases to its compliance with the <u>Section 23</u> hereunder:

(a)    The Company shall pay to the Executive in a lump sum within thirty (30) days after the Termination Date (i) any Base Salary that has accrued but is unpaid, (ii) any reimbursable expenses that have been incurred but are unpaid, and (iii) any accrued but unused vacation;

(b)    The Company shall pay the Executive for any Accrued Bonus prior to the Termination Date occurs that has not been paid as of the Termination Date.    This amount shall be paid in consecutive monthly installments of $10,000, beginning on January 31 following the Termination Date.    If cash flow permits, the Company may elect, within its sole and absolute discretion, to pay any or all parts of the Accrued Bonus on accelerated basis.

(c)    The Company will pay the Executive for any amount of the Annual Profit Share that has not been paid as of the Termination Date.    This amount shall be paid by September 30 of the next following calendar year.

(d)    To the extent not already paid, the Company will pay the Executive for any Strategic Transaction award as described in <u>Sections 4.4(b)</u> and <u>(c)</u>. This Award shall be paid as outlined in that <u>Section 4.4</u>.

(e)    If the Executive terminates the Executive's employment hereunder at any time (other than for Good Reason), the Company shall not pay the Executive severance and shall not pay the Executive compensation provided by <u>Sections 4.3</u> or <u>4.4</u> of this Agreement.    The Executive shall receive other compensation or benefits provided for by this Agreement in an amount equal to the compensation and benefits earned and accrued as of the date of the Executive's termination of this Agreement.

5.2.    <u>Payments Upon a Termination by the Company or the Executive's Resignation for Good Reason</u>. If the Company terminates the Executive's employment or if the Executive resigns for Good Reason (as defined below), the Company shall provide the Executive with the following (in addition to the amounts described in <u>Section 5.1</u>):

(a)    Severance.

(i)     If the Termination Date falls within the first twelve calendar months of the Employment Term, the Company shall pay the Executive severance in an amount equal to two months' worth of the Executive's Base Salary.

(ii)    If the Termination Date falls after the first twelve calendar months and before the end of the twenty-fourth calendar month of the Employment Term, the Company shall pay the Executive severance in an amount equal to three months' worth of the Executive's Base Salary.

(iii)   If the Termination Date falls after the first twenty-four calendar months and before the expiration of the Employment Term, the Company shall pay the Executive severance in an amount equal to four months' worth of the Executive's Base Salary.

Any severance owed to the Executive pursuant to this Section 5.2(a) of this Agreement shall be paid over the same period as would normally be paid with past payroll practices, namely over a period of time that is equal to the period of time to which the severance payment corresponds. For example, two months' severance shall be paid over the course of two months.  For purposes of this Agreement, "**Good Reason**" shall mean the following actions, if taken without the Executive's written consent:

(i)     Any action taken by the Company which results in a material reduction in Executive's authority, duties or responsibilities, including any requirement that Executive report directly to anyone other than the Board;

(ii)    Any assignment to Executive of duties that are materially inconsistent with Executive's authority, duties or responsibilities as the Chief Executive Officer of the Company;

(iii)   Any material decrease in Executive's Base Salary;

(iv)    The reassignment of Executive to any primary place of employment which is fifty (50) miles or more from the place of employment set forth in Section 3; or

(v)     Any material breach of this Agreement by the Company, including without limitation the Company's failure to make timely payment of the amounts set forth herein.

(b)   Accrued Bonus. The Company shall pay to the Executive the Accrued Bonus for each full calendar month occurring prior to the Termination Date for the calendar year in which the termination of employment occurs.  This amount shall be paid in equal, consecutive monthly installments, beginning on January 31 of the calendar year following the calendar year in which the Accrued Bonus accrued.  For example, if the Executive is terminated at the end of the 2nd month of the calendar year and two months of Accrued Bonus is then due, the Accrued Bonus will be paid in two monthly installments beginning on January 31 of the following calendar year.  If cash flow permits, the Company may elect, within its sole and absolute discretion, to pay any or all parts of the Accrued Bonus on accelerated basis.

(c)   Annual Profit Share.

(i)     If the Executive's employment terminates within the first six months of a calendar year, the Executive will receive no Annual Profit Share (if any) for that calendar year.

(ii)    If the Executive's employment terminates within the second six months of a calendar year, the Executive shall receive the entire Annual Profit share, if any, for that calendar year, paid within six months after the Company has declared any annual profits.

5.3. <u>Resignation of All Other Positions</u>.  Upon termination of the Executive's employment hereunder for any reason, the Executive shall be deemed to have resigned from all positions that the Executive holds as an officer or member of the Board (or a committee thereof) of the Company or any of its affiliates.

6.   <u>Cooperation</u>. The parties agree that certain matters in which the Executive will be involved during the Employment Term may necessitate the Executive's cooperation in the future. Accordingly, following the termination of the Executive's employment for any reason, to the extent reasonably requested by the Board, the Executive shall, subject to his reasonable availability and at the Company's expense, cooperate with the Company in connection with matters arising out of the Executive's service to the Company; provided that, the Company shall make reasonable efforts to minimize disruption of the Executive's other activities. The Company shall pay the Executive at the rate of $2,000 per day and reimburse the Executive for reasonable expenses incurred in connection with such cooperation.

6.1. <u>Strategic Transaction Award Assistance</u>.  If the Executive receives a Strategic Transaction Award in excess of $1,000,000.00, the Executive will without further compensation assist the Company to transition with up to 5 hours per week over the next 3 months.  If the Executive is retained thereafter, the Executive will commit to up to an additional 6 months of service at the rate of $2,000.00 per five hour day, 1 day per week.

7.   <u>Confidential Information</u>. The Executive understands and acknowledges that during the Employment Term, he will have access to and learn about Confidential Information of the Company, as defined below.

7.1. <u>Confidential Information Defined</u>.  For purposes of this Agreement, "**Confidential Information**" includes, but is not limited to, proprietary or confidential information, documents or materials (in spoken, printed, electronic or any other form or medium) that belongs to or pertains to the Company, is not generally known to the public, has tangible or intangible value to the Company and that was disclosed to the Executive or that the Executive became aware of as a consequence of his employment with the Company. Confidential Information may include but is not limited to: business processes, practices, methods, policies, plans, publications, documents, research, operations, services, strategies, techniques, agreements, contracts, terms of agreements, transactions, potential transactions, negotiations, pending negotiations, know-how, trade secrets, computer programs, computer software, applications, operating systems, software design, web design, work-in-process, databases, manuals, records, articles, systems, material, sources of material, supplier information, vendor information, financial information, results, accounting information, accounting records, legal information, marketing information, advertising information, pricing information, credit information, design information, payroll information, staffing information, personnel information, employee lists, supplier lists, vendor

lists, developments, reports, internal controls, security procedures, graphics, drawings, sketches, market studies, sales information, revenue, costs, formulae, notes, communications, algorithms, product plans, designs, styles, models, ideas, audiovisual programs, inventions, unpublished patent applications, original works of authorship, discoveries, experimental processes, experimental results, specifications, customer information, customer lists, client information, client lists, manufacturing information, factory lists, distributor lists, and buyer lists of the Company or its businesses or any existing or prospective customer, supplier, investor or other associated third party, or of any other person or entity that has entrusted information to the Company in confidence.

Notwithstanding the foregoing, Confidential Information shall not include information that has been independently developed and disclosed by others or that is generally available to and known by the public at the time of disclosure to the Executive, provided that such disclosure is through no direct or indirect fault of the Executive or person(s) acting on the Executive's behalf. Confidential Information also shall not include information or documents that were developed or obtained by the Executive prior to his employment with the Company or outside the scope of his employment with the Company (although information developed by the Executive during and in the course of his employment with the Company may constitute Confidential Information).

7.2.  Company Creation and Use of Confidential Information. The Executive understands and acknowledges that the Company has invested, and continues to invest, substantial time, money, and specialized knowledge into developing its resources, creating a customer base, generating customer and potential customer lists, training its employees, and improving its offerings in the field of trucking distribution and retail logistics in the clothing industry. The Executive understands and acknowledges that as a result of these efforts, the Company has created, and continues to use and create Confidential Information and that the Company believes that this Confidential Information provides the Company with a competitive advantage over others in the marketplace.

7.3.  Disclosure and Use Restrictions. The Executive agrees and covenants:   (i) to treat all Confidential Information as strictly confidential; (ii) not to directly or indirectly disclose, publish, communicate, or make available Confidential Information, or allow it to be disclosed, published, communicated, or made available, in whole or part, to any entity or person whatsoever (including other employees of the Company) not having a need to know and authority to know and use the Confidential Information in connection with the business of the Company and, in any event, not to anyone outside of the direct employ of the Company except as required in the performance of the Executive's authorized employment duties to the Company or with the prior consent of the Company in each instance (and then, such disclosure shall be made only within the limits and to the extent of such duties or consent); and (iii) not to access or use any Confidential Information, and not to copy any documents, records, files, media, or other resources containing any Confidential Information, or remove any such documents, records, files, media, or other resources from the premises or control of the Company, except as required in the performance of the Executive's authorized employment duties to the Company or with the prior consent of the Company in each instance (and then, such disclosure shall be made only within the limits and to the extent of such duties or consent). Nothing herein shall be construed to prevent disclosure of Confidential Information as may be

required by applicable law or regulation, or pursuant to the valid order of a court of competent jurisdiction or an authorized government agency, provided that the disclosure does not exceed the extent of disclosure required by such law, regulation, or order. To the extent permissible by law, the Executive shall promptly provide written notice of any such order to the Company. In addition, nothing in this Agreement is intended to or will be used to limit the Executive's right to communicate with a government agency, as provided for, protected under, or warranted by applicable law.

7.4. <u>Notice of Immunity Under the Economic Espionage Act of 1996, as amended by the Defend Trade Secrets Act of 2016 ("DTSA")</u>.  Notwithstanding any other provision of this Agreement:

(a)  The Executive will not be held criminally or civilly liable under any federal or state trade secret law for any disclosure of a trade secret that:

(i)  is made (1) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (2) solely for the purpose of reporting or investigating a suspected violation of law; or

(ii)  is made in a complaint or other document filed under seal in a lawsuit or other proceeding.

(b)  If the Executive files a lawsuit for retaliation by the Company for reporting a suspected violation of law, the Executive may disclose the Company's trade secrets to the Executive's attorney and use the trade secret information in the court proceeding if the Executive:

(i)  files any document containing trade secrets under seal; and

(ii)  does not disclose trade secrets, except pursuant to court order.

8.  <u>Restrictive Covenants.</u>

8.1. <u>Acknowledgement</u>.  The Executive understands that the nature of the Executive's position gives him access to and knowledge of Confidential Information and places him in a position of trust and confidence with the Company. The Executive understands and acknowledges that the intellectual or artistic services he provides to the Company are unique, special, or extraordinary because of the nature of the Executive's role as Chief Executive Officer and integral part of the operation and management of the Company, and the Executive's access to Confidential Information.

The Executive further understands and acknowledges that the Company's ability to reserve Confidential Information for the exclusive knowledge and use of the Company is of great competitive importance and commercial value to the Company, and that improper use or disclosure by the Executive may result in unfair or unlawful competitive activity.

8.2. <u>Non-Competition</u>.  Because of the Company's legitimate business interest as described herein and the good and valuable consideration offered to the Executive, during the Employment Term and for the term of two years, to run consecutively, beginning on the last day of the Executive's employment with the Company, for any reason or no reason and whether employment is terminated at the option of the Executive or the Company, the Executive agrees and covenants

not to engage in Prohibited Activity within trucking distribution and retail logistics in the clothing industry.

For purposes of this Section 8.2, "**Prohibited Activity**" is activity in which the Executive contributes Confidential Information, directly or indirectly, in whole or in part, as an employee, employer, owner, operator, manager, advisor, consultant, agent, employee, partner, director, stockholder, officer, volunteer, intern, or any other similar capacity to a Competitor.

Nothing herein shall prohibit the Executive from purchasing or owning less than five percent (5%) of the publicly traded securities of any corporation, provided that such ownership represents a passive investment and that the Executive is not a controlling person of, or a member of a group that controls, such corporation.

This Section does not, in any way, restrict or impede the Executive from exercising protected rights to the extent that such rights cannot be waived by agreement or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency, provided that such compliance does not exceed that required by the law, regulation, or order. The Executive shall promptly provide written notice of any such order to the Company.

8.3.  Non-Solicitation of Employees. The Executive agrees and covenants not to directly or indirectly solicit for employment any employee of the Company with whom the Executive had material contact during the two-year period immediately preceding the termination of his employment, or induce such employees to leave their employment with the Company, during the Employment Term and for two years, to run consecutively, beginning on the last day of the Executive's employment with the Company.  Notwithstanding the foregoing, following the Executive's separation from the Company, nothing herein shall prohibit the Executive in his future endeavors from soliciting or hiring former employees of the Company (i) via a general solicitation, (ii) who were terminated by the Company or (iii) after one hundred twenty (120) days following an employee's voluntary termination from the Company. If the Executive is not entitled to severance under Section 5.2, this Section 8.3 will be null and void.

8.4.  Non-Solicitation of Customers.  The Executive understands and acknowledges that because of the Executive's experience with and relationship to the Company, he will have access to and learn about much or all of the Company's customer information. "**Customer Information**" includes, but is not limited to, names, phone numbers, addresses, e-mail addresses, order history, order preferences, chain of command, pricing information, and other information identifying facts and circumstances specific to the customer and relevant to sales/services.

The Executive understands and acknowledges that loss of the Company's relationship with one or more of its customers and/or their goodwill may cause significant and irreparable harm.

The Executive agrees and covenants, during the Employment Term and for two years, to run consecutively, beginning on the last day of the Executive's employment with the Company, not to directly or indirectly solicit or initiate contact (including but not limited to e-mail, regular mail, express mail, telephone, fax, social media post, social media message, and instant message) with the Company's then-current (determined as of the date any such contact), active

or proposed customers for purposes of offering goods or services similar to or competitive with those offered by the Company. If the Executive is not entitled to severance under <u>Section 5.2</u>, this <u>Section 8.4</u> will be null and void.

9. <u>Mutual Non-Disparagement</u>.  The Executive agrees and covenants that he will not at any time make, publish or communicate to any person or entity or in any public forum any defamatory or disparaging remarks, comments, or statements concerning the Company or its businesses, or any of its employees, officers, and existing and prospective customers, suppliers, investors and other associated third parties.

This <u>Section 9</u> does not, in any way, restrict or impede the Executive from exercising protected rights to the extent that such rights cannot be waived by agreement or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency, provided that such compliance does not exceed that required by the law, regulation, or order. To the extent permitted by law, the Executive shall promptly provide written notice to the Company of any such order. In addition, nothing in this Agreement is intended to or will be used to limit the Executive's right to communicate with a government agency, as provided for, protected under, or warranted by applicable law.

The Company agrees and covenants that it shall cause its officers and directors to refrain from making any defamatory or disparaging remarks, comments, or statements concerning the Executive to any third parties.

10. [Reserved]

11. <u>Remedies</u>. In the event of a breach or threatened breach by the Executive of <u>Section 7</u>, <u>Section 8</u>, or <u>Section 9</u> of this Agreement, each party hereby consents and agrees that the other shall be entitled to seek, in addition to other available remedies, a temporary or permanent injunction or other equitable relief against such breach or threatened breach from any court of competent jurisdiction, without the necessity of showing any actual damages or that money damages would not afford an adequate remedy, and without the necessity of posting any bond or other security. The aforementioned equitable relief shall be in addition to, not in lieu of, legal remedies, monetary damages, or other available forms of relief.

12. [Reserved]

13. <u>Security and Access</u>.  The Executive agrees and covenants (a) to comply with all Company security policies and procedures as in force from time to time including without limitation those regarding computer equipment, telephone systems, voicemail systems, facilities access, monitoring, key cards, access codes, Company intranet, internet, social media and instant messaging systems, computer systems, e-mail systems, computer networks, document storage systems, software, data security, encryption, firewalls, passwords and any and all other Company facilities, IT resources and communication technologies ("**Facilities and Information Technology Resources**"); (b) not to access or use any Facilities and Information Technology Resources except as authorized by the Company; and (iii) not to access or use any Facilities and Information Technology Resources in any manner after the termination of the Executive's employment by the Company, whether termination is voluntary or involuntary. The Executive agrees to notify the Company promptly in the event he

learns of any violation of the foregoing by others, or of any other misappropriation or unauthorized access, use, reproduction, or reverse engineering of, or tampering with any Facilities and Information Technology Resources or other Company property or materials by others.

14. Exit Obligations.  Upon (a) the voluntary or involuntary termination of the Executive's employment or (b) the Company's request at any time during the Executive's employment, the Executive shall (i) provide or return to the Company any and all Company property, including keys, key cards, access cards, identification cards, security devices, employer credit cards, network access devices, computers, cell phones, smartphones, PDAs, pagers, fax machines, equipment, speakers, webcams, manuals, reports, files, books, compilations, work product, e-mail messages, recordings, tapes, disks, thumb drives and other removable information storage devices, hard drives, negatives and data and all Company documents and materials belonging to the Company and stored in any fashion, including but not limited to those that constitute or contain any Confidential Information or Work Product, that are in the possession or control of the Executive, whether they were provided to the Executive by the Company or any of its business associates or created by the Executive in connection with his employment by the Company but not including any documents or materials that the Executive possessed or viewed prior to his employment with the Company; and (ii) delete or destroy all copies of any such documents and materials not returned to the Company that remain in the Executive's possession or control, including those stored on any non-Company devices, networks, storage locations, and media in the Executive's possession or control. Notwithstanding anything herein to the contrary, following the Executive's separation from employment, the Executive shall be permitted to retain documents and materials relating to his own compensation and benefits.

15. [Reserved]

16. Governing Law: Jurisdiction and Venue.  This Agreement shall be governed by and construed in accordance with the laws of the State of New Jersey applicable to agreement made and to be performed in that state, without regard to any of its principles of conflicts of law that would result in the application of the laws of another jurisdiction. Each of the parties unconditionally and irrevocably consents to the exclusive jurisdiction of the courts of the State of New Jersey, Union County and the federal district court for the District of New Jersey with respect to any suit, action or proceeding arising out of or relating to this Agreement, and each of the parties hereby unconditionally and irrevocably waives any objection to venue in any such court or to assert that any such court is an inconvenient forum, and agrees that service of any summons, complaint, notice or other process relating to such suit, action or other proceeding may be effected in the manner provided in Section 26 hereof.

17. Entire Agreement.  Unless specifically provided herein, this Agreement contains all of the understandings and representations between the Executive and the Company pertaining to the subject matter hereof and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter. The parties mutually agree that the Agreement can be specifically enforced in court and can be cited as evidence in legal proceedings alleging breach of the Agreement.

18. Modification and Waiver.  No provision of this Agreement may be amended or modified unless such amendment or modification is agreed to in writing and signed by the Executive and the Company. No waiver by either of the parties of any breach by the other party hereto of any condition or

provision of this Agreement to be performed by the other party hereto shall be deemed a waiver of any similar or dissimilar provision or condition at the same or any prior or subsequent time, nor shall the failure of or delay by either of the parties in exercising any right, power, or privilege hereunder operate as a waiver thereof to preclude any other or further exercise thereof or the exercise of any other such right, power, or privilege.

19. Severability.  Should any provision of this Agreement be held by a court of competent jurisdiction to be enforceable only if modified, or if any portion of this Agreement shall be held as unenforceable and thus stricken, such holding shall not affect the validity of the remainder of this Agreement, the balance of which shall continue to be binding upon the parties with any such modification to become a part hereof and treated as though originally set forth in this Agreement.

The parties further agree that any such court is expressly authorized to modify any such unenforceable provision of this Agreement in lieu of severing such unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to this Agreement, or by making such other modifications as it deems warranted to carry out the intent and agreement of the parties as embodied herein to the maximum extent permitted by law.

The parties expressly agree that this Agreement as so modified by the court shall be binding upon and enforceable against each of them. In any event, should one or more of the provisions of this Agreement be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provisions hereof, and if such provision or provisions are not modified as provided above, this Agreement shall be construed as if such invalid, illegal, or unenforceable provisions had not been set forth herein.

20. Captions.  Captions and headings of the sections and paragraphs of this Agreement are intended solely for convenience and no provision of this Agreement is to be construed by reference to the caption or heading of any section or paragraph.

21. Counterparts.  This Agreement may be executed in separate counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

22. [Reserved]

23. Section 409A.

23.1.    General Compliance.  This Agreement is intended to comply with Section 409A or an exemption thereunder and shall be construed and administered in accordance with Section 409A.  Notwithstanding any other provision of this Agreement, payments provided under this Agreement may only be made upon an event and in a manner that complies with Section 409A or an applicable exemption.  Any payments under this Agreement that may be excluded from Section 409A either as separation pay due to an involuntary separation from service or as a short-term deferral shall be excluded from Section 409A to the maximum extent possible.  For purposes of Section 409A, each installment payment provided under this Agreement shall be treated as a separate payment.  Any payments to be made under this Agreement upon a termination of employment shall only be made upon a "separation from service" under Section 409A.  Notwithstanding the foregoing, the Company makes no

representations that the payments and benefits provided under this Agreement comply with Section 409A. The Company shall reimburse the Executive, on an after tax basis all excess taxes, penalties, interest, or other expenses that may be incurred by the Executive on account of non-compliance with Section 409A.

23.2.    Specified Employees.    Notwithstanding any other provision of this Agreement, if any payment or benefit provided to the Executive in connection with his termination of employment is determined to constitute "nonqualified deferred compensation" within the meaning of Section 409A and the Executive is determined to be a "specified employee" as defined in Section 409A(a)(2)(b)(i), then such payment or benefit shall not be paid until the first payroll date to occur following the six-month anniversary of the Termination Date or, if earlier, on the Executive's death (the "**Specified Employee Payment Date**").    The aggregate of any payments that would otherwise have been paid before the Specified Employee Payment Date shall be paid to the Executive in a lump sum on the Specified Employee Payment Date and thereafter, any remaining payments shall be paid without delay in accordance with their original schedule.

23.3.    Reimbursements.    To the extent required by Section 409A, each reimbursement or in-kind benefit provided under this Agreement shall be provided in accordance with the following:

(a)    the amount of expenses eligible for reimbursement, or in-kind benefits provided, during each calendar year cannot affect the expenses eligible for reimbursement, or in-kind benefits to be provided, in any other calendar year;

(b)    any reimbursement of an eligible expense shall be paid to the Executive on or before the last day of the calendar year following the calendar year in which the expense was incurred; and

(c)    any right to reimbursements or in-kind benefits under this Agreement shall not be subject to liquidation or exchange for another benefit.

23.4.    Tax Gross-ups. Any tax gross-up payments provided under this Agreement shall be paid to the Executive on or before December 31 of the calendar year immediately following the calendar year in which the Executive remits the related taxes.

24. [Reserved].

25. Successors and Assigns.  This Agreement is personal to the Executive and shall not be assigned by the Executive. Any purported assignment by the Executive shall be null and void from the initial date of the purported assignment. The Company may assign this Agreement to any successor or assign (whether direct or indirect, by purchase, merger, consolidation, or otherwise) to all or substantially all of the business or assets of the Company. This Agreement shall inure to the benefit of the Company and permitted successors and assigns.

26. Notice.  Notices and all other communications provided for in this Agreement shall be in writing and shall be delivered personally or sent by registered or certified mail, return receipt requested, or by overnight carrier to the parties at the addresses set forth below (or such other addresses as specified by the parties by like notice):

If to the Company:

Vijay K. Aggarwal and Ajay Aggarwal
EZ Worldwide Express 669 Division Street
Elizabeth, NJ 07201

If to the Executive:

Chris Carey
Chris Carey Advisors, LLC
146 South 4th Street, Unit 11B
Brooklyn, NY 11211

27. Representations of the Executive.  The Executive represents and warrants to the Company that:

   27.1.      The Executive's acceptance of employment with the Company and the performance of his duties hereunder will not conflict with or result in a violation of, a breach of, or a default under any contract, agreement, or understanding to which he is a party or is otherwise bound.

   27.2.      The Executive's acceptance of employment with the Company and the performance of his duties hereunder will not violate any non-solicitation, non-competition, or other similar covenant or agreement of a prior employer.

28. Withholding.  The Company shall have the right to withhold from any amount payable hereunder any Federal, state, and local taxes in order for the Company to satisfy any withholding tax obligation it may have under any applicable law or regulation.

29. Survival.  Upon the expiration or other termination of this Agreement, the respective rights and obligations of the parties hereto shall survive such expiration or other termination to the extent necessary to carry out the intentions of the parties under this Agreement.

30. Acknowledgement of Full Understanding.  THE EXECUTIVE ACKNOWLEDGES AND AGREES THAT HE HAS FULLY READ, UNDERSTANDS AND VOLUNTARILY ENTERS INTO THIS AGREEMENT. THE EXECUTIVE ACKNOWLEDGES AND AGREES THAT HE HAS HAD AN OPPORTUNITY TO ASK QUESTIONS AND CONSULT WITH AN ATTORNEY OF HIS CHOICE BEFORE SIGNING THIS AGREEMENT.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

EZ MAILINGS SERVICES, INC. D/B/A EZ WORLDWIDE EXPRESS, UNITED BUSINESS FREIGHT FORWARDERS, LLC

By_____

Name: VIJAY K. AGGARWAL

By_____

Name: AJAY AGGARWAL

EXECUTIVE

Signature: _____

Name: CHRISTOPHER CAREY

<u>Exhibit A</u>
<u>Code Section 409A Compliance</u>

To remain in compliance with Section 409A of the Code, if the Company establishes that:

- it is administratively impracticable to pay Executive's base salary (without such decrease) and such impracticability was unforeseeable, or the payment of such base salary (without such decrease) will jeopardize the Company's ability to continue as a going concern, Executive's base salary may be reduced provided payment of such decrease in base salary, plus interest at the rate of five (5%) percent per annum, then is made as soon as administratively practical or as soon as the payment, plus interest at the rate of five (5%) percent per annum, would not jeopardize the Company's ability to continue as a going concern.  Alternatively, such decrease may be communicated to the Executive and becomes irrevocable prior to the end of the calendar year immediately preceding the calendar year with respect to which the decrease will be effective, or

- the Company is unable to timely pay to the Executive any other amounts due hereunder in compliance with the Code,

Such amounts shall be credited to a nonqualified deferred compensation plan established in writing on behalf of the Executive and shall (i) accrue interest at the rate of five (5%) percent per annum, (ii) be paid by the Company, when it becomes payable, senior in priority to all other debts of the Company other than secured debt in existence at such time, and trade payables , (iii) be repaid, when it becomes payable, in advance of or concurrently with any future payments in excess of "total compensation" made by the Company to Vijay K. Aggarwal and/or Ajay Aggarwal and (iv) otherwise be subject to the terms set forth in a mutually-acceptable written nonqualified deferred compensation plan or agreement established prior to and for each calendar year with respect to which such decrease is to be effective.

Any subsequent increase in the Executive's Base Salary to reinstate Executive's previously-reduced Base Salary, in lieu of such credit, will be effective when such increase is communicated to the Executive and becomes irrevocable prior to the end of the calendar year immediately preceding the calendar year with respect to which the increase will be effective.

Notwithstanding the foregoing, if any payment made hereunder fails to comply with Section 409A of the Code, the Company will indemnify Executive as set forth in <u>Section 23</u> of the Agreement.

# EXHIBIT B

# VALTERRA
### P A R T N E R S

August 30, 2018

Chris Carey
EZ Worldwide
669 Division Street
Elizabeth, New Jersey 07201

VIA EMAIL: ccarey@chriscareyadvisors.com

Dear Mr. Carey:

On behalf of Valterra Partners LLC (together with affiliates, "Valterra") we would like to thank you for providing us with the opportunity to evaluate a potential transaction ("Transaction") with EZ Worldwide (the "Company" or "EZ"). Based on discussions to date, we believe that the Company represents an attractive investment opportunity, where Valterra could assist in facilitating the creation of a sustainable business platform that, in addition to recognizing all existing key stakeholders, would position the business strongly in the third-party logistics sector and provide it with the best possible opportunity for future growth. As such, we would like to express our interest in exploring a potential Transaction with you and the Company.

Founded in 2015, Valterra is a New York-based private equity firm that provides partnership capital to lower middle market companies with compelling growth prospects. Valterra's limited partner base is comprised of some of the most respected family offices and institutional investors in the world. The firm targets investments in asset-intensive businesses with a significant operational overlay where its capital can serve as real catalyst for growth. Valterra's sectors of focus include businesses in the needs-based healthcare, communications, food & beverage and travel & transportation industries.

Valterra's due diligence for a potential Transaction would entail meetings with management, tours of facilities, review of the information systems and financial controls, and general financial and industry due diligence to verify historical results and determine the future prospects of the Company's business. In addition, we would rely on industry consultants and outside experts in the areas of legal, accounting and environmental due diligence. We take pride in our ability to marshal our resources to move as expeditiously as possible towards a successful closing. Our experience in completing transactions of this type will enable us to respond quickly and appropriately to any issues that may arise during this process. We would work to close the acquisition as expeditiously as possible following the execution of a definitive agreement.

We envision financing the Transaction with 100% equity to be contributed by Valterra. Valterra has strong relationships with a number of institutional investors, family offices and other providers of long-term capital. Since its inception, Valterra's success has been predicated on its ability to raise capital through its extensive network of limited partners, many of whom Valterra has worked with closely for over a decade.

This letter and the Transaction contemplated expresses current intentions only. It is not an offer capable of acceptance and shall not otherwise give rise to a binding contract. It does not constitute a commitment to acquire, underwrite, place and/or distribute any assets, financing or securities in relation to the Company or any potential Transaction. Unless and until, a definitive agreement is entered into regarding a proposed acquisition or the provision of financing or securities, no member of Valterra will be under any obligation whatsoever with respect to the proposed Transaction or otherwise.

Any formal Transaction proposal from Valterra is subject to satisfactory completion of our due diligence including by not limited to business, commercial, legal, environmental and accounting due diligence, the negotiation and execution of a mutually satisfactory definitive purchase agreement, and an agreement with the Company's existing creditors on acceptable terms to Valterra.

We are excited about the unique investment opportunity that we believe is presented here, and we stand ready to commit extensive resources to satisfy the conditions referred to above as expeditiously as possible.  Please feel free to contact Drew Reid at (646) 717-3606, Scott Macintosh at (646) 469-6465 or Kevin Reed at (770) 826-7692 to discuss or clarify any aspect of this letter. Thank you in advance for your consideration.

*[The rest of this page is intentionally left blank]*

Sincerely,

VALTERRA PARTNERS LLC


By:

Scott Macintosh
Managing Partner


cc:      Drew Reid – Managing Partner
         Kevin P. Reed – Vice President