UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**Caption in Compliance with D.N.J. LBR 9004-1**

**LAW OFFICES OF KENNETH L. BAUM**

Kenneth L. Baum, Esq.
167 Main Street
Hackensack, New Jersey 07601
(201) 853-3030
kbaum@kenbaumdebtsolutions.com

*Proposed Counsel to Debtors and Debtors-in-Possession*

**Order Filed on May 22, 2019 by
Clerk U.S. Bankruptcy Court
District of New Jersey**

| | |
|---|---|
| In Re: <br><br> E Z MAILING SERVICES, INC. d/b/a E Z WORLDWIDE EXPRESS AND UNITED BUSINESS XPRESS[1], <br><br> Debtor. | Case No.: 19-17900 (SLM) <br><br> Chapter 11 <br><br> Judge: Hon. Stacey L. Meisel |
| In Re: <br><br>   UNITED BUSINESS FREIGHT FORWARDERS, LLC[2], <br><br> Debtor. | Case No.: 19-17906 (SLM) <br><br> Chapter 11 <br><br> Judge: Hon. Stacey L. Meisel |

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 362, 363, 364, 503 AND 507 (1) AUTHORIZING DEBTORS, *NUNC PRO TUNC* TO MAY 17, 2019, TO (A) CONTINUE TO SELL ELIGIBLE ACCOUNTS FREE AND CLEAR OF INTERESTS AND (B) INCUR POSTPETITION SECURED INDEBTEDNESS, (2) GRANTING LIENS, (3) AUTHORIZING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIM STATUS, (4) MODIFYING AUTOMATIC STAY, (5) SCHEDULING A FURTHER INTERIM HEARING, AND (6) GRANTING OTHER RELATED RELIEF**

---

[1]   The debtor and debtor-in-possession in this Chapter 11 case is EZ Mailing Services, Inc. d/b/a EZ Worldwide Express and United Business Xpress and the last four digits of its taxpayer identification number are 0072.

[2]   The debtor and debtor-in-possession in this Chapter 11 case is United Business Freight Forwarders, LLC and the last four digits of its taxpayer identification number are 0577.

DATED: May 22, 2019

_____
Honorable John K. Sherwood
United States Bankruptcy Court

The relief set forth on the following pages, numbered two (3) through twenty three

(23), is hereby **ORDERED**.

THIS MATTER having come before the Court upon the motion (the "**Motion**") of the above-captioned debtors,  EZ Mailing Services, Inc. d/b/a EZ Worldwide Express and United Business Express ("**EZ**") and United Business Freight Forwarders, LLC ("**UBFF**" and, together with EZ, the "**Debtors**"), debtors and debtors-in-possession in the above-captioned jointly-administered chapter 11 cases (collectively, the "**Cases**"), pursuant to sections 105, 362, 363, 364, 503 and 507 of title 11 of the United States Code (11 U.S.C. §§ 101 et seq., as amended, the "**Bankruptcy Code**"), Rules 2002, 3003, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 3001-1, 3003-1, 4001-1,  4001-3, 6004-1  and  6004-5  of  the Local Rules of the Bankruptcy Court for the District of New Jersey (the "**Local Rules**"), seeking entry of an interim order (this "**Interim Order**"), a further interim order ("**Further Interim Order**"),  and a final order (the "**Final Order**") *inter alia*:

(i)  authorizing the Debtors to continue to perform their obligations to North Mill Capital LLC under that certain Accounts Receivable Agreement With Recourse,  dated as of December 30, 2016, a true and correct copy of which is annexed hereto as Exhibit A hereto (as amended and as may be further amended, the "**NMC Factoring Agreement**"; North Mill Capital LLC being referred to in the NMC Factoring Agreement and hereinafter as the "**Purchaser**"),[1] with recourse to the Debtors and the Debtors' estates in an amount not to exceed, inclusive of the amounts outstanding as of the entry of an order for relief in the Debtors' cases, the Maximum Client Account Limit, which is $5,000,000.00 (the "**NMC Factoring Facility**");

(ii)  as security for the repayment of the Obligations arising under the NMC Financing Agreement, among other things, (A) approving and authorizing the Debtors to grant to

---

[1] Capitalized terms used in this Interim Order but not defined herein shall have the meanings ascribed to such terms in the NMC Factoring Agreement.

Purchaser a continuing Lien on the Collateral (with the exception of any property owned by or pledged to Total Warehouse, Inc. or Mercedes Benz Financial Services USA, LLC), (B) approving and authorizing Purchaser to have an allowed Superpriority Administrative Expense Claim (as defined herein below) in the Involuntary Chapter 11 Cases (as defined herein below);

(iii)    modifying the automatic stay imposed by Bankruptcy Code Section 362(a) to the extent necessary to allow the implementation of the terms and provisions of this Interim Order and the NMC Factoring Agreement; and

(iv)    scheduling a further interim hearing (the "**Further Interim Hearing**") to consider the relief requested in the Motion and approving the form of notice with respect to the Further Interim Hearing.

The Court having considered the Motion, the NMC Factoring Agreement, and the evidence submitted or adduced and the arguments of counsel made at the interim hearing held on the Motion (the "**Interim Hearing**"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules, the Local Rules and any scheduling order entered by this Court with respect to the Motion; and the Interim Hearing to consider the interim relief requested in the Motion having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that granting the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Further Interim Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and their creditors and equity holders, and is essential for the continued operation of the Debtors' business; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING BY THE

DEBTORS, INCLUDING THE REPRESENTATIONS OF COUNSEL, THE COURT HEREBY

MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A.    *Involuntary Petition Date*.  On April 18, 2019, Christopher Carey, Azadian Group,

LLC and Change Capital Holdings I, LLC (together, the "**Petitioning Creditors**"), filed

involuntary Chapter 11 petitions against the Debtors pursuant to Bankruptcy Code Section 303(b)

(the "**Involuntary Chapter 11 Cases**") in this Court.  The Debtors consented to the entry of orders

for relief in the Involuntary Chapter 11 Cases pursuant to Bankruptcy Code Section 303(h), and

orders for relief with respect thereto were entered by this Court on May 17, 2019 (together,

"**Orders for Relief**").

B.    *Debtor in Possession*.  The Debtors are continuing in the management and operation

of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of

the Bankruptcy Code.  No trustee or examiner has been appointed in the Case.

C.    *Jurisdiction and Venue*. The Court has jurisdiction, pursuant to 28 U.S.C. §§ 157(b)

and 1334, over these proceedings, and over the persons and property affected hereby.

Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2). Venue for

the Case and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408

and 1409.

D.    *Committee Formation*.  The Office of the United States Trustee for the District of

New Jersey (the "**U.S. Trustee**") has not appointed any official committee(s) in the Debtors'

Cases.

E.    *Findings Regarding the Sale of Accounts and Incurring Postpetition Debt*

5

(i)       The Debtors seek authority to continue to perform under the NMC Factoring Agreement.  Pursuant to the NMC Factoring Agreement, the Debtors will continue to assign and sell to Purchaser, free and clear of any interests therein, all of the Debtors' right, title and interest in and to all Eligible Accounts approved and deemed acceptable by Purchaser, with Purchaser purchasing and holding such right, title and interest as sole and absolute owner of the Eligible Accounts with recourse to the Debtors and the Debtors' estates in an amount, inclusive of all amounts outstanding under the NMC Factoring Agreement as of the May 17, 2019 (the date that this Court entered the Orders for Relief, not to exceed $5,000,000.00.  Purchaser shall have no obligation to purchase Eligible Accounts from the Debtors except upon the terms set forth in the NMC Factoring Agreement and this Interim Order.  The repayment of the Obligations arising under the NMC Factoring Agreement are to be secured a Lien granted to Purchaser on the Collateral (with the exception of any property owned by or pledged to Total Warehouse, Inc. or Mercedes Benz Financial Services USA, LLC) and by granting Purchaser an allowed Superpriority Administrative Expense Claim (as defined herein below) in the Cases.

(ii)      *Further Interim Hearing*.  At the Further Interim Hearing, the Debtors will seek further interim approval of the Motion pursuant to a proposed Further Interim Order, which shall be in form and substance acceptable to Purchaser.  Notice of the Further Interim Hearing and Further Interim Order will be provided in accordance with this Interim Order.

(iii)     *Continued Need for Sale of Accounts and Incurring Postpetition Debt*.  The Debtors need to continue to sell its Eligible Accounts pursuant to the terms and conditions of the NMC Factoring Agreement and to incur postpetition debt in the form of the Obligations as and to the extent as set forth in the NMC Factoring Agreement is immediate and critical in order to enable the Debtors to continue operations and to administer and preserve the value of their estates pending the orderly sale or liquidation of their assets. The ability of the Debtors to finance their operations,

6

maintain business relationships, pay employees, protect the value of their assets and otherwise finance their operations requires the continued availability of funding under the NMC Factoring Agreement, the absence of which would immediately and irreparably harm the Debtors and their estates and creditors.  The Debtors do not have sufficient available sources of working capital or other means of financing to operate their business or to maintain their properties pending the consummation of a sale or liquidation of the Debtors' assets without continued access to the NMC Financing Agreement.

(iv)  *No Credit Available on More Favorable Terms*.  Given their current financial condition and capital structure, the Debtors are unable to obtain postpetition financing from sources other than Purchaser or on terms more favorable than those in the NMC Factoring Agreement.  The Debtors have been unable to obtain unsecured credit allowable under Bankruptcy Code Sections 364(a) and (b) and 503(b)(1) as an administrative expense.  The Debtors have also been unable to obtain credit: (a) having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a) and 507(b) of the Bankruptcy Code; (b) secured by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (c) secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien.  The Debtors' sale of their Eligible Accounts without recourse is not otherwise available.

(v)  *Use of Proceeds*.  As a condition to Purchaser agreeing to permit the Debtors to continue to finance their operations under the NMC Factoring Agreement, Purchaser requires, and the Debtors have agreed, that proceeds of Purchaser's purchase of Eligible Accounts shall continue to be used in accordance with the terms of the NMC Factoring Agreement and the budget (as the same may be supplemented, updated, revised and modified from time to time, in each instance with Purchaser's prior written consent, the "**Budget**", a copy of which is attached as Exhibit  B hereto),  solely  for  (i)  the  payment  of  postpetition  operating  expenses  and  other  working

capital, (ii) the payment of certain fees and expenses due to Purchaser, (iii) permitted payment of costs of administration of the Cases, including professional fees and fees payable to the Office of the United States Trustee, as and to the extent provided for in the Budget; and (iv) otherwise in accordance with the NMC Factoring Agreement.

F.      *Bankruptcy Code Sections 506(c) and 552(b)*.      Purchaser has demanded and Debtors submit that Purchsaer is entitled to a waiver of (a) the provisions of section 506(c) of the Bankruptcy Code, and (b) any "equities of the case" claims under section 552(b) of the Bankruptcy Code.

G.      *Good Faith of Purchaser*.

(i)      *Willingness to Purchase Eligible Accounts*.      Purchaser has indicated a willingness to continue purchasing Eligible Accounts from the Debtors on a secured with recourse basis subject to the entry of this Interim Order, including the findings contained herein that the NMC Factoring Agreement and the facility provided for thereby is essential to the Debtors' estates, that Purchaser has provided the terms set forth in the NMC Factoring Agreement in good faith, and that the rights and interests being provided to Purchaser under the NMC Factoring Agreement will have the protections provided in Bankruptcy Code Section 364(e) and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument or reconsideration of this Interim Order, the Further Interim Order or any other order.

(ii)      *Business Judgment and Good Faith Pursuant to Section 364(e)*. The terms and conditions of the NMC Factoring Agreement, which were previously approved by this Court in the Debtors prior voluntary chapter 11 cases, (a) are fair, reasonable and the best available to the Debtors under the circumstances, (b) reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and (c) are supported by reasonably equivalent value and consideration. The NMC Factoring Agreement was originally negotiated in good faith and at arms'

8

length among the Debtors and Purchaser. Accounts purchased by Purchaser and Obligations incurred by the Debtors in accordance with the terms of the NMC Factoring Agreement, and the Lien and Superpriority Administrative Expense Claim granted pursuant to the NMC Factoring Agreement and this Interim Order, shall all be deemed to be done in good faith. Accordingly, Purchaser is therefore entitled to the protection and benefits of Bankruptcy Code Section 364(e) and this Interim Order.

H.    *Notice*. Notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtors to North Mill Capital, LLC's counsel, counsel to the Petitioning Creditors, the Office of the United States Trustee, any additional secured parties, and all persons or entities that have requested notice in the Involuntary Chapter 11 Cases, whether by email, facsimile, overnight courier or hand delivery. The Debtors have made reasonable efforts to afford the best notice of the Interim Hearing possible under the circumstances and such notice is good and sufficient to permit the interim relief set forth in this Interim Order, and no other or further notice is or shall be required.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1.    Continued Performance Under NMC Factoring Agreement Approved. The Motion is granted, and the Debtors continued performance under the NMC Factoring Agreement is approved. The Debtors are authorized to continue to perform, incur and undertake all obligations (including the Obligations) set forth in the NMC Factoring Agreement in accordance with the terms set forth therein and herein.

2.    Objections Overruled. All objections to the Motion to the extent not withdrawn or resolved are hereby overruled.

3.      <u>Authorization of the NMC Factoring Agreement</u>. The NMC Factoring Agreement shall represent a valid and binding agreement enforceable against the Debtors and their estates in accordance with its terms and this Interim Order.

4.      <u>Authorization to Continue to Sell Accounts on Interim Basis</u>. Subject to the terms of the NMC Factoring Agreement and this Interim Order, until the earliest to occur of the entry of the Further Interim Order or the termination of the NMC Factoring Agreement pursuant to its terms and conditions, the Debtors are hereby authorized to continue to sell their Eligible Accounts to Purchaser in accordance with the terms of the NMC Factoring Agreement so long as at the time of such purchase, the aggregate unpaid balance of the Accounts, before and after such purchase, plus the principal amount outstanding under any promissory notes executed by Debtors in favor of Purchaser, does not exceed the Maximum Client Account Limit.

5.      <u>Obligations</u>.  All Obligations incurred in accordance with the terms of the NMC Factoring Agreement (without respect to the date such Obligations were incurred) and this Interim Order shall be fully earned and payable in accordance with the terms of the NMC Factoring Agreement and this Interim Order, and shall represent valid and binding Obligations of the Debtors enforceable against the Debtors, their estates and any successors thereto, including, without limitation, any trustee or other estate representative appointed in the Cases or any case under Chapter 7 of the Bankruptcy Code upon the conversion of the Cases (or either Case) (a "**Successor Case**").

6.      <u>Lien</u>.  Purchaser is granted a continuing Lien against the Collateral (with the exception of any property owned by or pledged to Total Warehouse, Inc. or Mercedes Benz Financial Services USA, LLC), which Lien shall be and hereby is deemed immediate, continuing, valid, binding, enforceable, non-avoidable and properly perfected.  Other than with respect to property owned by or pledged to Total Warehouse, Inc. or Mercedes Benz Financial Services USA,

LLC, the Lien is not and shall not otherwise be or made subject to or *pari passu* with any other

lien or security interest heretofore or hereafter granted in the Cases or any Successor Case with

respect to any of the Collateral.  The Lien is valid and enforceable, including, but not limited to,

against any trustee or other estate representative appointed in the Cases or any Successor Case and

shall not be subject to challenge under Bankruptcy Code Sections 510, 549 or 550.  No lien or

interest avoided and preserved for the benefit of the Debtors' estates pursuant to Bankruptcy Code

Section 551 shall be *pari passu* with or senior to the Lien.

       7.      Superpriority Administrative Expense Claim.  Effective immediately upon entry of

this Interim Order, pursuant to Bankruptcy Code Section 364(c)(1), Purchaser is hereby granted

an allowed superpriority administrative expense claim in the Cases with respect to the Obligations

("**Superpriority Administrative Expense Claim**"), which Superpriority Administrative Expense

Claim shall be and hereby is deemed immediate, continuing, valid, binding, enforceable, non-

avoidable and not subject to objection and shall be senior to any existing and future administrative

expense of any kind and nature arising under or pursuant to any statute (including, but not limited

to, the Bankruptcy Code), Court rule (including, but not limited to, the Bankruptcy Rules), Court

order (including, but not limited to, all orders previously entered and subsequently entered in this

Cases or any Successor Case) or otherwise.   The Superpriority Administrative Expense Claim

shall be at all times senior and first in priority with respect to all other administrative expense

claims in the Cases with the sole exception of fees payable to the Office of the United States

Trustee.  Other than as expressly set forth herein to the contrary, at no time shall the Superpriority

Administrative Expense Claim be or made subject to or *pari passu* with any other administrative

expense or unsecured claim now existing or hereafter arising in the Cases or any Successor Case.

The Superpriority Administrative Expense Claim shall be valid and enforceable, including, but not

limited to, against any trustee or other estate representative appointed in the Cases or any Successor Case.

8.      No Obligation to Purchase Accounts. Notwithstanding entry of this Interim Order, Purchaser shall purchase only such Accounts as Purchaser may select and approve in its sole and absolute discretion.  Purchaser shall not have any liability to the Debtors or any of their customers or otherwise for any failure or refusal by Purchaser to purchase any Account.

9.      Use of NMC Factoring Agreement Proceeds. The Debtors shall use the proceeds from the Purchaser's postpetition purchase of Accounts only for the purposes specifically set forth in the NMC Factoring Agreement and this Interim Order and in compliance with the Budget.

10.      Budget Maintenance. The Budget and any modification to, or amendment or update of, the Budget shall be in form and substance reasonably acceptable to, and approved in advance by Purchaser, in its reasonable discretion. The Budget may be amended or modified in writing from time to time only with the written consent of Purchaser, in its reasonable discretion. The Debtors shall update the Budget from time to time (provided that any update shall be in form and substance acceptable to Purchaser, in its reasonable discretion) as required under the NMC Factoring Agreement and shall provide such Budget updates to Purchaser in accordance with the NMC Factoring Agreement.

11.      Modification of Automatic Stay. The automatic stay imposed under Bankruptcy Code Section 362(a) shall be and hereby is modified as necessary to effectuate all of the terms and provisions of this Interim Order and the NMC Factoring Agreement, including, without limitation, to (a) permit the Debtors to grant the Lien against the Collateral and permit Purchaser to take all steps it deems necessary to perfect such Lien, (b) authorize the Debtors to pay, and Purchaser to retain and apply, payments made in accordance with this Interim Order and the NMC Factoring

12

Agreement, and (c) authorize Purchaser to exercise its rights with respect to the Collateral and in accordance with the NMC Factoring Agreement.

12.    <u>Automatic Perfection of Lien</u>. This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the Lien against the Collateral without the necessity of filing or recording any financing statement, mortgage, notice or other instrument or document that may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the Lien or to entitle Purchaser to the priorities granted herein.  Notwithstanding the foregoing, Purchaser is authorized to, as it in its reasonable business judgment deems prudent, file a copy of this Interim Order and any financing statement, mortgage, notice and other instrument or document to perfect or otherwise evidence the Lien in accordance with applicable non-bankruptcy law, and each such financing statement, mortgage, notice and other instrument or document so filed shall be deemed to have been filed or recorded as of the date hereof.

13.    <u>Modifications and Amendments</u>. In accordance with Local Rule 4001-3(d), the Debtors and Purchaser may enter into modifications and amendments with respect to the NMC Factoring Agreement without the need for further Court approval provided that: (a) such modifications and amendments are not material; (b) notice of any proposed modification and amendment is filed with the Court; and (c) such notice is provided in advance to counsel for the Petitioning Creditors and any party requesting notice of all proceedings and the United States Trustee.  Any material modifications and amendments to the NMC Factoring Agreement made during the pendency of the Cases shall be by application filed with the Court.

14.    <u>Restriction Regarding Accounts</u>.  Immediately upon entry of this Interim Order and

13

during the Term of the NMC Factoring Agreement, the Debtors may not sell, transfer, assign or encumber or seek authority to sell, transfer, assign or encumber any personal property that would otherwise come within the definition of Account as set forth in the NMC Factoring Agreement to or in favor of any other party other than Purchaser.

15.    <u>Misdirected Payments on Accounts</u>.

(a)    Debtors shall immediately turn over to Purchaser and, until doing so, hold in trust and safekeeping separate and apart from the Debtors' other property and as the sole and separate property of Purchaser any payment on an Account purchased by Purchaser whenever any such payment, whether cash, check (payable to either of the Debtors, Purchaser or both), money order or other form of payment, comes into the Debtors' possession, and all goods giving rise to Accounts purchased by Purchaser which are returned or rejected by, or repossessed from Customer(s).

(b)    In the event any other party receives any payment on an Account purchased by Purchaser, such party shall immediately turn over to Purchaser and, until doing so, hold in trust and safekeeping separate and apart from such other party's other property and as the sole and separate property of Purchaser any such payment whenever any such payment, whether cash, check (payable to such party, either of the Debtors, Purchaser or any combination of the foregoing), money order or other form of payment, comes into such other party's possession, and all goods giving rise to Accounts purchased by Purchaser which are returned or rejected by, or repossessed from Debtors' customer(s).

16.    <u>Proceeds of Subsequent Financing</u>. Unless Purchaser expressly agrees in writing otherwise, the proceeds of any subsequent credit or financing obtained by or on behalf of the Debtors in the Cases or any Successor Case, whether or not as part of a confirmed plan of

reorganization or liquidation, shall be required to be first paid to Purchaser to satisfy and be applied

to all unpaid Obligations under the NMC Factoring Agreement.

17.    <u>Maintenance of Collateral</u>. Until the payment in full in cash of all Obligations, the

Debtors shall insure the Collateral as required under the NMC Factoring Agreement.

18.    <u>Application of Proceeds of Collateral, Payments and Collections</u>.  All payments and

collections received by the Debtors with respect to any Accounts and all proceeds of Collateral

shall be applied as set forth in the NMC Factoring Agreement and this Interim Order.

19.    <u>Termination Event</u>. The occurrence of (i) an Event of Default under the NMC

Factoring Agreement or (ii) any breach of a provision of this Interim Order or the Further Interim

Order (as entered) inuring to the benefit of Purchaser shall constitute an event of default under this

Interim Order (each and collectively, a "**Termination Event**"). Immediately upon the occurrence

and during the continuance of a Termination Event, Purchaser may, in its sole and absolute

discretion, immediately exercise any and all of its rights and remedies under the NMC Factoring

Agreement, without further order of the Court.  Within no more than one (1) business day of the

occurrence of a Termination Event, Purchaser shall serve a notice on the Debtors and the U.S.

Trustee advising of the occurrence of a Termination Event and the remedy(ies) Purchaser has

effected or will be immediately effecting (such notice a "**Termination Notice**" and the date of any

such notice the "**Termination Notice Date**"). The Termination Notice shall be served by e-mail

on the Debtors, their counsel of record in the Cases, counsel to the Petitioning Creditors and

counsel to the U.S. Trustee.

20.    <u>Good Faith under Bankruptcy Code Section 364; No Modification or Stay of this</u>
<u>Interim Order</u>.  Purchaser has acted in good faith in connection with this Interim Order and its

reliance on this Interim Order is in good faith.  Based on the findings set forth in this Interim Order

and the record made during the Interim Hearing, and in accordance with Bankruptcy Code Section

364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter modified, amended or vacated by a subsequent order of the Court, or any other court of competent jurisdiction, Purchaser is entitled to the protections provided in Bankruptcy Code Section 364(e). Any such modification, amendment or vacatur shall not affect the validity and enforceability of the Obligations, or any lien, claim or priority authorized or created hereby, provided that this Interim Order was not stayed by court order after due notice had been given to Purchaser at the time such obligations were incurred or the liens, claims or priorities were authorized and/or created.  Any liens or claims granted to Purchaser hereunder arising prior to the effective date of any such modification, amendment or vacatur of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges and benefits granted herein, provided that the Interim Order was not stayed by court order after due notice had been given to Purchaser at the time the obligations were incurred or the liens, claims or priorities were authorized and/or created.

21.     <u>Proofs of Claim</u>. Notwithstanding any provision in the Bankruptcy Code, the Bankruptcy Rules, the Local Rules or otherwise, Purchaser shall not be required to file proofs of claim or requests for approval of administrative expenses in the Cases or any Successor Case.  The provisions of this Interim Order relating to the Obligations, the Lien, and the Superpriority Administrative Expense Claim shall constitute a timely filed proof of claim and request for payment of administrative expense.

22.     <u>Rights of Access and Information</u>. Without limiting the rights of access and information afforded Purchaser under the NMC Factoring Agreement, the Debtors shall be, and hereby are, required to afford representatives, agents and/or employees of Purchaser reasonable access to the Debtors' premises and their books and records in accordance with the NMC Factoring Agreement, and shall reasonably cooperate, consult with, and provide to such persons all such

information as may be reasonably requested.  In addition, the Debtors authorize their independent

certified public accountants, financial advisors, and any consultants to cooperate, consult with, and

provide to Purchaser all such information as may be reasonably requested with respect to the

business, results of operations and financial condition of the Debtors.

23.    Prohibited Use of Proceeds of the NMC Factoring Agreement, Collateral, Etc.

Proceeds from Purchaser's purchase of the Accounts and Collateral, may not be used: (a) in

connection with or to finance in any way any action, suit, arbitration, proceeding, application,

motion or other litigation of any type (i) adverse to Purchaser or its rights and remedies under the

NMC Factoring Agreement or this Interim Order or the Further Interim Order (as entered),

including, without limitation, for the payment of any services rendered by the professionals

retained by the Debtors or any official committee that may be appointed in these Cases in

connection with the assertion of or joinder in any claim, counterclaim, action, proceeding,

application, motion, objection, defense or other contested matter, the purpose of which is to seek,

or the result of which would be to obtain, any order, judgment determination, declaration or similar

relief, (ii) invalidating, objecting to, setting aside, avoiding or subordinating, in whole or in part,

the Obligations, any right of Purchaser under the NMC Factoring Agreement, the Lien or the

Superpriority Administrative Expense Claim, (iii) for monetary, injunctive or other affirmative

relief against Purchaser or Purchaser's enforcement of any of its rights under the NMC Factoring

Agreement or with respect to the Lien, the Collateral or the Superpriority Administrative Expense

Claim, (iv) preventing, hindering or otherwise delaying the exercise by Purchaser of any rights

and remedies under this Interim Order, the NMC Factoring Agreement, or applicable law, or the

enforcement or realization (whether by foreclosure, credit bid, further order of the Court or

otherwise) by Purchaser, upon any of the Collateral or the Superpriority Administrative Expense

Claim, or (v) to pursue litigation against Purchaser; (b) to make any distribution under a plan of

liquidation or reorganization in the Cases without the prior written consent of Purchaser; (c) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of Purchaser; (d) to pay any fees or similar amounts to any person who has proposed or may propose to purchase interests in the Debtors (including so-called "**Topping Fees**") without the prior written consent of Purchaser; (e) objecting to, contesting, or interfering with, in any way, Purchaser's enforcement or realization upon any of the Collateral or the Superpriority Administrative Expense Claim once a Termination Event has occurred, except as provided for in this Interim Order or Further Interim Order (as entered), or seeking to prevent Purchaser from credit bidding in connection with any proposed plan of reorganization or liquidation or any proposed transaction pursuant to Bankruptcy Code Section 363; (f) using or seeking to use any insurance proceeds constituting Collateral without the consent of Purchaser; (g) incurring additional indebtedness outside the ordinary course of business without the prior consent of Purchaser; (h) objecting to or challenging in any way the claims, rights, liens or interests held by or on behalf of Purchaser under the NMC Factoring Agreement, including, but not limited to, with respect to the Lien, the Collateral or the Superpriority Administrative Expense Claim; or (i) prosecuting an objection to, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the Obligations or the Lien or the Superpriority Administrative Expense Claim, or any other rights or interests of Purchaser.

24.   Payment of Case Professionals Compensation. Nothing herein shall be construed as a consent by Purchaser to the allowance of any professional fees or expenses of any professionals retained by the Debtors or any official committee that may be appointed in these Cases pursuant to an order entered in the Cases (collectively, the "**Case Professionals**") or shall affect the right of Purchaser, in its reasonable business judgment, to object to the allowance and payment of such fees and expenses. So long as no Termination Event has occurred and is

continuing, the Debtors shall be permitted to pay such fees and expenses allowed and payable by order (that has not been vacated or stayed, unless the stay has been vacated) under sections 330 and 331 of the Bankruptcy Code, as the same may be due and payable, solely to the extent set forth in the Budget and not to exceed the amounts set forth in the Budget.

25.    No Third-Party Rights. Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, account debtor or any direct, indirect, or incidental beneficiary.

26.    Section 506(c) Claims. Upon entry of this Interim Order, no costs or expenses of administration which have been or may be incurred in the Cases at any time shall be charged against Purchaser or the Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, and no consent from Purchaser to the contrary shall be implied from any other action, inaction or acquiescence by Purchaser.

27.    No Marshaling/Applications of Proceeds. Upon entry of this Interim Order, Purchaser shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Collateral.

28.    Section 552(b). Subject to the entry of this Interim Order, the "equities of the case" exception under Bankruptcy Code Section 552(b) shall not apply to Purchaser with respect to the Collateral.

29.    Effect of Plan. The Debtors expressly stipulate, and the Court finds and adjudicates that, none of the Obligations or the Lien shall be discharged by the entry of an order confirming any plan of reorganization or liquidation, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless the Obligations have been paid in full in cash on or before the effective date of a confirmed plan.  Except as otherwise agreed to by Purchaser, the Debtors shall not propose or support any plan or sale of all or substantially all of the Debtors' assets or entry of any

19

confirmation order or sale order that is not conditioned upon the payment in full, in cash of all Obligations.  The Superpriority Administrative Expense Claim and the Lien shall not be affected in any manner by the entry of an order confirming a plan in the Cases or any Successor Case. In the event that Debtors and Purchaser agree to continue a business arrangement as part of a plan of reorganization after the effective date of confirmation thereof (which shall be subject to each party's sole and absolute discretion), Debtors and Purchaser acknowledge and agree that any such arrangement shall be subject to the execution and delivery of a new agreement and related documents relating thereto.

30.    <u>Rights Preserved and Standing</u>. Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) Purchaser's rights to seek any other or supplemental relief with respect to the Debtors or the Debtors' estates; (b) any of the rights of Purchaser under the Bankruptcy Code or under non-bankruptcy law.  Other than as expressly set forth in this Interim Order, any other rights, claims or privileges (whether legal, equitable or otherwise) of Purchaser are preserved.  During the Term of the NMC Factoring Agreement and while there remains any unpaid Obligations thereunder and while the Cases or any Successor Case are still pending, pursuant to Bankruptcy Code Section 1109(b), without objection or contestation, Purchaser shall have standing and may raise and may appear and be heard on any issue in the Cases or any Successor Case.

31.    <u>No Waiver by Failure to Seek Relief</u>. The failure of Purchaser to seek relief or otherwise exercise their respective rights and remedies under this Interim Order, the NMC Factoring Agreement or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder or otherwise of Purchaser.

32.    <u>Binding Effect of Interim Order</u>.   Immediately upon entry of this Interim Order(notwithstanding any applicable law or rule to the contrary), the terms and provisions of this

Interim Order shall become valid and binding on the Debtors, the Debtors' estates, all creditors

and equity holders of the Debtors, any official committee appointed in the Cases, the U.S. Trustee

and all other parties in interest and their respective successors and assigns, including any trustee

or other fiduciary hereafter appointed in the Cases, any Successor Case, or upon dismissal of the

Cases or any Successor Case.

33.    No Modification of Interim Order.  The Debtors irrevocably waive the right to seek

and shall not seek or consent to, directly or indirectly: (a) without the prior written consent of

Purchaser (i) any modification, stay, vacatur or amendment to this Interim Order; or (ii) any

administrative expense claim or unsecured claim against the Debtors (now existing or hereafter

arising of any kind or nature whatsoever, including, without limitation any administrative expense

of the kind specified in Bankruptcy Code Sections 503(b), 507(a) or 507(b)) in the Cases or any

Successor Case, equal or superior to the Superpriority Administrative Expense Claim; (b) without

the prior written consent of Purchaser, any lien or security interest on any of the Collateral with

priority equal or superior to the Lien. The Debtors irrevocably waive any right to seek any material

amendment, modification or extension of this Interim Order without the prior written consent, as

provided in the foregoing, of Purchaser, and no such consent shall be implied by any other action,

inaction or acquiescence of Purchaser.

34.    Interim Order Controls. In the event of any inconsistency between the terms and

conditions of the NMC Factoring Agreement or this Interim Order, the provisions of this Interim

Order shall govern and control.

35.    Survival. The provisions of this Interim Order and any actions taken pursuant hereto

shall survive entry of any order which may be entered: (a) confirming any plan of reorganization

or liquidation in the Cases; (b) converting any of the Cases to a case under Chapter 7 of the

Bankruptcy Code; (c) dismissing the Cases or any Successor Case; or (d) pursuant to which the

21

Court abstains from hearing the Cases or any Successor Case. The terms and provisions of this Interim Order, including the claims, liens, security interests and other protections granted to Purchaser pursuant to this Interim Order and/or the NMC Factoring Agreement, notwithstanding the entry of any such order, shall continue in the Cases, in any Successor Case, or following dismissal of the Cases or any Successor Case, and shall maintain their priority as provided by this Interim Order until all Obligations have been paid in full in cash to the Purchaser.

36.    <u>Further Interim Hearing</u>. The Further Interim Hearing to consider entry of the Further Interim Order and approval of the Debtors continued performance under the NMC Factoring Agreement is scheduled for May 30, 2019 at 10:00 a.m. (ET) before the Honorable Stacey L. Meisel, United States Bankruptcy Judge, 3rd Floor, Courtroom 3A, at the United States Bankruptcy Court for the District of New Jersey, 50 Walnut Street, Newark, NJ 07102.

37.    <u>Notice of Further Interim Hearing</u>: On or before May 23, 2019, the Debtors shall serve, by United States mail, first-class postage prepaid, a copy of the Motion and this Interim Order upon: North Mill Capital LLC's counsel, counsel to the Petitioning Creditors, the Office of the United States Trustee, any additional secured parties, and all persons or entities that have requested notice in the Involuntary Chapter 11 Cases.

38.    <u>Objection Deadline</u>: Objections, if any, to the relief sought in the Motion and entry of the Further Interim Order shall be in writing, shall set forth with particularity the grounds for such objections or other statement of position, shall be filed with the clerk of the Court in accordance with the Local Rules and the Court's guidelines by May 28, 2019, and shall be served upon: (i) proposed counsel to the Debtors, Law Offices of Kenneth L. Baum, 167 Main Street, Hackensack,    New    Jersey    07601,    Attn:    Kenneth    L.    Baum,    Esq. (kbaum@kenbaumdebtsolutions.com); (ii) counsel to Purchaser, Okin Hollander LLC, Glenpointe Centre West, Suite 40, 2nd Floor, 500 Frank W. Burr Blvd., Teaneck, NJ 07666, Attn: Paul S.

Hollander, Esq. (phollander@okinhollander.com); (iii) counsel to the Petitioning Creditors, Stradley Ronon Stevens & Young, LLP, 100 Park Avenue, Suite 2000, New York, New York 10017, Attn: Scott H. Bernstein, Esq. (sbernstein@stradley.com); and (iv) counsel to the U.S. Trustee, Office of the United States Trustee, 1 Newark Center, Newark, New Jersey 07102, Attn: Mitchell B. Hausman, Esq.

39. <u>Effect of this Interim Order</u>. This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect immediately, notwithstanding anything to the contrary proscribed by applicable law.

40. <u>Retention of Jurisdiction</u>. The Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

## EXHIBIT "A"

## NMC FACTORING AGREEMENT

ACCOUNTS RECEIVABLE AGREEMENT WITH RECOURSE

THIS ACCOUNTS RECEIVABLE AGREEMENT WITH RECOURSE (this "**Agreement**") is entered into as of December 3̶0̶, 2016, by and between **E Z MAILING SERVICES INC.**, a New Jersey corporation, d/b/a **E Z Worldwide Express** and **United Business Xpress**, and **UNITED BUSINESS FREIGHT FORWARDERS LIMITED LIABILITY COMPANY**, a New Jersey limited liability company, (individually and collectively, "**Client**"), each with an address of 669 Division Street, Elizabeth, New Jersey  07201, and **NORTH MILL CAPITAL LLC,** a Delaware limited liability company ("**Purchaser**"), whose address is 821 Alexander Road, Suite 130, Princeton, New Jersey 08540.

## RECITALS

**WHEREAS**, on or about July 6, 2016, E Z Mailing Services Inc., a New Jersey corporation, d/b/a E Z Worldwide Express and United Business Xpress, as debtor and debtor-in-possession, and United Business Freight Forwarders Limited Liability Company, a New Jersey limited liability company, as debtor and debtor-in-possession (individually and collectively, "Debtor-in-Possession") entered into a Debtor-in Possession Accounts Receivable Agreement with Purchaser (as subsequently amended by Amendment No. 1 to Debtor-in-Possession Accounts Receivable Agreement dated November 30, 2016  ("Amendment No. 1") the "DIP Agreement"); and

**WHEREAS**, the DIP Agreement (prior to its amendment by Amendment No.1) was approved by the Interim Financing Order and thereafter by the Final Financing Order, both entered by the Bankruptcy Court having jurisdiction over the Case; and

**WHEREAS**, Amendment No. 1 was approved by the Supplemental Financing Order; and

**WHEREAS**, on December 8, 2016, the Debtor-in-Possession filed with the Bankruptcy Court the Debtors' Fifth Modified Joint Plan of Reorganization (the "Plan"); and

**WHEREAS**, on December 9, 2016, the Bankruptcy Court enter an Order Confirming Debtors' Fifth Amended Joint Plan of Reorganization (the "Confirmation Order"); and

**WHEREAS**, pursuant to Section 3.2 of the Plan, as of the "Effective Date" (as defined in the Plan), Purchaser reserved the right to enter into this Agreement with Client, pursuant to which Purchaser would continue to purchase the Accounts of Client following the Effective Date of the Plan

**NOW, THEREFORE,** in consideration of the foregoing premises and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Client and Purchaser, intending to be legally bound, agree as follows:

## I. DEFINITIONS

In addition to the terms defined in the preamble and recitals above, as used in this Agreement, the following terms shall have the meanings set forth herein:

"**Account**" means, collectively, in addition to the definition of "Account" in the UCC, Client's right to payment of a monetary obligation, presently existing and hereafter arising including, but not limited to, all accounts receivable, contract rights, health-care-receivables, and all other forms of obligations owing to Client, whether or not earned by performance, (i) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (ii) for services rendered or to be rendered, (iii) for a policy of insurance issued or to be issued, (iv) for a secondary obligation incurred or to be incurred including, but not limited to, all credit insurance, guaranties and other security therefor, as well as merchandise returned to or reclaimed by Client, (v) for energy provided or to be provided, (vi) for the use or hire of a vessel under a charter or other contract, (vii) arising out of the use of a credit or charge card or information contained on or for use with the card and any and all the proceeds therefrom, and (v) Client's Books relating to the foregoing.  As used in this Agreement, the term "Account" does not include (i) rights to payment evidenced by chattel paper or an instrument, (ii) commercial tort claims, (iii) deposit accounts, (iv) investment property, (v) letter of credit rights or letters of credit, or (vi) rights to payment for money or funds advanced or sold, other than rights arising out of the use of a credit or charge card or information contained on or for use with the card.  For the avoidance of doubt, reference in this Agreement to "Account" shall include Accounts created during the term of this Agreement and Accounts created during the term of the DIP Agreement.

"**Affiliate**" means, with respect to Client, any person which directly or indirectly controls, is controlled by, or is under common control with Client.  Client shall be deemed to control another person if Client owns directly or indirectly 5% or more of any class of voting stock of the controlled person or possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of the controlled person, whether through ownership of stock, by contract or otherwise. In addition, Client's Affiliates shall include Client's officers, directors, joint venturers and partners and any person controlled by any such officer, director, joint venturer partner.

1

**"Bankruptcy Code"** means Title 11 of the United States Code as in effect on the date hereof and as amended from time to time.

**"Bankruptcy Court"** means the United States Bankruptcy Court for the District of New Jersey, or such other court having jurisdiction over the Case.

**"Bankruptcy Rule"** or **"Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure as in effect on the date hereof and as amended from time to time.

**"Case"** means collectively, the Client's respective cases under Chapter 11 of the Bankruptcy Code that were pending before the Bankruptcy Court under Docket Nos. 16-10615 (SLM) and 16-10616 (SLM), jointly administered under Docket No. 16-10615.

**"Clearance Days"** means five (5) business days.

**"Client's Books"** means all of Client's books and records including, without limitation, all of the following:  ledgers; records indicating, summarizing or evidencing Client's assets or liabilities, or the Collateral; all information relating to Client's business operations or financial condition; and all computer programs, disks or tape files, printouts, runs or other computer prepared information, whether inscribed on tangible medium or stored in an electronic or other medium and which information is retrievable in perceivable form and the goods containing such information.

**"Collateral"** means all of the property, real or personal, tangible or intangible, given as security to Purchaser pursuant to Section 7.01 hereof for repayment of the Obligations of Client under this Agreement and under the DIP Agreement.

**"Collected Reserve"** shall have the meaning set forth in Section 2.09 hereof.

**"Credit Problem"** means a Customer is unable to pay its debts because of insolvency, the dissolution, termination of existence, or business failure of a Customer, the voluntary filing of a petition of bankruptcy, or the commencement of any proceeding under Title 11 of the United States Code as in effect on the date hereof and as amended from time to time (the **"Bankruptcy Code"**) or any other bankruptcy or insolvency laws by or against a Customer such that payment on the Account is or will be impaired.

**"Customer"** means Client's customer or the account debtor.

**"Customer Dispute"** means any claim by a Customer against Client, valid or invalid, now existing or hereafter arising (including, but not limited to, a claim for credit or refund due to a return of goods which gave rise to an Account), and which the Customer claims or may otherwise result in any reduction in the amount to be paid by the Customer under any Account or Accounts. The foregoing notwithstanding, a dispute with a Customer involving a Customer Dispute and/or a Credit Problem shall be deemed a Customer Dispute.

**"Daily Rate"** means the amount per diem equal to one twenty-third of one percent ($1/23^{rd}$ of 1%) of the Eligible Amount for each day an Account assigned hereunder remains unpaid.

**"Eligible Amount"** means the difference between the gross face amount of an Account and any partial payments under such Account if less than the gross face amount, and any trade or cash discounts, credits or allowances, or any adjustments to the Account taken by a Customer.

**"Events of Default"** and **"Event of Default"** shall have the meaning set forth in Section 8.01 hereof.

**"Field Examination Fee"** shall have the meaning set forth in Section 2.12 hereof.

**"Final Financing Order"** shall mean that "Final Order Pursuant to 11 U.S.C. §§ 105, 362, 363, 364, 503 and 507 (1) Authorizing Debtors to (A) Sell Accounts Outside of the Ordinary Course of Business Free and Clear of interests and (B) Incur Post-Petition Secured Indebtedness, (2) Granting Liens and Superiority Liens, (3) Authorizing Superpriority Administrative Expense Claim Status, (4) Modifying Automatic Stay, and (5) Granting Other Related Relief" entered by the Bankruptcy Court on July 26, 2016 as Docket No. 552.

**"Initial Termination Date"** means December 31, 2017.

**"Insolvent"** means, with respect to any person or entity, that such person's or entity's liabilities exceed such person's or entity's assets and/or such person or entity is not generally paying its debts as they become due and includes "insolvent" as that term is used and defined in Section 101(32) of the Bankruptcy Code and as that term is used in New Jersey Statutes 25:2-23 of the Uniform Fraudulent Transfer Act as adopted by New Jersey.

**"Insolvency Proceeding"** means any proceeding commenced by or against any person or entity under any provision of the Bankruptcy Code or under any other state or federal insolvency law, including assignments for the benefit of creditors, formal or informal moratoria, compositions or extension generally with its creditors.

**"Interim Financing Order"** shall mean that "Interim Order Pursuant to 11 U.S.C. §§ 105, 362, 363, 364, 503 and 507 (1) Authorizing Debtors to (A) Sell Accounts Outside of the Ordinary Course of Business Free and Clear of Interests and (B) Incur Post-

Accounts Receivable Agreement

Petition Secured Indebtedness, (2) Granting Liens and Superpriority Liens, (3) Authorizing Superpriority Administrative Expense Claim Status, (4) Modifying Automatic Stay, (5) Scheduling A Final Hearing and (6) Granting Other Related Relief" entered by the Bankruptcy Court on June 30, 2016 as Docket No. 476.

**"Lien"** means a lien (as such term is defined in the Bankruptcy Code) and security interest (as such term is defined in UCC) against interest in property to secure the payment of a debt or performance of an obligation.

**"Maximum Client Account Limit"** means Four Million and no/100 Dollars ($4,000,000.00).

**"Monthly Minimum"** shall have the meaning set forth in Section 9.07 hereof.

**"Obligation or Obligations"** means the amount(s) paid by Purchaser for Accounts pursuant to this Agreement and/or the DIP Agreement together with Purchaser's Discount and all other amounts due Purchaser that remain unpaid including, without limitation, all amounts due Purchaser: (i) under the terms of this Agreement; (ii) under any promissory notes executed by Client in favor of Purchaser now or hereafter; and (iii) under the terms of the DIP Agreement, the Interim Financing Order, the Final Financing Order and the Supplemental Financing Order; it being understood that all "Obligations" arising under the DIP Agreement shall be considered part of the Obligations arising under this Agreement as and to the same extent as if Client had assumed, ratified and acknowledged such Obligations as its direct liabilities.

**"Part Payment"** shall have the meaning set forth in Section 2.06 hereof.

**"Purchase Price"** shall have the meaning set forth in Section 2.08 hereof.

**"Purchaser's Discount"** means for each Account purchased by Purchaser in accordance with the terms hereof or the terms of the DIP Agreement, the difference between the Eligible Amount of such Account and the Purchase Price of such Account, the Purchase Price determined as of the date that the Eligible Amount is paid in full, whether by the Customer or Client.

**"Reference Rate"** means the rate designated by Wells Fargo Bank, N.A., or any successor thereof, from time to time as its prime rate, which shall not necessarily constitute the lowest available rate.

**"Supplemental Financing Order"** shall mean that "Supplemental Final Order Modifying the Final Order Pursuant to 11 U.S.C. §§ 105, 362, 363, 364, 503 and 507 (1) Authorizing Debtors to (A) Sell Accounts outside of the Ordinary Course of Business Free and Clear of Interests and (B) Incur Post-Petition Secured Indebtedness, (2) Granting Liens and Superpriority Liens, (3) Authorizing Superpriority Administrative Expense Claim Status, (4) Modifying Automatic Stay, and (5) Granting Other Related Relief" entered by the Bankruptcy Court on November 30, 2016 as Docket No. 709.

**"Term"** means the period from the date of the execution and delivery by Purchaser of this Agreement through and including the later of (i) the Termination Date and (ii) the payment and performance in full of the Obligations.

**"Termination Date"** means (i) the Initial Termination Date of December 31, 2017, unless such date is extended pursuant to Section 9.06, and if so extended on one or more occasions, the last date of the last such extension, or (ii) if earlier terminated by Purchaser pursuant to Section 9.06, the date of such termination.

**"UCC"** means the Uniform Commercial Code as in effect on the date hereof in the State of New Jersey and as amended from time to time.

## II. PURCHASE OF ACCOUNTS RECEIVABLE

2.01    **Assignment/Purchase.**  Client hereby transfers, assigns and sells to Purchaser as absolute owner with recourse all of Client's right, title and interest in and to, and Purchaser purchases and holds such right, title and interest as sole and absolute owner with recourse, all Accounts approved and deemed acceptable by Purchaser, and represented by Client to be bona fide existing obligations of its Customers arising out of, and acquired by it, in the ordinary course of its business, which Accounts are or will be due and owing to Client without defense, offset or counterclaim; *provided, however*, Purchaser shall only purchase Accounts of Client, so long as at the time of such purchase, the aggregate unpaid balance of the Accounts purchased under this Agreement and previously purchased under the DIP Agreement, before and after such purchase, plus the principal amount outstanding under any promissory notes executed by Client in favor of Purchaser, does not exceed the Maximum Client Account Limit. All Accounts assigned and sold by Client to Purchaser shall be free and clear of any interest in such Accounts asserted by an entity other than the Client. Client shall not retain any interest in the Accounts purchased and held by Purchaser. For the avoidance of doubt, in determining whether the Maximum Client Account Limit has been reached, Purchaser shall have the right, in its sole and absolute discretion, to include, in calculating the "aggregate unpaid balance of the Accounts", all Accounts purchased under this Agreement, plus, all Accounts purchased under the DIP Agreement and which remain unpaid as of the date on which such calculation is made.

2.02    **Purchaser's Discretion.**  Purchaser shall purchase only such Accounts as Purchaser may select and approve in its sole and absolute discretion.  Purchaser shall not have any liability to Client or any of Client's Customers for any failure or refusal by

Accounts Receivable Agreement

Purchaser to purchase any Account.

2.03    **Assignment Documents**.  Client will provide Purchaser with an assignment of Accounts, in a form(s) satisfactory to Purchaser in its sole and absolute discretion (including any notices of assignment as may be required by Purchaser), together with the original invoice or a true copy of each invoice and/or statement, as may be specified by Purchaser, including evidence of shipment, or other instruments or papers that Purchaser may require.

2.04    **Stamping**.  At Purchaser's request, Client will place a sticker on, or stamp, each original invoice being sold to Purchaser, in a form acceptable to Purchaser, indicating that the Account has been sold to Purchaser and that payment must be made directly to Purchaser.  If for any reason Client fails to provide an Account with proper notification, Purchaser will charge a missing notation fee of three percent (3.0%) of the Eligible Amount.

2.05    **Notification**.  Client agrees to provide Purchaser a sufficient number of Notice of Assignment of Account forms, in a form satisfactory to Purchaser, signed by authorized representative of Client, which may, at Purchaser's sole discretion, be distributed by Purchaser to each Customer whose Account is assigned and sold to Purchaser by Client.  If Purchaser so requires, it shall be Client's obligation to ensure that the Notice of Assignment of Accounts form be duly executed by an authorized representative of the Customer and returned to Purchaser.

2.06    **Part Payment**.  Upon approval and acceptance by Purchaser of an Account, Purchaser shall pay to Client part payment of the Purchase Price in an amount not exceeding eighty percent (80%) of the Eligible Amount (the **"Part Payment"**).

2.07    **Processing Fee**.  For each Account approved and accepted by Purchaser hereunder, Purchaser shall receive from Client and Client shall be obligated to pay to Purchaser a processing fee equal to one quarter of one percent (1/4%) of the Eligible Amount (the **"Processing Fee"**).

2.08    **Purchase Price**.  The purchase price payable by Purchaser to Client for each Account shall be equal to one hundred percent (100%) of the Eligible Amount reduced by the Daily Rate beginning as of the date that Purchaser makes Part Payment as to each Account and continuing for each day thereafter that such Account remains unpaid (the **"Purchase Price"**).

2.09    **Collected Reserve**.  Purchaser may hold in a reserve account all collections of purchased and non-purchased Accounts (the **"Collected Reserve"**).  The Collected Reserve may be held by Purchaser as security against charge-backs or any of the Obligations and may be applied by Purchaser against such charge-backs or Obligations.  Client hereby transfers and assigns to Purchaser all of its right, title and interest in and to the Collected Reserve.

2.10    **Return of Collected Reserve**.  Purchaser will return to Client that portion or all of the sums in the Collected Reserve once each week only if and to the extent, in Purchaser's sole and absolute discretion, Purchaser has determined that Client has complied with all of the terms and conditions of this Agreement and the DIP Agreement, including, without limitation, that no Event of Default has occurred, and that Client acknowledges to Purchaser that there are no offsets or claims against or Customer Disputes relating to any Account purchased by Purchaser under this Agreement or under the DIP Agreement.  However, if the Collected Reserve has a deficit balance at any time, Client shall be obligated to immediately pay to Purchaser, with or without demand, the amount of such deficit.

2.11    **Customer Disputes**.  Upon the occurrence of any Customer Dispute with respect to an Account purchased under this Agreement or under the DIP Agreement, whether valid or invalid, Client will immediately pay to Purchaser, on the Account purchased by Purchaser subject to the Customer Dispute, the amount of any Part Payment made on the Account by Purchaser plus the Purchaser's Discount.  Further, notwithstanding the payment obligation set forth herein, Purchaser may, in addition to any other remedies available to Purchaser under this Agreement, immediately charge back any Account purchased by Purchaser, which is subject to the Customer Dispute, to Client and provide notice thereof to Client.  Any such charged back Account whether purchased pursuant to this Agreement or pursuant to the DIP Agreement, shall be subject to Purchaser's security interest therein.  Client shall notify Purchaser immediately of any disputes between a Customer and Client.  Purchaser may, but is not obligated to, settle any Customer Dispute directly with the Customer.  Such settlement does not relieve Client of final responsibility for payment of any such Account purchased by Purchaser.

2.12    **Field Examination Fee**.  Client shall pay Purchaser a fee (the **"Field Examination Fee"**) in amount equal to nine hundred Dollars ($900) per day, per examiner plus out of pocket expenses for each examination of Client's Books or the other Collateral performed by Purchaser or its designee.

2.13    **Termination Fee**.  If the Term is terminated (a) by Purchaser upon the occurrence of an Event of Default or otherwise as set forth in Section 9.06 or (b) is terminated by Client, other than in compliance with Section 9.06, in view of the impracticability and extreme difficulty of ascertaining actual damages, and by mutual agreement of the parties as to a reasonable calculation of Purchaser's lost profits, as a result thereof, in addition to payment of all principal, interest, fees, expenses and other Obligations, Client shall pay Purchaser upon the effective date of such termination (which includes renewals) a fee (the **"Termination Fee"**) in an amount equal to one percent (1%) of the Maximum Client Account Limit.  Such fee shall be presumed to be the amount of damages sustained by Purchaser as the result of termination, and Client acknowledges that such fee is reasonable under the circumstances currently existing.  The fee provided for in this Section 2.14 shall be deemed included in the Obligations.

4

2.14    **Client's Obligation.** As long as any amounts owed by Purchaser to Client or any other Accounts whether purchased pursuant to this Agreement or pursuant to the DIP Agreement together with the Purchaser's Discount relating thereto and any other amounts due Purchaser under the terms of this Agreement, the DIP Agreement and/or under any promissory notes executed by Client remain unpaid, Client shall be liable to Purchaser for the Obligations.  For the avoidance of doubt, Client shall be obligated to pay and perform, fully and unconditionally, all obligations of the Debtors-in-Possession arising under or relating to the DIP Agreement as if Client were the Debtors-in-Possession originally named in the DIP Agreement and continued to be fully liable thereon.

2.15    **Clearance Days.**  For all purposes under this Agreement, Clearance Days will be added to the date on which Purchaser receives any payment before crediting such payment to the Obligations.

### III. WARRANTIES AND REPRESENTATIONS OF CLIENT

In order to induce Purchaser to enter into this Agreement and purchase Accounts under the terms hereof, and with full knowledge that the truth and accuracy of the warranties and representations set forth in this Agreement are being relied upon by Purchaser, because, among other reasons, time is of the essence and a substantial delay in the purchase of Accounts by Purchaser could be caused by a complete credit investigation of each Customer, Client warrants and represents to Purchaser now, and during the Term, that:

3.01    **Client Organization; Etc**.  Client:

      (i)    Client, E Z Mailing Services Inc., is a corporation duly organized, validly existing and in good standing under the laws of the State of Jersey, and Client, United Business Freight Forwarders Limited Liability Company, is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Jersey;

      (ii)    Client has the power and authority to own its properties and carry on its business as it is now being conducted, and is to be conducted following consummation of the transactions contemplated by this Agreement;

      (iii)    Client is qualified to do business in every jurisdiction where such qualification is necessary;

      (iv)    Client, E Z Mailing Services Inc., is duly authorized to conduct business under the alternate names: E Z Worldwide Express and United Business Xpress, and such alternate names have been properly registered as required by the laws of the State of New Jersey; and

      (v)    Client has the power to execute and deliver this Agreement and to execute and deliver to Purchaser any and all documents required to be executed and delivered hereunder.

3.02    **Customer Solvency**.  To the best knowledge of Client, no Customer of Client whose Accounts are to be assigned to and purchased by Purchaser is Insolvent.

3.03    **Title to Assets**.  Client has good title to all Collateral, free and clear of all mortgages, security interests, liens and encumbrances, covenants or restrictions, except in favor of Purchaser or the continuing liens and security interests, if any, set forth on **Schedule 3.03** attached hereto.  All other mortgages, security interests, liens and encumbrances against the other assets of Client are set forth on **Schedule 3.03**.

3.04    **Validity of Accounts; Etc**.  Each Account offered for sale to Purchaser: (a) is an accurate and undisputed (without claim of offset, defense or counterclaim) statement of indebtedness by the Customer to Client, for a sum certain, which is due and payable within thirty (30) days or less, or within such time as is agreed to, in writing, by Purchaser and Client; and (b) arises out of a bona fide absolute sale, delivery and acceptance of goods (not on consignment, or on approval, or on bill and hold basis, or subject to any other contingency), or rendition of service by Client to the Customer, made in the ordinary course of Client's business.

3.05    **Title to Accounts; Etc**.  None of the Accounts being sold to Purchaser pursuant to this Agreement has heretofore been sold or assigned to any person, firm or corporation, nor has any lien, security interest or other encumbrance in such Accounts been granted to any person, firm or corporation, or are owed by a Customer who is one of Client's Affiliates.

3.06    **No Contravening Agreements**.  There are no agreements, verbal or written, between Client and a Customer, or any other party, which would prohibit the sale of the Customer Account by Client to Purchaser.

3.07    **Authorization; Etc**.  The execution and performance by Client of the terms and provisions of this Agreement and the execution and delivery of any other documents required to be executed and delivered hereunder have been duly authorized by all requisite company action, and neither the execution and performance of this Agreement nor the execution and performance of any other documents required to be delivered hereunder, will violate any provision of law, any order of any court or other agency of government, the articles/certificate of incorporation/organization/formation or agreement of partnership, if any, of Client, or any indenture, agreement or other instrument to which Client is a party, or by which Client is bound, or be in conflict with, result in breach of, or constitute (with due notice or lapse of time or both) a default under, or result in the creation or imposition of any lien,

charge or encumbrance of any nature whatsoever upon any of the property or assets of Client pursuant to, any such indenture, agreement or instrument, except as provided in this Agreement.

3.08    **No Litigation**. There is no action, suit or proceeding at law or in equity or by or before any governmental instrumentality or other agency now pending or, to the knowledge of Client, threatened against or affecting Client which, if adversely determined, would have a material adverse effect on the business, operations, properties, assets or condition, financial or otherwise, of Client.

3.09    **No Adverse Agreements**. Client is not a party to any material agreement or instrument or subject to any restriction adversely affecting its business, properties or assets, operations or condition, financial or otherwise. Client is not in default in the performance, observance or fulfillment of any agreement or instrument to which it is a party which materially adversely affects the business, operations, affairs or condition of Client or any of its properties.

3.10    **No Adverse Event**. Except as disclosed in writing to Purchaser, there is no fact known to Client which materially adversely affects the business, operations, affairs or condition of Client or any of its properties or collectability of any of the Accounts.

3.11    **Taxes**. Client has filed all tax returns required by law to be filed and has paid all taxes, assessments and other governmental charges levied upon its properties, assets and income, other than those not yet delinquent. There are no unpaid assessments for additional taxes or any basis therefor.

3.12    **Compliance With Laws**. Client is in full compliance with all state and federal laws relating to the conduct of its business.

3.13    **Use of Proceeds**. The proceeds from the initial purchase of Accounts (Part Payment) will be used by Client for the purposes set forth on **Schedule 3.14** attached hereto. Absent Purchaser's written consent to the contrary, the proceeds from the purchase of Accounts after the initial purchase of Accounts (Part Payment) shall be used by Client solely for working capital purposes.

3.14    **Confirmation Order and Occurrence of Effective Date under the Plan**. The Confirmation Order has been duly entered, is valid, subsisting and continuing in full force and effect and has not been vacated, modified or reversed by any order or decree of the Bankruptcy Court (other than as consented to in writing by Purchaser, in its sole and absolute discretion) and is not subject to any appeal, stay or motion for reconsideration or relief from such Confirmation Order. In addition, the Plan as confirmed by the Confirmation Order has not been modified or amended and no application for such relief is pending or, to the knowledge of Client (which for purposes hereof, shall include, without limitation, counsel for the Debtor-in-Possession and the Client) is presently contemplated.

## IV. CONDITIONS TO PURCHASER'S OBLIGATIONS HEREUNDER

4.01    **Conditions Precedent**. Except as to those obligations of Purchaser that are discretionary as set forth herein, the obligations of Purchaser to perform its obligations hereunder are subject to the conditions precedent that (a) the representations and warranties set forth in Article III hereof shall be true and correct on and as of the date hereof and on the date each Account is offered to Purchaser for sale pursuant to this Agreement; (b) no Event of Default, nor any event which upon notice or lapse of time or both would constitute such an Event of Default, shall have occurred and be continuing, and each offer of an Account for sale to Purchaser shall constitute a certification by Client as to the foregoing as of the date of such offer; and (c) Purchaser has received duly executed originals of the loan documents described on Schedule 4.01 hereto.

4.02    **Conditions to Effectiveness of this Agreement**. This Agreement shall only become effective upon: (i) the satisfaction of all Conditions Precedent set forth in Section 4.01 of this Agreement; (ii) the occurrence of the Effective Date (as defined in the Plan) and the satisfaction of the Conditions Precedent to the Effective Date set forth in Section 8.2 of the Plan (it being understood that to the extent the Debtor-in-Possession proposes to waive any such conditions set forth in Section 8.2 of the Plan, Purchaser has approved such waiver in writing); and (iii) the Debtor-in-Possession and/or Client have paid the Termination Fee payable to Purchaser under the DIP Agreement together with all other fees and expenses which the Debtor-in-Possession is obligated to pay and/or reimburse Purchaser for under the DIP Agreement.

## V. AFFIRMATIVE COVENANTS BY CLIENT

Client covenants and agrees that, from the date hereof and until termination of this Agreement and performance of all of the Obligations hereunder, Client will, unless otherwise agreed to in writing by Purchaser:

5.01    **Inspection of Records**. Promptly, from time to time, permit Purchaser to inspect Client's Books, at reasonable business hours (except when an Event of Default exists, then at any time), and to make copies thereof or of abstracts thereof, and furnish such other information regarding its operations, assets, business affairs and financial condition, as Purchaser may request.

5.02    **Notices**. Promptly notify Purchaser of:

        (a)      any developments which would materially adversely affect the business of Client, its properties or affairs or the

6

ability of Client to perform its obligations under this Agreement, or any other documents delivered in connection herewith, or the collectability of any of the Accounts purchased by Purchaser under this Agreement or under the DIP Agreement;

(b)    any material adverse change in Client's condition, financial or otherwise;

(c)    of the occurrence of any Event of Default, and of the occurrence of any event which upon notice or lapse of time, or both, would constitute such an Event of Default; and

(d)    any change of address of Client.

5.03    **Taxes**.  Pay all taxes or fees in relation to the Accounts, goods sold or services rendered, giving rise to the Accounts.

5.04    **Purchaser's Property**.  Immediately turn over to Purchaser and, until doing so, hold in trust and safekeeping separate and apart from Client's other property and as the sole and separate property of Purchaser any payment on an Account purchased by Purchaser (whether pursuant to this Agreement or pursuant to the DIP Agreement) whenever any such payment, whether cash, check (payable to Client, Purchaser or both), money order or other form of payment, comes into Client's possession, and all goods giving rise to Accounts purchased by Purchaser (whether pursuant to this Agreement or pursuant to the DIP Agreement) which are returned or rejected by, or repossessed from Customer(s).  If Client fails to turn over payment on a purchased Account to Purchaser (whether purchased pursuant to this Agreement or pursuant to the DIP Agreement), Purchaser will charge a misdirected payment fee of fifteen percent (15%) of the Eligible Amount, and Client shall be obligated to immediately pay such fee with or without demand by Purchaser.

5.05    **Book Entries**.  Upon the sale of any of its Accounts to Purchaser, Client will immediately make proper entries on Client's Books recognizing and disclosing the sale of such Accounts to Purchaser.

5.06    **Reimbursement of Expenses; Etc**.  Reimburse Purchaser for its reasonable expenses, fees and disbursements (including, without limitation, reasonable attorneys' fees and legal expenses, including in-house counsel fees, and customary wire transfer fees, ACH fees and lockbox fees) incurred in connection with (a) the preparation or administration of this Agreement or the DIP Agreement or any other document relating hereto and (b) Purchaser's enforcement of any and all of the Obligations of Client under this Agreement, the DIP Agreement or any other such document, whether or not suit is commenced, and which attorneys' fees and legal expenses shall include, but not be limited to, any attorneys' fees and legal expenses incurred in connection with any appeal of a lower court's judgment or order.  Purchaser is hereby authorized to charge from time to time against the any reserve account (including, without limitation, the Collected Reserve) established by Purchaser pursuant to this Agreement any obligation of Client to Purchaser hereunder or under the DIP Agreement when due and apply any collections or other proceeds of any Account or other Collateral received by Purchaser first to the reimbursement of Client's obligation hereunder and under the DIP Agreement.

5.07    **Reserved.**

5.08    **Reporting to Purchaser**.

(a)    Client shall provide the financial information to Purchaser as follows:

(i)    Client's annual financial statements, prepared on a review basis by a certified public accountant satisfactory to Purchaser, shall be delivered by Client within 120 days of Client's fiscal year end during the Term;

(ii)    Client's monthly financial statements, including Client's accounts receivable aging and account payable aging, shall be delivered by Client by the twentieth (20th) day of the month next succeeding the month to which the financial statements relate during the Term;

(iii)    Client's guarantors' updated personal financial statements shall be delivered on an annual basis, not later than June 30th of each year during the Term; and

(iv)    Copies of Client's and Client's guarantors' income tax returns and related extensions by April 15th of each year during the Term.

5.09    **Insurance**.  Maintain insurance of such types and in such amounts as are maintained by companies of similar size engaged in the same or similar businesses; provided, however, that each policy insuring any Collateral securing any and all of the Obligations shall name Purchaser as the lender loss payee and all general liability policies shall name Purchaser as additional insured.

## VI. NEGATIVE COVENANTS

Client covenants and agrees that, until termination of this Agreement and performance by Client of all of the Obligations hereunder, unless Purchaser shall otherwise consent in writing, it will not directly or indirectly:

6.01    **No Liens**.  Create, incur, assume or suffer to exist any pledge, lien, charge or other encumbrance of any nature whatsoever

Accounts Receivable Agreement

on any of its Accounts and accounts as otherwise described in the UCC as general intangibles related thereto or any of the Collateral, now owned or hereafter acquired, including, without limitation, in connection with merchant advances, or its other assets, except in favor of Purchaser or the continuing liens and security interests, if any, set forth on **Schedule 3.03** attached hereto.

6.02    **No Sale of Assets; Etc**.  Except with respect to the Accounts purchased by Purchaser pursuant to this Agreement, sell, lease, transfer or otherwise dispose of any of its assets, except in the ordinary course of its business.

6.03    **No Interference With Purchaser's Rights**.  Interfere in any way or fashion or under any circumstances with any of Purchaser's right under this Agreement or undertake any action or omit to undertake any action that would adversely affect the collectability of any of the Accounts purchased by Purchaser.

6.04    **No Other Sale of Accounts**.  Finance or sell its Accounts except to Purchaser during the Term.

6.05    **No Change of Account Terms**.  Change or modify the terms of the original Account with a Customer.

6.06    **No Pledge of Purchaser's Credit**.  Pledge the credit of Purchaser to any person or entity for any purpose whatsoever.

6.07    **No Alternations of Payment Schedule**.  Alter any Customer payment schedule.

## VII. SECURITY INTEREST

7.01    **Grant of Security Interest**.  This Agreement is and shall be on a recourse basis.  As a further inducement for Purchaser to enter into this Agreement, Client hereby grants to Purchaser, as security for the repayment of all Obligations hereunder, a Lien against all assets of Client now owned or hereafter acquired or arising and wherever located, including, without limitation, all of Client's (as such terms are defined in the Uniform Commercial Code **"UCC"**) accounts (including the Accounts), inventory, equipment, goods, instruments, documents, contract rights, chattel paper, instruments, general intangibles, payment intangibles, deposit accounts, all other personal property and the proceeds thereof (including any insurance proceeds) and all supporting obligations now or hereafter owned by Client, or in which Client now or hereafter may have any rights, wherever situated and whenever acquired (collectively, the **"Collateral"** which for purposes of this Agreement shall include, without limitation, all "Collateral" granted to Purchaser under the DIP Agreement, the Interim Order, the Final Order and the Supplemental Order.  Subject to the provisions of Section 7.02 below, Client agrees to execute, from time to time, and authorizes Purchaser to execute and file such UCC financing statements (including, without limitation, an "all assets" filing), assignments, and other documents covering the Collateral, including proceeds, to create, evidence, perfect, maintain or continue its security interest and its lien with respect to the Collateral (including additional Collateral acquired by Client after the date hereof).  Client will pay the cost of filing the same (including, but not limited to, all filing fees) in all public offices in which Purchaser may deem filing to be appropriate and will notify Purchaser promptly upon acquiring any additional Collateral that may require an additional filing.  Upon the occurrence of and during the continuance of an Event of Default, Client appoints Purchaser irrevocably as Client's agent and attorney-in-fact to perform such tasks as Purchaser in the sole exercise of its discretion determines to undertake to protect and/or enforce its rights to recover all sums due under the Agreement including, without limitation, notifying the United States Postal Service to change the address for delivery of Client's mail to any address designated by Purchaser, otherwise intercept Client's mail, and receive, open and dispose of Client's mail.  Upon request, Client will deliver to Purchaser all Client's documents, chattel paper and instruments constituting part of the Collateral.

7.02    With respect to that portion of the Collateral that consists of motor vehicles that are the subject matter of certificates of title/ownership and under which applicable state law requires that in order to perfect a lien/security interest granted in favor of a third party such lien must be noted on the certificate of title/ownership (individually, a "Titled Vehicle" and collectively, the "Titled Vehicles") the following rules shall apply:

    (a)    With respect to those Titled Vehicles (the "Utica Vehicles") that are subject to a Master Lease Agreement with Utica Leasco, LLC ("Utica") dated November 15, 2016, Clients shall use their best good faith efforts to cause Utica to endorse or cause the applicable state authority to add Purchaser's lien information on the certificate of title/ownership for the Utica Vehicles, reflecting the fact that Purchaser is the holder of a subordinate lien on such Utica Vehicles; and

    (b)    With respect to all other Titled Vehicles that now, or at any time in the future, comprise a portion of the Collateral and which are subject to a prior lien or lease in favor of a third party lender/lessor (including but not limited to those prior liens/leases disclosed on Schedule 3.03 hereto), as such Titled Vehicles roll off such prior liens/leases, Clients shall promptly take, at Clients sole cost and expense, all actions as may be required or necessary to endorse Purchaser's lien on the certificates of title/ownership for such Titled Vehicle that are no longer subject to a prior lien/lease in favor of a third party lender/lessor.

## VIII. EVENTS OF DEFAULT

8.01    **Events of Default**.  Upon the occurrence of any of the following events (each of which is herein sometimes called an **"Event of Default"**):

8

(a)     If Client shall fail to pay any Obligation to Purchaser when due;

(b)     If Client confesses inability to continue performance in accordance with this Agreement;

(c)     If any representation or warranty made herein or in any report, assignment, certificate, financial statement or other instrument furnished in connection with this Agreement, shall prove to be false or misleading in any material respect;

(d)     If Client shall fail to perform any covenant, condition or agreement contained in this Agreement;

(e)     If an Insolvency Proceeding is commenced by Client or any other person liable in whole or in part for payment or performance of any Obligations in this Agreement, or if an Insolvency Proceeding is commenced against Client or any other person liable in whole or in part for payment or performance of any Obligations in this Agreement;

(f)     If any order, judgment or decree shall be entered, without the application, approval or consent of Client by any court or competent jurisdiction, approving a petition seeking reorganization of Client or appointing a receiver trustee, custodian or liquidator of Client, or of all or a substantial part of the assets of Client;

(g)     If there occurs any attachment on any deposits or other property of Client in the hands or possession of Purchaser;

(h)     If any "default" (however defined) shall occur under any guaranty of any Obligations hereunder or if any guarantor terminates said guarantor's guaranty;

(i)     If there is a default in any material agreement to which Client or any guarantor is a party or by which binds Client or any guarantor of their respective assets; or

(j)     The occurrence of an Event of Default (as defined in the DIP Agreement) under the DIP Agreement (other than under Section 8.01 (m) of the DIP Agreement).

then, and upon every such Event of Default and at any time thereafter during the continuance of such event, Purchaser may take any action permitted at law or in equity including, without limitation, any one or more of the following: (i) charge back to Client all outstanding Accounts and declare all Obligations secured hereby immediately due and payable; (ii) enforce the security interest given hereunder pursuant to the UCC or any other law; (iii) require Client to assemble the Collateral and the records pertaining to the Accounts and make them available to Purchaser at a place designated by Purchaser; (iv) enter the premises of Client and take possession of the Collateral and of the records pertaining to the Accounts and any other Collateral; (v) grant extensions, compromise claims and settle the Accounts for less than the face value, and without prior notice to Client; (vi) to the extent permitted by law, use, in connection with any assembly or disposition of the Collateral, a trademark, trade name, copyright, patent right or technical process used or utilized by Client without payment of any license fee or royalty to Client; (vii) retain any surplus realized to cover any and all Obligations and hold Client liable for any deficiency as provided in the UCC; (viii) offset any funds held by Purchaser in any reserve account for any and all Obligations of Client to Purchaser, including, but not limited to, legal fees or other costs associated with the collection of Accounts, or pursue any other remedy at law or equity which Purchaser may have; (ix) charge an Event of Default fee of Seven Hundred Fifty Dollars ($750.00) per occurrence.

## IX. <u>MISCELLANEOUS</u>

9.01     <u>Survival of Agreement; Etc</u>. This Agreement and all covenants, agreements, representations and warranties made herein, shall survive the purchase by Purchaser of the Accounts hereunder, and shall continue in full force and effect, so long as there shall be any Obligations owing to Purchaser hereunder.  Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the heirs, personal representatives, legal representatives, successors and assigns of such parties; and all covenants, promises and agreements in this Agreement contained, by or on behalf of Client, shall inure to the benefit of the successors and assigns of Purchaser.

9.02     <u>Purchaser's Property</u>.  Any payment or payment(s) due as to any Account purchased by or assigned to Purchaser is/are the sole property of Purchaser.

9.03     <u>Appointment of Attorney-in-Fact</u>.  In order to carry out this Agreement and avoid unnecessary notification to Customers, Client irrevocably appoints Purchaser, or any person designated by Purchaser, its special attorney in fact or agent, with power to:

(a)     Delete Client's address on all invoices and statements mailed to Customers and to substitute in its place Purchaser's address;

(b)     Notify the post office authorities to change the address for delivery of Client's mail to an address designated

9

by Purchaser or otherwise receive Client's mail, and receive, open and dispose of all mail addressed to Client or to Client's trade name at Purchaser's address;

(c)     Endorse the name of Client or Client's trade name on any checks or other evidences of payment that may come into the possession of Purchaser with respect to any Collateral;

(d)     In Client's name, or otherwise, to demand, sue for, collect, receive and give acquittance for any and all monies due or to become due on Accounts purchased by Purchaser;

(e)     Settle, compromise, compound, prosecute or defend any action or proceeding with respect to said Accounts;

(f)     Extend the time of payment of any or all of the Accounts purchased by Purchaser and to make any allowances and other adjustments with reference thereto;

(g)     Offer discounts to Client's Customer exclusive of Client's normal business custom with said Customer where necessary to affect collection; and

(h)     Do any and all things necessary and proper to carry out the purpose of this Agreement. The authority granted pursuant to this power of attorney shall continue in full force and effect until all Accounts purchased by Purchaser have been paid in full.

9.04    **Open Items**. Should Purchaser receive a double payment on an Account or other payment which is not identified, Purchaser shall carry such sums as open items and shall return such sum to Client or the Customer, as appropriate, upon written request for payment actually received by Purchaser.

9.05    **Indemnifications of Purchaser**. Client agrees to indemnify and hold Purchaser and its officers, directors, investors, bank group members, attorneys, agents and employees or participants harmless from any loss, damage, judgment, liability or expense (including attorneys' fees) suffered by or rendered against Purchaser or any of them on account of any claims arising out of or relating to the Obligations, the Accounts or the other Collateral (unless caused by the gross negligence or willful misconduct of Purchaser and any of the other indemnified parties).

9.06    **Term of Agreement**. This Agreement shall continue in full force and effect through the Term. Purchaser may terminate this Agreement at any time. No such termination shall relieve or discharge Client of Client's Obligations hereunder, and Purchaser's continuing security interest and Lien against the Collateral shall remain in effect until the Obligations have been irrevocably paid and satisfied in full in cash or cash equivalent. On the Termination Date, the Obligations shall be immediately due and payable in full. Absent termination of this Agreement by Purchaser, or as provided elsewhere in this Agreement, this Agreement shall automatically and continually renew for successive periods of twelve (12) months (each such period referred to as a **"Renewal Period"**) from the Initial Termination Date or the end of a Renewal Period unless, Client, no less than thirty (30) days prior to the Initial Termination Date or the expiration of a Renewal Period (a) gives Purchaser written notice to terminate this Agreement and (b) pays Purchaser as liquidated damages the Termination Fee as set forth in Section 2.13. and an amount equal to the Monthly Minimum, as set forth in Section 9.07 below, for each month or part of a month between the stated termination date and the Initial Termination Date or end of a Renewal Period, whichever is applicable.

9.07    **Monthly Minimum**  Client agrees to generate a minimum of fees, i.e. the Processing Fees plus Purchaser's Discount to Purchaser in the amount of Three Thousand and no/100 Dollars ($3,000.00) per month during the Term (said dollar amount being, the **"Monthly Minimum"**). Should Purchaser not receive the Monthly Minimum for any month during the Term, Client agrees to remit immediately to Purchaser the difference between the Monthly Minimum and the fees actually earned for such month.] Remittance of the difference to Purchaser shall be made as follows:  by Purchaser's deducting the difference from Client's Assignment and Schedule of Accounts, the Collected Reserve and/or any Collateral securing Obligations to Purchaser, or by Client's direct payment to Purchaser of such difference.

9.08    **Survival of Security Interest; Etc**. After termination of this Agreement, Client shall remain fully responsible to Purchaser for all Accounts purchased before such termination, and Purchaser's security interest shall survive such termination until any and all Obligations hereunder shall have been fully paid and/or satisfied.

9.09    **Binding Effect; Etc**. This Agreement shall inure to the benefit of and be binding upon the heirs, executors, administrators, successors and assigns of the parties hereto.

9.10    **Rights and Remedies**. No failure on the part of Purchaser to exercise, and no delay in exercising, and no course of dealing with respect to, any right, power or remedy under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise by Purchaser of any right, power or remedy under this Agreement preclude any other right, power or remedy. The remedies in this Agreement are cumulative and are not exclusive of any other remedies provided by law.

9.11    **Governing Law**. This Agreement shall be construed in accordance with and governed by the laws of the State of New Jersey without regard to conflict of law principles. Unless otherwise defined herein, or unless the context otherwise requires, all terms used herein which are defined in the UCC have the meanings therein stated.

Accounts Receivable Agreement

9.12    **Consent to Jurisdiction; Etc**. Client hereby consents to the jurisdiction of the courts of the State of New Jersey and the United States District Court for the District of New Jersey for the purpose of any suit, action or other proceeding arising out of any of the Obligations hereunder or with respect to the transactions contemplated hereby, and expressly waives any and all objections it may have as to venue in any of such courts. **EACH OF CLIENT AND PURCHASER ALSO WAIVES TRIAL BY JURY IN ANY ACTION BROUGHT ON OR WITH RESPECT TO THIS AGREEMENT.**

9.13    **Purchaser's Customer Notification Rights; Etc**. Purchaser may in its sole discretion give notice of assignment to any and all Customers of Client and collect Accounts directly from such Customers.

9.14    **Notices**. All notices and communications hereunder shall be given or made to the parties at their respective addresses set forth in the first paragraph of this Agreement, or at such other address as the addressee may hereafter specify for the purpose by written notice to the other party hereto. Such notices and other communications will be effectively given only if and when given in writing and delivered to the parties' addresses set forth herein and (except for financial statements and other informational documents which may be duly deposited in the mails with first-class postage prepaid) sent by registered or certified mail, postage prepaid, return receipt requested, personally delivered or by receipted overnight delivery service or sent by telecopy/facsimile or other electronic transmission for which confirmation is received (followed up by a mailing or overnight mail).

9.15    **Severability**. If any provision hereof is held invalid, illegal or unenforceable in any jurisdiction, for any reason whatsoever, the other provisions hereof shall remain in full force and effect in such jurisdiction and to that end, provisions hereof are declared to be severable and the remaining provisions shall be liberally construed in favor of Purchaser.

9.16    **Headings**. The various headings of this Agreement are inserted for convenience only and shall not affect the meaning or interpretation of this Agreement or any provision hereof.

9.17    **Joint and Several Obligations; Dealings with Multiple Clients**. If more than one person or entity is named as Client in this Agreement and in all other related documents executed and delivered pursuant to the terms of this Agreement or otherwise required by Purchaser, all Obligations, representations, warranties, covenants and indemnities set forth in the Loan Documents to which such person or entity is a party shall be joint and several. Purchaser shall have the right to deal with any authorized officer of any Client with regard to all matters concerning the rights and obligations of Purchaser and Client hereunder and pursuant to applicable law with regard to the transactions contemplated under this Agreement. All actions or inactions of the officers, managers, members and/or agents of any Client with regard to the transactions contemplated under this Agreement shall be deemed with full authority and binding upon all Clients hereunder. Each Client hereby appoints each other Client as its true and lawful attorney-in-fact, with full right and power, for purposes of exercising all rights of such person hereunder and under applicable law with regard to the transactions contemplated under this Agreement. The foregoing is a material inducement to the agreement of Purchaser to enter into this Agreement and to consummate the transactions contemplated hereby. Each Client represents that it and each other Client together, are operated as part of one consolidated business entity and are directly dependent upon each other for and in connection with each of their respective business activities and financial resources. Each Client will receive a direct economic and financial benefit from the Obligations incurred under this Agreement and the incurrence of such Obligations is in the best interests of each Client.

## X. TRANSITION PROVISIONS

10.1    **Effectiveness of the DIP Agreement**. Notwithstanding: (i) the confirmation of the Plan; (ii) the entry by the Bankruptcy Court of the Confirmation Order; (iii) the occurrence of the Effective Date under the Plan; (iv) the effectiveness of this Agreement; or (v) the Clients assumption, pursuant to this Agreement, of all Obligations of the Debtor-in-Possession under the DIP Agreement, the DIP Agreement shall remain in force and effect and shall, along with the Interim Financing Order, the Final Financing Order and the Supplemental Financing Order, continue to govern the rights of Purchaser with respect to all Accounts purchased from the Debtor-in-Possession under the DIP Agreement prior to the Effective Date under the Plan until all Obligations under the DIP Agreement have been fully paid and satisfied in accordance with its terms. Unless and until all Obligations of the Debtor-in-Possession under the DIP Agreement have been fully paid and satisfied, all of Purchaser's right under the DIP Agreement, the Interim Financing Order, the Final Financing Order and the Supplemental Financing Order are fully preserved. For the avoidance of doubt, upon this Agreement becoming effective, Purchaser shall have no further obligation to purchase any Accounts from the Debtor-in-Possession and the Debtor-in-Possession shall not be entitled to any further advances from Purchaser.

10.2    **Releases**. Each of Client, the Debtor-in-Possession, and each undersigned guarantor of the Obligation of the Debtor-in-Possession under the DIP Agreement and Client under this Agreement, for himself/herself/itself and its predecessors, parents, subsidiaries, affiliates, agents, employees, members, managers, officers, directors, shareholders, attorneys, legal representatives, successors and assigns, heirs, executors and administrators, as he case may be (each a "Releasing Party") hereby waives and releases and forever discharges Purchaser, its predecessors, parents, subsidiaries, affiliates, agents, employees, members, managers, officers, directors, investors, bank group members, shareholders, attorneys, legal representatives, successors and assigns, and each of them (each a "Released Party"), of and from any and all claims, demands, counterclaims, setoffs, defenses, debts obligations, costs, expenses, actions, causes of action and damages of every kind, nature and description whatsoever, known or unknown, foreseeable or unforeseeable, liquidated or unliquidated, and insured or uninsured, which each Releasing Party heretofore, now or from time to time hereafter owns, holds or has by reason of any matter, cause or thing whatsoever, arising on or before the date hereof from, relating to or in connection with the DIP Agreement (and all documents executed and delivered in connection therewith), the Interim Financing Order, the Final Financing Order, the Supplemental Financing Order,

11

the Case, the Obligations under the DIP Agreement or any matters relating to any of the foregoing.  Each of Releasing Party for himself/herself/itself and its predecessors, parents, subsidiaries, affiliates, agents, employees, members, managers, officers, directors, shareholders, attorneys, legal representatives, successors and assigns, heirs, executors and administrators, as the case may be, further agrees to indemnify and hold harmless each Released Party from any loss, damage, judgments, liability or expense (including reasonable attorneys' fees) suffered by or rendered against Released Party or any of them on account of any claims arising out of or relating to the foregoing matters, any matters relating thereto.

10.3    **Conflicts**.  The extent any of the terms or conditions of the Plan or the Confirmation Order conflict with the terms and conditions of this Agreement, the terms and conditions of this Agreement shall control and govern.

**[signatures on next page]**

Accounts Receivable Agreement

IN WITNESS WHEREOF, intending to be legally bound, this Agreement has been executed by the parties hereto all as of the day and year first above written.

**E Z MAILING SERVICES INC.**

Witness: _____
      Name:

By: _____

Name: _Ajay Aggarwal_____

Its _President_____

**UNITED BUSINESS FREIGHT FORWARDERS LIMITED LIABILITY COMPANY**

Witness: _____
      Name:

By: _____

Name: _Ajay Aggarwal_____

Title: _Member_____

**NORTH MILL CAPITAL LLC**

By: _Rochelle Hilson_____

Name: _Rochelle Hilson_____

Its: _Senior Vice President____

Joinder by Debtor-in-Possession

**E Z MAILING SERVICES INC.
AS DEBTOR-IN-POSSESSION**

By: _____

Name: _Ajay Aggarwal_____

Its: _President_____

**UNITED BUSINESS FREIGHT FORWARDERS LIMITED LIABILITY COMPANY,
AS DEBTOR-IN-POSSESSION**

By: _____

Name: _Ajay Aggarwal_____

Its: _Member_____

[Additional Signatures on next page]

13

Accounts Receivable Agreement

Joinder by Vijay K. Aggarwal and Ajay K. Aggarwal as to
Section 10.2 only

_____
Vijay K. Aggarwal, individually

_____
Ajay K. Aggarwal, individually

O:\North Mill Capital LLC\E Z Mailing Services\Post Effective Date Agreements\Accounts Receivable Agreement with recourse -
Post Confirmation - EZ - C...with PSH Comments-12-27-16-Clean-12.30 p.m. .docx

14

**SCHEDULE 3.03**
**Existing Liens**

The priority of the liens and security interests of Purchaser and Utica Leaseco, LLC are subject to a Subordination Agreement, dated as of November 11, 2016 and amended from time to time, by and between Purchaser and Utica Leaseco, LLC.

As to Client E Z Mailing Services Inc.:

| New Jersey File # | Filing Date | Debtor Name | Secured Party | Filing Type | Collateral |
|---|---|---|---|---|---|
| 26064437 | 08/12/11 | E Z Mailing Services Inc. | De Lage Landen Financial Services, Inc. | UCC 1 Financing Statement | Equipment Leased under a/c 25119873 |
| | | 669 Division Street | 1111 Old Eagle School Rd | | |
| | | Elizabeth NJ 07201 | Wayne, PA 19087 | | |
| | | | | | |
| 50170395 | 01/25/12 | E Z Mailing Services Inc. | Isuzu Finance of America, Inc. | UCC 1 Financing Statement | Specific Equipment |
| | | 669 Division Street | 3020 Westchester Ave, Suite 203 | | |
| | | Elizabeth NJ 07021 | Purchase, NY 10577 | | |
| | | | | | |
| 50205644 | 03/16/12 | E Z Mailing Services Inc. | Isuzu Finance of America, Inc. | UCC 1 Financing Statement | Specific Equipment - lease |
| | | 669 Division Street | 3020 Westchester Ave, Suite 203 | | |
| | | Elizabeth NJ 07021 | Purchase, NY 10577 | | |
| | | | | | |
| 50218572 | 04/03/12 | E Z Mailing Services Inc. | Isuzu Finance of America, Inc. | UCC 1 Financing Statement | Specific Equipment |
| | | 669 Division Street | 3020 Westchester Ave, Suite 203 | | |
| | | Elizabeth NJ 07021 | Purchase, NY 10577 | | |
| | | | | | |
| 26172767 | 04/04/12 | E Z Mailing Services Inc. | Toyota Motor Credit Corporation & Franks Truck Center | UCC 1 Financing Statement | Specific Equipment |
| | | 669 Division Street | PO Box 3457 / 325 Orient Way | | |
| | | Elizabeth NJ 07021 | Torrance, CA 90510-3457 / Lyndhurst NJ 07071 | | |
| | | | | | |
| 50225200 | 04/12/12 | E Z Mailing Services Inc. | Frank's Truck Center/Toyota Motor Credit Corporation | UCC 1 Financing Statement | Specific Equipment |
| | | 669 Division Street | 325 Orient Way / PO Box 3457 | | |
| | | Elizabeth NJ 07021 | Lyndhurst, NJ 07071 / Torrance, CA 90510-3457 | | |
| | | | | | |
| 50243204 | 05/03/12 | E Z Mailing Services Inc. | Frank's Truck Center/Toyota Motor Credit Corporation | UCC 1 Financing Statement | Specific Equipment |
| | | 669 Division Street | 325 Orient Way / PO Box 3457 | | |
| | | Elizabeth NJ 07021 | Lyndhurst, NJ 07071 / Torrance, CA 90510-3457 | | |
| | | | | | |

Accounts Receivable Agreement

| | | | | | |
|---|---|---|---|---|---|
| 50268333 | 06/07/12 | E Z Mailing Services Inc. | Isuzu Finance of America, Inc. | UCC 1 Financing Statement | Specific Equipment |
| | | 669 Division Street | 3020 Westchester Ave, Suite 203 | | |
| | | Elizabeth NJ 07201 | Purchase, NY 10577 | | |
| | | | | | |
| 50268362 | 06/07/12 | E Z Mailing Services Inc. | Isuzu Finance of America, Inc. | UCC 1 Financing Statement | Specific Equipment |
| | | 669 Division Street | 3020 Westchester Ave, Suite 203 | | |
| | | Elizabeth NJ 07201 | Purchase, NY 10577 | | |
| | | | | | |
| 50293681 | 07/11/12 | E Z Mailing Services Inc. | Frank's Truck Center/Toyota Motor Credit Corporation | UCC 1 Financing Statement | Specific Equipment |
| | | 669 Division Street | 325 Orient Way / PO Box 3457 | | |
| | | Elizabeth NJ 07021 | Lyndhurst, NJ 07071 / Torrance, CA 90510-3457 | | |
| | | | | | |
| 50303784 | 07/25/12 | E Z Mailing Services Inc. | Frank's Truck Center/Toyota Motor Credit Corporation | UCC 1 Financing Statement | Specific Equipment |
| | | 669 Division Street | 325 Orient Way / PO Box 3457 | | |
| | | Elizabeth NJ 07021 | Lyndhurst, NJ 07071 / Torrance, CA 90510-3457 | | |
| | | | | | |
| 50303511 | 07/25/12 | E Z Mailing Services Inc. | Isuzu Finance of America, Inc. | UCC 1 Financing Statement | Specific Equipment |
| | | 669 Division Street | 3020 Westchester Ave, Suite 203 | | |
| | | Elizabeth NJ 07021 | Purchase, NY 10577 | | |
| | | | | | |
| 50379712 | 11/14/12 | E Z Mailing Services Inc. | Frank's Truck Center/Toyota Motor Credit Corporation | UCC 1 Financing Statement | Specific Equipment |
| | | 669 Division Street | 325 Orient Way / PO Box 3457 | | |
| | | Elizabeth NJ 07021 | Lyndhurst, NJ 07071 / Torrance, CA 90510-3457 | | |
| | | | | | |
| 26288000 | 11/27/12 | E Z Mailing Services Inc. | De Lage Landen Financial Services, Inc. | UCC 1 Financing Statement | Equipment Leased under a/c 25208432 |
| | | 669 Division Street | 1111 Old Eagle School Rd | | |
| | | Elizabeth NJ 07201 | Wayne, PA 19087 | | |
| | | | | | |
| 50386824 | 11/27/12 | E Z Mailing Services Inc. | Isuzu Finance of America, Inc. | UCC 1 Financing Statement | Specific Equipment - lease |
| | | 669 Division Street | 3020 Westchester Ave, Suite 203 | | |
| | | Elizabeth NJ 07021 | Purchase, NY 10577 | | |
| | | | | | |
| 50443491 | 02/08/13 | E Z Mailing Services Inc. | Webbank | UCC 1 Financing Statement | Lease-All computer equip, peripherals and other |
| | | 669 Division Street | 6440 S. Wasatch Blvd., Ste 300 | | equipment financed to EZ Mailing Services |

16

Accounts Receivable Agreement

| | | Elizabeth NJ 07201 | San Lake City, UT 94121 | | by Creditor a/c 687945020800067XXXX |
|---|---|---|---|---|---|
| 26390109 | 06/21/13 | E Z Mailing Services Inc. | Toyota Motor Credit Corporation & Franks Truck Center | UCC 1 Financing Statement | Specific Equipment - lease |
| | | 669 Division Street | PO Box 3457 / 325 Orient Way | | |
| | | Elizabeth NJ 07021 | Torrance, CA 90510-3457 / Lyndhurst NJ 07071 | | |
| | | | | | |
| 26395739 | 07/03/13 | E Z Mailing Services Inc. | Toyota Motor Credit Corporation & Franks Truck Center | UCC 1 Financing Statement | Specific Equipment - lease |
| | | 669 Division Street | PO Box 3457 / 325 Orient Way | | |
| | | Elizabeth NJ 07021 | Torrance, CA 90510-3457 / Lyndhurst NJ 07071 | | |
| | | | | | |
| 26475981 | 11/27/13 | E Z Mailing Services Inc. | Toyota Motor Credit Corporation & Franks Truck Center | UCC 1 Financing Statement | Specific Equipment - lease |
| | | 669 Division Street | PO Box 3457 / 325 Orient Way | | |
| | | Elizabeth NJ 07021 | Torrance, CA 90510-3457 / Lyndhurst NJ 07071 | | |
| | | | | | |
| 26476988 | 12/06/13 | E Z Mailing Services Inc. | Toyota Motor Credit Corporation & Franks Truck Center | UCC 1 Financing Statement | Specific Equipment - lease |
| | | 669 Division Street | PO Box 3457 / 325 Orient Way | | |
| | | Elizabeth NJ 07201 | Torrance, CA 90510-3457 / Lyndhurst NJ 07071 | | |
| | | | | | |
| 51005854 | 11/14/14 | E Z Mailing Services Inc. | Toyota Motor Credit Corporation | UCC 1 Financing Statement | Specific Equipment |
| | | 669 Division Street | PO Box 3457 | | |
| | | Elizabeth NJ 07201 | Torrance, CA 90510-3457 | | |
| | | | | | |
| 51006341 | 11/14/14 | E Z Mailing Services Inc. | Hitachi Capital America Corp. | UCC 1 Financing Statement | Specific Equipment |
| | | 669 Division Street | 800 Connecticut Avenue | | |
| | | Elizabeth NJ 07201 | Norwalk, CT 6854 | | |
| | | | | | |
| 51030025 | 12/11/14 | E Z Mailing Services Inc. | Toyota Motor Credit Corporation | UCC 1 Financing Statement | Specific Equipment |
| | | 669 Division Street | PO Box 3457 | | |
| | | Elizabeth NJ 07201 | Torrance, CA 90510-3457 | | |
| | | | | | |
| 51036294 | 12/18/14 | E Z Mailing Services Inc. | Toyota Motor Credit Corporation | | |
| | | 669 Division Street | PO Box 3457 | UCC 1 Financing Statement | Specific Equipment |
| | | Elizabeth NJ 07201 | Torrance, CA 90510-3457 | | |
| | | | | | |
| 51047173 | 12/31/14 | E Z Mailing Services Inc. | Toyota Motor Credit Corporation | UCC 1 Financing Statement | Specific Equipment |

Accounts Receivable Agreement

| | | | | | |
|---|---|---|---|---|---|
| | | 669 Division Street | PO Box 3457 | | |
| | | Elizabeth NJ 07201 | Torrance, CA 90510-3457 | | |
| | | | | | |
| 51058173 | 01/14/15 | E Z Mailing Services Inc. | Wells Fargo Bank, N.A. | UCC 1 Financing Statement | Specific Equipment |
| | | 669 Division Street | 300 Tri-State International Ste 400 | | |
| | | Elizabeth NJ 07201 | Lincolnshire, IL 60069 | | |
| | | | | | |
| 51091851 | 02/24/15 | E Z Mailing Services Inc. | Wells Fargo Bank, N.A. | UCC 1 Financing Statement | Specific Equipment |
| | | 669 Division Street | 300 Tri-State International Ste 400 | | |
| | | Elizabeth NJ 07201 | Lincolnshire, IL 60069 | | |
| | | | | | |
| 51100001 | 03/05/15 | E Z Mailing Services Inc. | Corporation Service Company, as Rep for Ascentium Capital | UCC 1 Financing Statement | Equipment leased under agreement #2150037 |
| | | 669 Division Street | PO box 2576 UCCPREP@cscinfo.com | | |
| | | Elizabeth NJ 07201 | Springfield, IL 62708 | | |
| | | | | | |
| 51211516 | 06/17/15 | E Z Mailing Services Inc. | Toyota Motor Credit Corporation | UCC 1 Financing Statement | Specific Equipment |
| | | 669 Division Street | PO Box 3457 | | |
| | | Elizabeth NJ 07201 | Torrance, CA 90510-3457 | | |
| | | | | | |
| 51262192 | 07/29/15 | E Z Mailing Services Inc. | Toyota Motor Credit Corporation | UCC 1 Financing Statement | Specific Equipment |
| | | 669 Division Street | PO Box 3457 | | |
| | | Elizabeth NJ 07201 | Torrance, CA 90510-3457 | | |
| | | | | | |
| 51264352 | 07/30/15 | E Z Mailing Services Inc. | Toyota Motor Credit Corporation | UCC 1 Financing Statement | Specific Equipment |
| | | 669 Division Street | PO Box 3457 | | |
| | | Elizabeth NJ 07201 | Torrance, CA 90510-3457 | | |
| | | | | | |
| 51284754 | 08/13/15 | E Z Mailing Services Inc. | Corporation Service Company, as Rep for Ascentium Capital | UCC 1 Financing Statement | Equipment leased under agreement #2161607 |
| | | 669 Division Street | PO box 2576 UCCPREP@cscinfo.com | | |
| | | Elizabeth NJ 07201 | Springfield, IL 62708 | | |
| | | | | | |
| 51323806 | 09/14/15 | E Z Mailing Services Inc. | Toyota Motor Credit Corporation | UCC 1 Financing Statement | Specific Equipment |
| | | 669 Division Street | PO Box 3457 | | |
| | | Elizabeth NJ 07201 | Torrance, CA 90510-3457 | | |
| | | | | | |
| 51326193 | 09/15/15 | E Z Mailing Services Inc. | Toyota Motor Credit Corporation | UCC 1 Financing Statement | Specific Equipment |
| | | 669 Division Street | PO Box 3457 | | |
| | | Elizabeth NJ 07201 | Torrance, CA 90510-3457 | | |
| | | | | | |

Accounts Receivable Agreement

| 51328812 | 09/17/15 | E Z Mailing Services Inc. | Toyota Motor Credit Corporation | UCC 1 Financing Statement | Specific Equipment |
|---|---|---|---|---|---|
| | | 669 Division Street | PO Box 3457 | | |
| | | Elizabeth NJ 07201 | Torrance, CA 90510-3457 | | |
| | | | | | |
| 51334383 | 09/22/15 | E Z Mailing Services Inc. | Toyota Motor Credit Corporation | UCC 1 Financing Statement | Specific Equipment |
| | | 669 Division Street | PO Box 3457 | | |
| | | Elizabeth NJ 07201 | Torrance, CA 90510-3457 | | |
| | | | | | |
| 51353562 | 10/05/15 | E Z Mailing Services Inc. | Toyota Motor Credit Corporation | UCC 1 Financing Statement | Specific Equipment |
| | | 669 Division Street | PO Box 3457 | | |
| | | Elizabeth NJ 07201 | Torrance, CA 90510-3457 | | |
| | | | | | |
| 51377052 | 10/21/15 | E Z Mailing Services Inc. | Toyota Industries Commercial Finance, Inc. | UCC 1 Financing Statement | Specific Equipment |
| | | 669 Division Street | PO Box 950 | | |
| | | Elizabeth NJ 07201 | Dallas, TX 75019-9050 | | |
| | | | | | |
| 51377212 | 10/21/15 | E Z Mailing Services Inc. | Toyota Industries Commercial Finance, Inc. | UCC 1 Financing Statement | Specific Equipment |
| | | 669 Division Street | PO Box 950 | | |
| | | Elizabeth NJ 07021 | Dallas, TX 75019-9050 | | |
| | | | | | |
| 51378804 | 10/22/15 | E Z Mailing Services Inc. | Toyota Industries Commercial Finance, Inc. | UCC 1 Financing Statement | Specific Equipment |
| | | 669 Division Street | PO Box 950 | | |
| | | Elizabeth NJ 07021 | Dallas, TX 75019-9050 | | |
| | | | | | |
| 51410911 | 11/12/15 | E Z Mailing Services Inc. | Toyota Industries Commercial Finance, Inc. | UCC 1 Financing Statement | Specific Equipment |
| | | 669 Division Street | PO Box 950 | | |
| | | Elizabeth NJ 07021 | Dallas, TX 75019-9050 | | |
| | | | | | |
| 51415211 | 11/16/15 | E Z Mailing Services Inc. | Toyota Industries Commercial Finance, Inc. | UCC 1 Financing Statement | Specific Equipment |
| | | 669 Division Street | PO Box 950 | | |
| | | Elizabeth NJ 07021 | Dallas, TX 75019-9050 | | |
| | | | | | |
| 51427573 | 11/24/15 | E Z Mailing Services Inc. | Toyota Industries Commercial Finance, Inc. | UCC 1 Financing Statement | Specific Equipment |
| | | 669 Division Street | PO Box 950 | | |
| | | Elizabeth NJ 07021 | Dallas, TX 75019-9050 | | |
| | | | | | |
| 51459156 | 12/17/15 | E Z Mailing Services Inc. | Marlin Business Bank | UCC 1 Financing Statement | Equipment Lease - Panasonic telephone system |
| | | 669 Division Street | 2795 E Cottonwood Pkwy | | |
| | | Elizabeth NJ 07201 | Salt Lake City, UT 84121 | | |
| | | | | | |

Accounts Receivable Agreement

| 51466961 | 12/22/15 | E Z Mailing Services Inc. | Crossroads Equipment Lease and Finance LLC | UCC-1 Financing Statement | Specific Equipment - lease |
|---|---|---|---|---|---|
| | | 669 Division Street | 9385 Haven Avenue | | |
| | | Elizabeth NJ 07201 | Rancho Cucamonga, CA 91730 | | |
| | | | | | |
| 51687823 | 05/19/16 | E Z Mailing Services Inc. | Crossroads Equipment Lease and Finance LLC | UCC 1 Financing Statement | As amended to specific equipment |
| | | 669 Division Street | 9385 Haven Avenue | | |
| | | Elizabeth NJ 07201 | Rancho Cucamonga, CA 91730 | | |
| | | | | | |
| 51899716 | 10/10/16 | EZ Mailing Services Inc. | Utica Leaseco, LLC | UCC | Subject to subordination and amendment to restate collateral to specific equipment. |
| | | 669 Division Street | 905 South Boulevard East | | |
| | | Elizabeth NJ 07201 | Rochester Hills, MI 48307 | | |
| | | | | | |
| 51922274 | 10/26/16 | EZ Mailing Services Inc. | Crossroads Equipment Lease & Finance, LLC | UCC | Subject to amendment to restate collateral to specific equipment. |
| | | 669 Division Street | 9385 Haven Avenue | | |
| | | Elizabeth NJ 07201 | Rancho Cucamonga, CA 91730 | | |

Accounts Receivable Agreement

SCHEDULE 3.03 (continued)

**Existing Liens**

As to Client E Z Mailing Services Inc.:

| Commonwealth of Virginia File # | Filing Date | Debtor Name | Secured Party | Filing Type | Collateral |
|---|---|---|---|---|---|
| 1207165391 | 07/16/12 | E Z Mailing Services Inc. a New Jersey corporation 669 Division Street Elizabeth, NJ 07201 | CLPF Dulles Woods III, LP, a Delaware limited partnership 2650 Cedar Springs Road, Suite 850 Dallas, TX 75201 | UCC 1 Financing Statement | Security interest in all goods, inventory, equipment, trade fixtures, furniture, improvements, fixtures, chattel paper, accounts , and general intangibles, and other personal property of Tenant now or hereafter situated on or relating to Tenant's use of the Premises, and all proceeds therefrom. Premises address: 45110 Ocean Court, Sterling, Virginia 20166** |

** For purposes of Section 3.03 of the Agreement, this UCC financing statement shall only be effective as to fixtures and the proceeds therefrom. The references to "accounts" and "general intangibles" shall not under any circumstances be deemed as part of the Accounts.

21

SCHEDULE 3.03 (continued)

**Existing Liens**

As to Client United Business Freight Forwarders Limited Liability Company:

| New Jersey File # | Filing Date | Debtor Name | Secured Party | Filing Type | Collateral |
|---|---|---|---|---|---|
| 51080334 | 02/10/15 | United Business Freight Forwarders Limited Liability Company | Toyota Motor Credit Corporation | UCC 1 Financing Statement | Specific equipment |
| | | 669 Division St | PO Box 3457 | | |
| | | Elizabeth, NJ 07201 | Torrance, CA 90510-3457 | | |
| | | | | | |
| 51270407 | 08/04/15 | United Business Freight Forwarders Limited Liability Company | Toyota Motor Credit Corporation | UCC 1 Financing Statement | Specific equipment |
| | | 669 Division St | PO Box 3457 | | |
| | | Elizabeth, NJ 07201 | Torrance, CA 90510-3457 | | |
| | | | | | |
| 51271374 | 08/04/15 | United Business Freight Forwarders Limited Liability Company | Toyota Motor Credit Corporation | UCC 1 Financing Statement | Specific equipment |
| | | 669 Division St | PO Box 3457 | | |
| | | Elizabeth, NJ 07201 | Torrance, CA 90510-3457 | | |
| | | | | | |
| 51271493 | 08/04/15 | United Business Freight Forwarders Limited Liability Company | Toyota Motor Credit Corporation | UCC 1 Financing Statement | Specific equipment |
| | | 669 Division St | PO Box 3457 | | |
| | | Elizabeth, NJ 07201 | Torrance, CA 90510-3457 | | |
| | | | | | |
| 51271552 | 08/04/15 | United Business Freight Forwarders Limited Liability Company | Toyota Motor Credit Corporation | UCC 1 Financing Statement | Specific equipment |
| | | 669 Division St | PO Box 3457 | | |
| | | Elizabeth, NJ 07201 | Torrance, CA 90510-3457 | | |
| | | | | | |
| 51280390 | 08/11/15 | United Business Freight Forwarders Limited Liability Company | Toyota Motor Credit Corporation | UCC 1 Financing Statement | Specific equipment |
| | | 669 Division St | PO Box 3457 | | |
| | | Elizabeth, NJ 07201 | Torrance, CA 90510-3457 | | |
| | | | | | |
| 51284565 | 08/13/15 | United Business Freight Forwarders | Toyota Motor Credit Corporation | UCC 1 Financing | Specific equipment |

Accounts Receivable Agreement

| | | Limited Liability Company | | Statement | |
|---|---|---|---|---|---|
| | | 669 Division St | PO Box 3457 | | |
| | | Elizabeth, NJ 07201 | Torrance, CA 90510-3457 | | |
| | | | | | |
| 26725505 | 09/22/15 | United Business Freight Forwarders Limited Liability Company | Toyota Motor Credit Corporation & Franks Truck Center | UCC 1 Financing Statement | Specific equipment |
| | | 669 Division St | PO Box 3457 / 325 Orient Way | | |
| | | Elizabeth, NJ 07201 | Torrance, CA 90510-3457 / Lyndhurst NJ 07071 | | |
| | | | | | |
| 51899716 | 10/10/16 | United Business Freight Forwarders Limited Liability Company | Utica Leaseco, LLC | UCC 1 Financing Statement | Subject to subordination and amendment to restate collateral to specific equipment. |
| | | 669 Division Street | 905 South Boulevard East | | |
| | | Elizabeth NJ 07201 | Rochester Hills, MI 48307 | | |

23

**SCHEDULE 3.03 (continued)**
**Existing Liens**

As to Client E Z Mailing Services Inc. and Client United Business Freight Forwarders Limited Liability Company:

In addition to the foregoing lists, Schedule 3.03 shall include those certain specific vehicles of Client in which a security interest and/or against which a lien was duly and properly perfected prior to the commencement of the Case in accordance with applicable state law, including those vehicles where a secured party, lessor or lender has title to the vehicles in its name or has filed a lien on the title or otherwise.

24

### SCHEDULE 3.13

#### Use of Proceeds

.      **Working Capital to Client**                            **100%**

\* To be determined at time of funding in accordance with terms of the Agreement.

25

SCHEDULE 4.9F

Closing Checklist

1.   Accounts Receivable Agreement with Recourse
2.   Assignment and Schedule of Accounts – E Z Mailing Services Inc.
3.   Assignment and Schedule of Accounts – United Business Freight Forwarders Limited Liability Company
4.   Continuing Individual Guaranty – Ajay K. Aggarwal
5.   Continuing Individual Guaranty – Vijay K. Aggarwal
6.   UCC Financing Statement – E Z Mailing Services Inc. filed on 12/27/16 #52011856
7.   UCC Financing Statement – United Business Freight Forwarders LLC filed on 12/27/16 #52011924
8.   Post-Closing Agreement
9.   Officer's Certificate – E Z Mailing Services Inc.
10.  Member's Certificate – United Business Freight Forwarders Limited Liability Company
11.  Authorized Signer Form – E Z Mailing Services Inc.
12.  Authorized Signer Form - United Business Freight Forwarders Limited Liability Company
13.  Notice of Assignment letter - E Z Mailing Services Inc.
14.  Notice of Assignment letter - United Business Freight Forwarders Limited Liability Company
15.  Form 8821 Tax – E Z Mailing Services Inc.
16.  Form 8821 Tax - United Business Freight Forwarders Limited Liability Company
17.  Pledge and Security Agreement - E Z Mailing Services Inc.
18.  Pledge and Security Agreement - United Business Freight Forwarders Limited Liability Company
19.  Stock Power Agreement and Shares – E Z Mailing Services Inc. - Ajay K. Aggarwal
20.  Stock Power Agreement and Shares – E Z Mailing Services Inc. - Vijay K. Aggarwal
21.  Membership Interest Power and Certificates - United Business Freight Forwarders LLLC – Ajay K. Aggarwal
22.  Membership Interest Power and Certificates - United Business Freight Forwarders LLLC – Vijay K. Aggarwal
23.  Proof of UCC terminations for PNC Bank and PNC Equipment Financing filing numbers:
     a.   50822881
     b.   50929131
     c.   50981663
     d.   51188854
     e.   51251406
24.  Proof of UCC amendment to restate collateral in a form acceptable to Purchaser related to filing number 51899716 by Utica Leaseco, LLC
25.  Fully executed copy of First Amendment to Lease Documents with Utica Leaseco, LLC
26.  Fully executed copy of Subordination Agreement with Utica Leaseco, LLC
27.  Proof that Crossroads Equipment Lease & Finance, LLC has terminated or amended in a form acceptable to Purchaser financing statement number 51922274 filed on October 26, 2016 originally covering all assets
28.  Proof that the Chapter 11 Debtors have filed with the Bankruptcy Court, a notice, in a form acceptable to Purchaser, confirming that the Plan has been declared to be Effective and that all conditions to the declaration of the Effective Date have been satisfied

Accounts Receivable Agreement

# EXHIBIT "B"

# BUDGET