UNITED STATES BANKRUPTCY
COURT DISTRICT OF NEW JERSEY

**Caption in Compliance with D.N.J. LBR 9004-1**

**OKIN HOLLANDER LLC**
Paul S. Hollander, Esq.
Margreta M. Morgulas, Esq.
Glenpointe Centre West, 2nd Floor
500 Frank W. Burr Blvd.
Teaneck, New Jersey 07666
(201) 947-7500
phollander@okinhollander.com
mmorgulas@okinhollander.com

*Counsel to North Mill Capital LLC*

| | |
|---|---|
| In Re: | Case No.: 19-17900 (SLM) |
| E Z MAILING SERVICES, INC. d/b/a E Z WORLDWIDE EXPRESS AND UNITED BUSINESS XPRESS[1], | Chapter 11 |
| | Judge: Hon. Stacey L. Meisel |
| Debtor. | **Hearing Date/Time: May 30, 2019, 10:00 a.m.** |
| In Re: | Case No.: 19-17906 (SLM) |
| UNITED BUSINESS FREIGHT FORWARDERS, LLC[2], | Chapter 11 |
| | Judge: Hon. Stacey L. Meisel |
| Debtor. | **Hearing Date/Time: May 30, 2019, 10:00 a.m.** |

**NOTICE OF FILING OF PROPOSED: (I) REVISED FORM OF ASSET PURCHASE AGREEMENT, (II) FORM OF ASSUMPTION AND ASSIGNMENT AGREEMENT BY AND BETWEEN QX LOGISTIX LLC AND NORTH MILL CAPITAL LLC, AND (III)**

---

[1]   The debtor and debtor-in-possession in this Chapter 11 case is EZ Mailing Services, Inc. d/b/a EZ Worldwide Express and United Business Xpress and the last four digits of its taxpayer identification number are 0072.

[2]   The debtor and debtor-in-possession in this Chapter 11 case is United Business Freight Forwarders, LLC and the last four digits of its taxpayer identification number are 0577.

# FORM OF ACCOUNT PURCHASE AGREEMENT WITH RECORSE BY AND BETWEEN QX LOGISTIX LLC AND NORTH MILL CAPITAL LLC

North Mill Capital LLC ("**NMC**"), the factor for EZ Mailing Services, Inc. d/b/a EZ Worldwide Express and United Business Express ("**EZ**") and United Business Freight Forwarders, LLC ("**UBFF**" and, together with EZ, the "**Debtors**"), the above-captioned debtors and debtors in possession, by and through NMC's undersigned counsel, hereby submits for consideration of parties in interest in the above-captioned Chapter 11 cases and this Court at the hearing to be held by this Court on **May 30, 2019 at 10:00 a.m.**, the following proposed forms of (each of which has previously been circulated to counsel for the Debtors and counsel to the proposed purchaser of certain of the Debtors' assets, QX Logistix LLC ("**QX**"), and remains subject to further comment, finalization, approval of this Court in connection with the requested approval of the proposed sale of assets by the Debtors to QX, and execution by all of the required parties):

1.      *Assumption and Guaranty Agreement*, by and between QX and NMC, which is annexed hereto as Exhibit A;

2.      *Accounts Receivable Agreement with Recourse*, by and between QX and NMC, which is annexed hereto as Exhibit B;

3.      *Amendment No. 2 to Accounts Receivable Agreement with Recourse*, by and between the Debtors and NMC regarding the Accounts Receivable Agreement with Recourse dated December 30, 2016 (as amended, modified, supplemented, substituted, extended or renewed from time to time and as may be further amended, modified, supplemented substituted, extended or renewed from time to time), which is annexed hereto as Exhibit C; and

4.      *Asset Purchase Agreement*, by and between the Debtors and QX (as provided to NMC by counsel to the Debtors and counsel to QX), blacklined to reflect the proposed comments of NMC thereto as previously provided to counsel to the Debtors and counsel to QX), which is annexed hereto as Exhibit D.

Dated: May 29, 2019

_____/s/ Margreta M. Morgulas_____
Margreta M. Morgulas, Esq.
Okin Hollander LLC
Glenpointe Centre West, 2nd Floor 500
Frank W. Burr Blvd.
Teaneck, New Jersey 07666
(201) 947-7500
mmorgulas@okinhollander.com

*Counsel to North Mill Capital LLC*

# EXHIBIT A

## ASSUMPTION AND GUARANTY AGREEMENT

This ASSUMPTION AND GUARANTY AGREEMENT (this "**Assumption and Guaranty Agreement**"), dated as of May _____, 2019, is made by **QX LOGISTIX LLC**, a New York limited liability company, with an address at 600 Madison Avenue, 18th Floor, New York, New York 10022 ("**QX**") in favor of North Mill Capital LLC ("**NMC**"), a Delaware limited liability company with an address at 821 Alexander Road, Suite 130, Princeton, New Jersey 08540.

## RECITALS

**WHEREAS**, reference is made to that certain Accounts Receivable Agreement with Recourse, dated as of December 30, 2016 (as amended and as may be further amended, modified, supplemented, substituted, extended or renewed from time to time, the **"EZ AR Agreement"**), by and between NMC and  E Z Mailing Services Inc., a New Jersey corporation, d/b/a  E Z Worldwide Express and United Business Xpress and United Business Freight Forwarders Limited Liability Company, a New Jersey limited liability company (individually and collectively, "**EZ**");

**WHEREAS**, EZ are debtors and debtors-in-possession in those Chapter 11 cases styled  *In re EZ Mailing Inc. d/b/a EZ Worldwide Express and United Business Express*, 19-17900 (SLM) and *In re United Business Freight Forwarders, LLC*, 19-17906 (SLM) (together, the "**Bankruptcy Cases**"), which Bankruptcy Cases are presently pending in the United States Bankruptcy Court for the District of New Jersey ("**Bankruptcy Court**");

**WHEREAS**, pursuant to the entry of final, non-appealable orders dated May _____, 2019 [Docket Nos. _____  (19-17900) and _____ (19-17906)] ("**Sale Orders**"), the Bankruptcy Court approved that certain Asset Purchase Agreement dated May _____, 2019, by and between EZ and QX and with respect to certain California-based operations and related assets owned by EZ (the "**QX Sale Transaction**");

**WHEREAS**, in connection with the QX Sale Transaction, QX agreed to assume joint and several liability with EZ for EZ's Obligations (as defined in the EZ AR Agreement), arising from or relating to those Accounts (as defined in the EZ AR Agreement), sold and assigned by EZ to NMC under the EZ AR Agreement that arose on account of or related to EZ's California-based business operations and related assets (collectively, as specifically identified on **Schedule 1** hereto, the "**Sold/Assigned California Accounts**");

**WHEREAS**, also in connection with the QX Sale Transaction, QX entered into that certain Accounts Receivable Agreement with Recourse, dated as of May _____, 2019, with NMC (as the same may be amended from time to time, the "**QX AR Agreement**"), which QX AR Agreement provides, *inter alia*, that QX's Obligations (as defined in the QX AR Agreement) include but are in no way limited to QX's obligations to NMC arising hereunder and under the Assumed EZ Obligations Note (as defined herein below);

**WHEREAS**, this Assumption and Guaranty Agreement is intended to effectuate QX's assumption of joint and several liability with EZ for EZ's Obligations to NMC on account of the Sold/Assigned California Accounts; and

**WHEREAS**, in connection with the execution of this Assumption and Guaranty Agreement, QX is executing and delivering to NMC that  certain Promissory Note dated May      , 2019, substantially in the form annexed hereto as **Exhibit A**, which Promissory Note is executed in favor of NMC and in the total principle amount (representing the total face amount of the Sold/Assigned California Accounts) (or $                      ) (the "**Assumed EZ Obligations Note**"), and which Assumed EZ Obligations Note evidences QX's obligations for the total face amount of the Sold/Assigned California Accounts and any and all expenses incurred by NMC in connection with the enforcement and collection of the Sold/Assigned California Accounts.

**NOW, THEREFORE**, in consideration of the premises and the agreements herein contained and set forth in this Assumption and Guaranty Agreement, the parties hereto agree as follows:

## SECTION 1. ASSUMPTION OF OBLIGATIONS.

### §1.1    Incorporation of Recitals.

The above Recitals are hereby incorporated into and shall constitute a part of this Assumption and Guaranty Agreement.

### §1.2    QX's Assumption.

QX hereby irrevocably and unconditionally assumes the duty of due and punctual performance and observance of each covenant and condition contained in the EZ AR Agreement with respect to the face amount of EZ's Obligations (as defined in the EZ AR Agreement) arising from and relating to the Sold/Assigned California Accounts (including but in no way limited to any and all expenses incurred by NMC in connection with the enforcement and collection if the Sold/Assigned California Accounts) and hereby agrees to be jointly and severally liable with EZ for the due and punctual performance and payment when due (whether at the stated maturity or otherwise) and at all times thereafter by EZ of all Obligations contained in the EZ AR Agreement with respect to the Sold/Assigned California Accounts (collectively, the "**Assumed EZ Obligations**").

### §1.3    Joint and Several Liability.

QX agrees that it is jointly and severally liable to NMC for the performance and payment in full when due of all of the face amount of the Assumed EZ Obligations, and that such liability is independent of the Obligations of EZ under the EZ AR Agreement.  Each obligation, promise, covenant, representation and warranty in the EZ AR Agreement which refers or relates to the Sold/Assigned California Accounts shall be deemed to have been made by, and be binding upon, QX.  NMC may bring an action against QX with respect to the Assumed EZ Obligations without regard to whether an action is brought against EZ.

2

**§1.4    No Discharge or Diminishment of Obligations.**

The obligations of QX on account of the Assumed EZ Obligations shall not be subject to any reduction, limitation, impairment or termination for any reason (other than the performance or payment in full to NMC of all Obligations under the EZ AR Agreement), including any claim of waiver, release, surrender, alteration or compromise of any of the Obligations, and shall not be subject to any defense or set-off, counterclaim, or termination whatsoever by reason of the invalidity, illegality or unenforceability of the Obligations as against EZ.  Without limiting the generality of the foregoing, the Assumed EZ Obligations shall not be discharged or impaired or otherwise affected by the failure of NMC to assert any claim or demand or to enforce any remedy under the EZ AR Agreement, any related guarantees or notes issued in connection with the EZ AR Agreement, or this Assumption and Guaranty Agreement, by any waiver or modification of any provision thereof or hereof, by any default, failure or delay, willful or otherwise, in the performance of the Obligations by EZ and/or the performance of the Assumed EZ Obligations by QX, or by any other act or omission that may or might in any manner or to any extent vary the risk of QX or that would otherwise operate as a discharge of QX as a matter of law or equity (other than the performance and payment in full of the Obligations to NMC).

**§1.5    Defenses of EZ Waived.**

To the fullest extent permitted by applicable law, QX waives any defense based on or arising out of any defense of EZ or the unenforceability of the Assumed EZ Obligations or any part thereof as against EZ from any cause, or the cessation from any cause of the liability of EZ, other than the performance and payment in full of the Assumed EZ Obligations and the Assumed EZ Obligations Note.  QX hereby acknowledges that NMC may compromise or adjust any part of the Assumed EZ Obligations, make any other accommodation with EZ or exercise any other right or remedy available to NMC against EZ, without affecting or impairing in any way the liability of QX hereunder except to the extent that the Assumed EZ Obligations Note and the Assumed EZ Obligations have been performed and paid in full.

**§1.6    Agreement to Hold in Trust/Remit to NMC.**

QX hereby acknowledges and agrees that all payments of amounts due and owing on account of any of the Sold/Assigned California Accounts constitute the sole and exclusive property of NMC and that if any such payment is received by QX (rather than, as required, NMC), such payment shall be held by QX in trust solely for the benefit of NMC, shall not be negotiated by QX or otherwise comingled with any other amounts that are not the sole and exclusive property of NMC, and, in any event, shall immediately be remitted by QX to NMC.

**§1.7    Agreement to Pay.**

In furtherance of the foregoing and not in limitation of any other right that NMC has at law or in equity against QX by virtue hereof, upon the failure of EZ to perform or pay any of the Assumed EZ Obligations when and as such performance or payment shall become due, whether at maturity, by acceleration, after notice of prepayment or otherwise, QX hereby promises to and will forthwith perform or pay, or cause to be performed or paid, for the benefit of NMC all such unperformed or

3

unpaid Assumed EZ Obligations.  Upon performance or payment by QX of any of the Assumed EZ Obligations as provided above, all rights of QX against EZ arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be waived and of no further force or effect.

## SECTION 2. OTHER PROVISIONS.

### §2.1    Effectiveness.

This Assumption and Guaranty Agreement shall become effective upon the entry by the Bankruptcy Court of the Sale Orders and the closing of the QX Sale Transaction, including the execution and delivery by QX of the QX AR Agreement, the Assumed EZ Obligations Note and all related documents and agreement, and is expressly conditioned upon the effectiveness thereof.

### §2.2    Termination.

This Assumption and Guaranty Agreement shall terminate when the Assumed EZ Obligations Note is paid in full and the Assumed EZ Obligations are fully satisfied; provided, however, that this Assumption and Guaranty Agreement and the obligations arising hereunder and under the Assumed EZ Obligations Note shall continue to be effective or be reinstated, as the case may be, if at any time performance or payment, or any part thereof, of any of the Assumed EZ Obligations or Assumed EZ Obligations Note is rescinded or must otherwise be restored to EZ or QX, as applicable, or their respective bankruptcy estates upon the bankruptcy or reorganization of either of them or otherwise.

### §2.3    Successors and Assigns.

All covenants and other agreements made by QX for the benefit of NMC in this Assumption and Guaranty Agreement shall bind and inure to the benefit of their respective successors and assigns whether so expressed or not.

### §2.4    Waivers; Amendment.

This Assumption and Guaranty Agreement may be amended, and the observance of any term hereof may be waived (either retroactively or prospectively), with (and only with) the written consent of NMC and QX.

### §2.5    Severability.

Any provision of this Assumption and Guaranty Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall (to the full extent permitted by law) not invalidate or render unenforceable such provision in any other jurisdiction.

### §2.6 Counterparts.

This Assumption and Guaranty Agreement may be executed in any number of counterparts, each of which shall be an original but all of which together shall constitute one instrument.

**§2.7 Governing Law.**

This Assumption and Guaranty Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the laws of the State of New Jersey, excluding choice-of-law principles of the law of such State that would require the application of the laws of another jurisdiction.

**[The remainder of this page is left intentionally blank]**

Dated: May _____, 2019                    QX LOGISTIX LLC


By: _____
Name: _____
Title: _____



Dated: May _____, 2019                    NORTH MILL CAPITAL LLC


By: _____
Name: _____
Title: _____

## <u>SCHEDULE 1</u>

**Sold/Assigned California Accounts**

[**TO BE PROVIDED BY NORTH MILL CAPITAL LLC**]

# **EXHIBIT A**

**Assumed EZ Obligations Note**

## PROMISSORY NOTE

U.S. $_____.00                                     May ____, 2019


**FOR VALUE RECEIVED**, QX Logistix LLC, a New York limited liability company, with its primary office at 600 Madison Avenue, 18th Floor, New York, New York 10022 (herein called "**QX**"), by this promissory note (this "**Note**"), hereby promises to pay to the order of North Mill Capital LLC, a Delaware limited liability company (herein called "**NMC**") with an address at 821 Alexander Road, Suite 130, Princeton, New Jersey, 08540, or such other address as NMC may notify QX in writing, such sum up to _____ (U.S.$_____.00), [with interest from and after July ____, 2019, at the rate of _____ percent (____%) per annum], as may be outstanding hereunder. This Note is being executed and delivered by QX to NMC in furtherance of that certain Assumption and Guaranty Agreement dated May _____, 2019, between QX and NMC (as the same may be amended from time to time, the "**Assumption and Guaranty Agreement**"). Capitalized terms not otherwise defined herein have the meanings set forth in the Assumption and Guaranty Agreement. The Assumption and Guaranty Agreement is incorporated herein as though fully set forth and QX acknowledges its reading and execution. To the extent not paid in full before July _____, 2019, all or such lesser amount of the principle amount due hereunder that remains unpaid as of July _____, 2019, shall be paid in full by QX to NMC on July _____, 2019.

To secure the payment of this Note and the other Obligations (as defined in the QX AR Agreement) due to NMC by QX under that certain QX AR Agreement, QX has granted to NMC a continuing, first priority security interest in and lien on the Collateral (as defined in the QX AR Agreement).

In addition to all remedies provided by law upon default on payment of this Note, or upon an Event of Default (as defined in the QX AR Agreement), NMC may, at its option:

(1)     Declare this Note and/or the other Obligations of QX under the QX AR Agreement immediately due and payable;

(2)     Collect interest on this Note at the rate set forth above from the date of such Event of Default (as defined in the QX AR Agreement), together with all charges, fees and costs chargeable by NMC upon the occurrence thereof under the QX AR Agreement; and

(3)     Exercise any and all remedies provided for in the QX AR Agreement.

This Note may not be amended except by a writing duly executed and delivered by QX and NMC. No waiver of any term or condition contained in this Note shall be effective unless made or confirmed in writing by the party alleged to have waived the right. Unless that writing

expressly states otherwise, no such waiver shall be construed as a waiver of a subsequent breach or failure of the same term or condition or a waiver of any other term or condition contained in this Note.

**QX HEREBY WAIVES DEMAND, DILIGENCE, PRESENTMENT, PROTEST AND NOTICE OF EVERY KIND IN RESPECT OF THIS NOTE AND TRIAL BY JURY IN ANY ACTION UNDER OR RELATING TO THIS NOTE AND THE AMOUNTS DUE NMC BY QX AS EVIDENCED HEREBY.**

QX LOGISTIX LLC

By: _____

    Name:  _____

    Title:   _____

# EXHIBIT B

## ACCOUNTS RECEIVABLE AGREEMENT WITH RECOURSE

THIS ACCOUNTS RECEIVABLE AGREEMENT (this **"Agreement"**) is entered into as of May _____, 2019 ("**Effective Date**"), by and between **QX LOGISTIX LLC**, a New York limited liability company (**"Client"**), with an address at 600 Madison Avenue, 18th Floor, New York, New York 10022, and **NORTH MILL CAPITAL LLC,** a Delaware limited liability company (**"Purchaser"**), with an address at 821 Alexander Road, Suite 130, Princeton, New Jersey 08540.  In consideration of the mutual covenants set forth herein, Client and Purchaser agree as follows:

## I.  DEFINITIONS

"**Account**" means, collectively, in addition to the definition of "Account" in the UCC, Client's right to payment of a monetary obligation, presently existing and hereafter arising including, but not limited to, all accounts receivable, contract rights, health-care-receivables, and all other forms of obligations owing to Client, whether or not earned by performance, (i) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (ii) for services rendered or to be rendered, (iii) for a policy of insurance issued or to be issued, (iv) for a secondary obligation incurred or to be incurred including, but not limited to,  all credit insurance, guaranties and other security therefor, as well as merchandise returned to or reclaimed by Client, (v) for energy provided or to be provided, (vi) for the use or hire of a vessel under a charter or other contract, (vii) arising out of the use of a credit or charge card or information contained on or for use with the card and any and all the proceeds therefrom, and (viii) Client's Books relating to the foregoing.  As used in this Agreement, the term does not include (i) rights to payment evidenced by chattel paper or an instrument, (ii) commercial tort claims, (iii) deposit accounts, (iv) investment property, (v) letter of credit rights or letters of credit, or (vi) rights to payment for money or funds advanced or sold, other than rights arising out of the use of a credit or charge card or information contained on or for use with the card.

"**Advance**" means any advance, which is deemed part of Client's Obligations under this Agreement when made, which is made, in the sole and absolute discretion of Purchaser, by Purchaser to Client under this Agreement over and above the outstanding amount of Client's Obligations under this Agreement and which exceeds the percentage limitation contained in Section 2.06 of the Eligible Amount of Accounts purchased under this Agreement and which shall be payable by Client to Purchaser as set out in the terms of the _____.

"**Affiliate**" means, with respect to Client, any person which directly or indirectly controls, is controlled by, or is under common control with Client.  Client shall be deemed to control another person if Client owns directly or indirectly 5% or more of any class of voting stock of the controlled person or possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of the controlled person, whether through ownership of stock, by contract or otherwise. In addition, Client's Affiliates shall include Client's officers, directors, joint venturers and partners and any person controlled by any such officer, director, joint venturer partner.

**"Assumed EZ Obligations Note"** means that certain Promissory Note dated May _____, 2019, executed by Client in favor of Purchaser, pursuant to which Client has evidenced its joint and several obligations to Purchaser under that certain EZ Assumption and Guaranty Agreement.

**"Bankruptcy Cases"** means, together, the Chapter 11 cases of EZ that are presently pending in the Bankruptcy Court and styled *In re EZ Mailing Inc. d/b/a EZ Worldwide Express and United Business Express*, 19-17900 (SLM) and *In re United Business Freight Forwarders, LLC*, 19-17906 (SLM).

**"Bankruptcy Code"** means the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq*.

**"Bankruptcy Court"** means the United States Bankruptcy Court for the District of New Jersey.

**"Bankruptcy Court Financing Orders"** means, collectively, those certain orders dated April 24, 2019 [Docket Nos. 7 (19-17900) and 7 (19-17906)] and May 22, 2019 [Docket Nos. 82 (19-17900) and 64 (19-17906)], which were entered by the Bankruptcy Court in the Bankruptcy Cases and with respect to the EZ AR Agreement.

**"California Assets"** include those California-based operations and assets of EZ sold to Client pursuant to the California Assets Sale Order.

**"California Assets Sale Order"** means that final order entered by the Bankruptcy Court in the Bankruptcy Cases on May _____, 2019, authorizing, *inter alia*, EZ's sale of the California Assets to Client [Docket Nos. _____ (19-19700) and _____ (19-19706)].

**"California Sale Transaction"** means that certain purchase and sale transaction by and between EZ and Client with respect to the California Assets presently owned by EZ pursuant to that certain Asset Purchase Agreement by and between EZ and QX dated May _____, 2019, which Asset Purchase Agreement was approved by the Bankruptcy Court pursuant to the California Assets Sale Order.

**"Clearance Days"** means five (5) business days.

**"Client's Books"** means all of Client's books and records including, without limitation, all of the following: ledgers; records indicating, summarizing or evidencing Client's assets or liabilities, or the Collateral; all information relating to Client's business operations or financial condition; and all computer programs, disks or tape files, printouts, runs or other computer prepared information, whether inscribed on tangible medium or stored in an electronic or other medium and which information is retrievable in perceivable form and the goods containing such information.

**"Collateral"** means all of the property, real or personal, tangible or intangible, given as security pursuant to Section 8.01 hereof for the Obligations of Client under this Agreement.

**"Credit Problem"** means a Customer is unable to pay its debts because of insolvency, the dissolution, termination of existence, or business failure of a Customer, the voluntary filing of a

petition of bankruptcy, or the commencement of any proceeding under the Bankruptcy Code or any other bankruptcy or insolvency laws by or against a Customer such that payment on the Account is or will be impaired.

"**Customer**" means Client's customer or the account debtor.

"**Customer Dispute**" means any claim by a Customer against Client, valid or invalid, now existing or hereafter arising (including, but not limited to, a claim for credit or refund due to a return of goods which gave rise to an Account), and which the Customer claims or may otherwise result in any reduction in the amount to be paid by the Customer under any Account or Accounts. The foregoing notwithstanding, a dispute with a Customer involving a Customer Dispute and/or a Credit Problem shall be deemed a Customer Dispute.

"**Daily Rate**" means the amount per diem equal to one thirty-third of one percent (1/33rd of 1%) of the Eligible Amount for each day an Account assigned herein remains unpaid and any other outstanding Obligations hereunder.

"**Eligible Amount**" means the difference between the gross face amount of an Account and any partial payments under such Account if less than the gross face amount, and any trade or cash discounts, credits or allowances, or any adjustments to the Account taken by a Customer.

"**EZ**" means, collectively, E Z Mailing Services Inc., a New Jersey corporation, d/b/a E Z Worldwide Express and United Business Xpress and United Business Freight Forwarders Limited Liability Company, a New Jersey limited liability company, both of which are debtors and debtors-in-possession in the Bankruptcy Cases.

"**EZ AR Agreement**" means that certain Accounts Receivable Agreement with Recourse, dated as of December 30, 2016 (as amended, modified, supplemented, substituted, extended or renewed from time to time) by and between Purchaser and EZ, which EZ AR Agreement is subject to the terms and conditions of the Bankruptcy Court Financing Orders.

"**EZ Assumption and Guaranty Agreement**" means that certain Assumption and Guaranty Agreement by and between EZ and Client dated May _____, 2019, pursuant to which Client agreed, in connection with the California Sale Transaction, to assume, on a joint and several basis with EZ, the EZ Obligations/Rights.

"**EZ Obligations/Rights**" means the Obligations (solely as defined in the EZ AR Agreement and not as otherwise defined herein) and all attendant rights of EZ with respect to the Sold/Assigned California Accounts.

"**Guarantors**" means, collectively and individually, Raffi Azadian and Christopher Carey.

"**Insolvent**" means, with respect to any person or entity, that such person's or entity's liabilities exceed such person's or entity's assets and/or such person or entity is not generally paying its debts as they become due and means "insolvent" as that term is used and defined in Section 101(32) of the United States Bankruptcy Code and Section 2 of the Uniform Fraudulent Transfer Act.

**"Insolvency Proceeding"** means any proceeding commenced by or against any person or entity under any provision of the Bankruptcy Code or under any other state or federal insolvency law, including assignments for the benefit of creditors, formal or informal moratoria, compositions or extension generally with its creditors.

**"Lien"** means a lien (as such term is defined in the Bankruptcy Code) and security interest (as such term is defined in UCC) against or interest in property to secure the payment of a debt or performance of an obligation.

**"Maximum Client Account Limit"** means Two Million Dollars ($2,000,000.00).

**"Obligation or Obligations"** means any and all amount(s) paid for by Purchaser for any and all Accounts together with Purchaser's Discount and any other amounts due Purchaser that remain unpaid including, without limitation, any and all amounts due Purchaser: (i) under the terms of this Agreement; (ii) under any Advance(s) and/or promissory notes executed by Client in favor of Purchaser now or hereafter; and (iii) on account of the EZ Obligations/Rights and the Assumed EZ Obligations Note.

**"Purchaser's Discount"** means for each Account purchased by Purchaser in accordance with the terms hereof, the difference between the Eligible Amount of such Account and the Purchase Price of such Account, the Purchase Price determined as of the date that the Eligible Amount is paid in full, whether by the Customer or Client.

**"Sold/Assigned California Accounts"** means all Accounts sold and assigned by EZ to Purchaser under the EZ AR Agreement that arose on account of or relate to the EZ California Assets, which Sold/Assigned California Accounts are specifically identified on Schedule _____ to the California Sale Assets Order.

**"Term"** means the period from the date of the execution and delivery by Purchaser of this Agreement through and including the later of (i) the Termination Date and (ii) the payment and performance in full of the Obligations.

**"Termination Date"** means (i) May __, 2020 (the period through such date, being, the **"Initial Term"** and such date being, the **"Initial Termination Date"**), unless such date is extended pursuant to Section 10.06, and if so extended on one or more occasions, the last date of the last such extension, or (ii) if earlier terminated by Purchaser pursuant to Section 10.06, the date of such termination.

**"UCC"** means the Uniform Commercial Code as in effect on the date hereof in the State of New Jersey and as amended from time to time.

## II.  PURCHASE OF ACCOUNTS RECEIVABLE

2.01    **Assignment/Purchase**.  Client hereby assigns and sells to Purchaser as absolute owner with recourse all Accounts approved and deemed acceptable by Purchaser, and represented by Client to be bona fide existing obligations of its Customers arising out of, and acquired by it, in the ordinary course of its business, which Accounts are or will be due and owing to Client without defense, offset or counterclaim; provided, however, Purchaser shall only purchase Accounts of Client, so long as at the time of such purchase, the: (a) aggregate unpaid balance of the Accounts, before and after such purchase, (b) principal amount outstanding under any Advance, (c) face amount of the Assumed EZ Obligations that remain unpaid, and (d) [ALL ALLOCATED FEES AND EXPENSES], collectively, do not exceed the Maximum Client Account Limit.

2.02    **Purchaser's Discretion**.  Purchaser shall purchase only such Accounts hereunder as Purchaser may select and approve in its sole and absolute discretion.  Purchaser shall not have any liability to Client or any of Client's Customers for any failure or refusal by Purchaser to purchase any Account.

2.03    **Assignment Documents**.  Client will provide Purchaser with an assignment of Accounts, in a form(s) satisfactory to Purchaser (including any notices of assignment as may be required by Purchaser), together with the original invoice or a true copy of each invoice and/or statement, as may be specified by Purchaser, including evidence of shipment, or other instruments or papers that Purchaser may require.

2.04    **Stamping**.  At Purchaser's request, Client will place a sticker on, or stamp, each original invoice being sold to Purchaser, in a form acceptable to Purchaser, indicating that the Account has been sold to Purchaser and that payment must be made directly to Purchaser.  If for any reason Client fails to provide an Account with proper notification, Purchaser will charge a missing notation fee of three percent (3.0%) of the Eligible Amount.

2.05    **Notification**.  Client agrees to provide Purchaser a sufficient number of Notice of Assignment of Account forms, in a form satisfactory to Purchaser, signed by authorized representative of Client, which may, at Purchaser's sole discretion, be distributed by Purchaser to each Customer whose Account is assigned and sold to Purchaser by Client.  If Purchaser so requires, it shall be Client's obligation to ensure that the Notice of Assignment of Accounts form be duly executed by an authorized representative of the Customer and returned to Purchaser.

2.06    **Part Payment**.  Upon approval and acceptance by Purchaser of an Account, Purchaser shall pay to Client part payment of the Purchase Price in an amount not exceeding eighty five percent (85%) of the Eligible Amount (the **"Part Payment"**).

2.07    **Processing Fee**.  For each Account approved and accepted by Purchaser hereunder, Purchaser shall receive from Client and Client shall be obligated to pay to Purchaser a processing fee equal to one quarter percent (1/4%) of the Eligible Amount (the **"Processing Fee"**).

2.08    **Purchase Price**. The purchase price payable by Purchaser to Client for each Account shall be equal to one hundred percent (100%) of the Eligible Amount reduced by the Daily Rate

beginning as of the date that Purchaser makes Part Payment as to each Account and continuing for each day thereafter that such Account remains unpaid (the **"Purchase Price"**).

2.09    **Collected Reserve**. Purchaser may hold in a reserve account all collections of purchased and non-purchased Accounts (the **"Collected Reserve"**). The Collected Reserve may be held by Purchaser as security against charge-backs or any of the Obligations and may be applied by Purchaser against such charge-backs or other Obligations. Client hereby transfers and assigns to Purchaser all of its right, title and interest in and to the Collected Reserve.

2.10    **Return of Collected Reserve**. Purchaser will return to Client that portion or all of the sums in the Collected Reserve not more often than once each week only if and to the extent, in Purchaser's sole and absolute discretion, Purchaser has determined that Client has complied with all of the terms and conditions of this Agreement and any promissory notes and guarantees executed in favor of Purchaser and with respect to the repayment of Client's Obligations arising hereunder, including, without limitation, that no Event of Default has occurred, and that Client acknowledges to Purchaser that there are no offsets or claims against or Customer Disputes relating to any Account purchased by Purchaser. However, if the Collected Reserve has a deficit balance at any time, Client shall be obligated to immediately pay to Purchaser, with or without demand, the amount of such deficit.

2.11    **Customer Disputes**. Upon the occurrence of any Customer Dispute, whether valid or invalid, Client will immediately pay to Purchaser, on the Account purchased by Purchaser subject to the Customer Dispute, the amount of any Part Payment made on the Account by Purchaser plus the Purchaser's Discount. Further, notwithstanding the payment obligation set forth herein, Purchaser may, in addition to any other remedies available to Purchaser under this Agreement, immediately charge back the Account purchased by Purchaser, which is subject to the Customer Dispute, to Client and provide notice thereof to Client. Any such charged back Account shall be subject to Purchaser's security interest therein. Client shall notify Purchaser immediately of any disputes between a Customer and Client. Purchaser may, but is not obligated to, settle any Customer Dispute directly with the Customer. Such settlement does not relieve Client of final responsibility for payment of any such Account purchased by Purchaser.

2.12    **Field Examination Fee**. Client shall pay Purchaser a fee (the **"Field Examination Fee"**) in amount equal to Nine Hundred Dollars ($900.00) per day, per examiner plus out of pocket expenses for each examination of Client's Books or the other Collateral performed by Purchaser or its designee.

2.13    **Termination Fee**. If the Term is terminated (a) by Purchaser upon the occurrence of an Event of Default or otherwise as set forth in Section 10.06 or (b) is terminated by Client, other than in compliance with Section 10.06, in view of the impracticability and extreme difficulty of ascertaining actual damages, and by mutual agreement of the parties as to a reasonable calculation of Purchaser's lost profits, as a result thereof, in addition to payment of all principal, interest, fees, expenses and other Obligations, Client shall pay Purchaser upon the effective date of such termination (which includes renewals) a fee (the **"Termination Fee"**) in an amount equal to one percent (1%) of the Maximum Client Account Limit. Such fee shall be presumed to be the amount of damages sustained by Purchaser as the result of termination, and Client acknowledges that such

fee is reasonable under the circumstances currently existing.  The fee provided for in this Section 2.13 shall be deemed included in the Obligations.

2.14    **Client's Obligation**.  As long as any amount paid for by Purchaser for any and all Accounts together with the Purchaser's Discount and any other amounts due Purchaser under the terms of this Agreement and/or under the Advance and/or on account of the EZ Obligations/Rights and/or any promissory notes executed by Client remain unpaid, Client shall be liable to Purchaser for the Obligations.

2.15    **Clearance Days**.  For all purposes under this Agreement, Clearance Days will be added to the date on which Purchaser receives any payment on Accounts before crediting such payment to the Obligations.

## III.  ASSUMED EZ OBLIGATIONS NOTE

3.01    At the closing of the California Sale Transaction, Client shall, in accordance with the terms and conditions of the EZ Assumption and Guaranty Agreement, execute and deliver to Purchaser the EZ Assumed EZ Obligations Note, in a form substantively identical to the form annexed as Exhibit _____ to the EZ Assumption and Guaranty Agreement.

3.02    Client acknowledges and agrees that all of the Obligations are cross-collateralized and that the Collateral described in this Agreement shall secure all such Obligations.

3.03    Except as otherwise explicitly set forth herein to the contrary, the terms and conditions of Section _____, shall not apply to _____.

## IV. WARRANTIES AND REPRESENTATIONS OF CLIENT

In order to induce Purchaser to enter into this Agreement and purchase Accounts under the terms hereof, and with full knowledge that the truth and accuracy of the warranties and representations set forth in this Agreement are being relied upon by Purchaser, because, among other reasons, time is of the essence and a substantial delay in the purchase of Accounts by Purchaser could be caused by a complete credit investigation of each Customer, Client warrants and represents to Purchaser now, and during the Term, that:

4.01    **Client Organization; Etc**.  Client:

(a) is a limited liability company duly formed, validly existing and in good standing, respectively, under the laws of the State of New York and is qualified to do business in the State of California;

(b) has the power and authority to own its properties and carry on its business as it is now being conducted, and is to be conducted following consummation of the transactions contemplated by this Agreement;

(c) is qualified to do business in every jurisdiction where such qualification is

7

necessary;

(d) [is duly authorized to conduct business under the name [NAME], and such trade/fictitious/alternate/assumed name has been property registered as required by the laws of the State of _____]; and

(e) has the power to execute and deliver this Agreement and to execute and deliver to Purchaser any and all documents required to be executed and delivered hereunder.

4.02    **Customer Solvency**.  To the best knowledge of Client, no Customer of Client whose Accounts are to be assigned to and purchased by Purchaser is Insolvent.

4.03    **Title to Assets**.  Client has good title to all Accounts, free and clear of all mortgages, security interests, liens and encumbrances, covenants or restrictions, except in favor of Purchaser.

4.04    **Validity of Accounts; Etc**.  Each Account offered for sale to Purchaser:  (a) is an accurate and undisputed (without claim of offset, defense or counterclaim) statement of indebtedness by the Customer to Client, for a sum certain, which is due and payable within thirty (30) days or less, or within such time as is agreed to, in writing, by Purchaser and Client; and (b) arises out of a bona fide absolute sale, delivery and acceptance of goods (not on consignment, or on approval, or on bill and hold basis, or subject to any other contingency), or rendition of service by Client to the Customer, made in the ordinary course of Client's business.

4.05    **Title to Accounts; Etc**.  None of the Accounts being sold to Purchaser has heretofore been sold or assigned to any person, firm or corporation, nor has any lien, security interest or other encumbrance in such Accounts been granted to any person, firm or corporation, or are owed by a Customer who is one of Client's Affiliates.

4.06    **No Contravening Agreements**.  There are no agreements, verbal or written, between Client and a Customer, or any other party, which would prohibit the sale of each Customer Account by Client to Purchaser.

4.07    **Authorization; Etc**.  The execution and performance by Client of the terms and provisions of this Agreement and the execution and delivery of any other documents required to be executed and delivered hereunder have been duly authorized by all requisite company action, and neither the execution and performance of this Agreement nor the execution and performance of any other documents required to be delivered hereunder, will violate any provision of law, any order of any court or other agency of government, the articles/certificate of incorporation/organization/formation or agreement of partnership, if any, of Client, or any indenture, agreement or other instrument to which Client is a party, or by which Client is bound, or be in conflict with, result in breach of, or constitute (with due notice or lapse of time or both) a default under, or result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of the property or assets of Client pursuant to, any such indenture, agreement or instrument, except as provided in this Agreement.

4.08    **No Litigation**.  There is no action, suit or proceeding at law or in equity or by or before any governmental instrumentality or other agency now pending or, to the knowledge of Client, threatened against or affecting Client which, if adversely determined, would have a material adverse effect on the business, operations, properties, assets or condition, financial or otherwise, of Client.

4.09    **No Adverse Agreements**.  Client is not a party to any material agreement or instrument or subject to any restriction adversely affecting its business, properties or assets, operations or condition, financial or otherwise.  Client is not in default in the performance, observance or fulfillment of any agreement or instrument to which it is a party which materially adversely affects the business, operations, affairs or condition of Client or any of its properties.

4.10    **No Adverse Event**.  Except as disclosed in writing to Purchaser, there is no fact known to Client which materially adversely affects the business, operations, affairs or condition of Client or any of its properties or collectability of any of the Accounts.

4.11    **Taxes**.  Client has filed all tax returns required by law to be filed and has paid all taxes, assessments and other governmental charges levied upon its properties, assets and income, other than those not yet delinquent.  There are no unpaid assessments for additional taxes or any basis therefor.

4.12    **Compliance With Laws**.  Client is in full compliance with all state and federal laws relating to the conduct of its business.

4.13    **Use of Proceeds**.  The proceeds from the Purchaser's purchase of Accounts shall be used by Client solely for: (a) working capital purposes, (b) payment of amounts due to Purchaser under any agreement entered into with or for the primary benefit of Purchaser.

## V.  **CONDITIONS TO PURCHASER'S OBLIGATIONS HEREUNDER**

5.01    **Conditions Precedent**.  Except as to those obligations of Purchaser that are discretionary as set forth herein, the obligations of Purchaser to perform its obligations hereunder are subject to the conditions precedent that (a) the Bankruptcy Court shall have entered the California Assets Sale Order and the closing of the California Sale Transaction shall have occurred and, in connection, all agreements and documents contemplated thereby, including but not limited to the EZ Assumption and Guaranty Agreement and the EZ Assumed Obligations Note, shall have been executed and delivered; (b) the representations and warranties set forth in Article IV hereof shall be true and correct on and as of the date hereof and on the date each Account is offered to Purchaser for sale pursuant to this Agreement; and (c) no Event of Default, nor any event which upon notice or lapse of time or both would constitute such an Event of Default, shall have occurred and be continuing, and each offer of an Account for sale to Purchaser shall constitute a certification by Client as to the foregoing as of the date of such offer.

# VI.  AFFIRMATIVE COVENANTS BY CLIENT

Client covenants and agrees that, from the date hereof and until termination of this Agreement and performance of all of the Obligations hereunder, Client will, unless otherwise agreed to in writing by Purchaser:

6.01    **Inspection of Records**.  Promptly, from time to time, permit Purchaser to inspect Client's Books, at reasonable business hours (except when an Event of Default exists, then at any time), and to make copies thereof or of abstracts thereof, and furnish such other information regarding its operations, assets, business affairs and financial condition, as Purchaser may request.

6.02    **Notices**.  Promptly notify Purchaser of:

(a)    any developments which would materially adversely affect the business of Client, its properties or affairs or the ability of Client to perform its obligations under this Agreement, or any other documents delivered in connection herewith, or the collectability of any of the Accounts purchased by Purchaser

(b)    any material adverse change in Client's condition, financial or otherwise;

(c)    of the occurrence of any Event of Default, and of the occurrence of any event which upon notice or lapse of time, or both, would constitute such an Event of Default; and

(d)    any change of address of Client.

6.03    **Taxes**.  Pay all taxes or fees in relation to the Accounts, goods sold or services rendered, giving rise to the Accounts.

6.04    **Purchaser's Property**.  Immediately turn over to Purchaser and, until doing so, hold in trust and safekeeping separate and apart from Client's other property and as the sole and separate property of Purchaser any payment on an Account purchased by Purchaser whenever any such payment, whether cash, check (payable to Client, Purchaser or both), money order or other form of payment, comes into Client's possession, and all goods giving rise to Accounts purchased by Purchaser which are returned or rejected by, or repossessed from Customer(s).  If Client fails to turn over payment on a purchased Account to Purchaser, Purchaser will charge a misdirected payment fee of fifteen percent (15%) of the Eligible Amount, and Client shall be obligated to immediately pay such fee with or without demand by Purchaser.

6.05    **Book Entries**.  Upon the sale of any of its Accounts to Purchaser, Client will immediately make proper entries on Client's Books recognizing and disclosing the sale of such Accounts to Purchaser.

6.06    **Reimbursement of Expenses; Etc**.  Reimburse Purchaser for its reasonable expenses, fees and disbursements (including, without limitation, reasonable attorneys' fees and legal expenses, including in-house counsel fees, and customary wire transfer fees, ACH fees and lockbox fees)

10

incurred in connection with (a) the preparation or administration of this Agreement or any other document relating hereto and (b) Purchaser's enforcement of any and all of the Obligations of Client under this Agreement or any other such document, whether or not suit is commenced, and which attorneys' fees and legal expenses shall include, but not be limited to, any attorneys' fees and legal expenses incurred in connection with any appeal of a lower court's judgment or order. Purchaser is hereby authorized to charge from time to time against the any reserve account (including, without limitation, the Collected Reserve) established by Purchaser pursuant to this Agreement any obligation of Client to Purchaser hereunder when due and apply any collections or other proceeds of any Account or other Collateral received by Purchaser first to the reimbursement of Client's obligation hereunder.  On the Effective Date, Client shall reimburse Purchaser the sum of [$_____] on account of Purchaser's legal fees incurred in connection with the negotiation and documentation of this Agreement and the transactions contemplated hereby.

6.07    **Reporting to Purchaser**.

(a)    Client shall provide the financial information to Purchaser as follows:

(i)  Client's annual financial statements, prepared on a review basis by a certified public accountant satisfactory to Purchaser, shall be delivered by Client within 120 days of Client's fiscal year end during the Term;

(ii) Client's monthly financial statements, including Client's accounts receivable aging and account payable aging, shall be delivered by Client by the twentieth (20th) day of the month next succeeding the month to which the financial statements relate during the Term;

(iii) Client's members' and/or Guarantors' updated personal financial statements shall be delivered on an annual basis, not later than May 31st of each year during the Term; and

(iv) Copies of Client's and Client's members' and/or Guarantors' federal and Client's and Client's shareholders/members' and/or Guarantors' income tax returns or filed extension by April 15th of each year during the Term.

6.08    **Insurance**.  Maintain insurance of such types and in such amounts as are maintained by companies of similar size engaged in the same or similar businesses; provided, however, that each policy insuring any Collateral securing any and all of the Obligations shall name Purchaser as the lender loss payee and all general liability policies shall name Purchaser as additional insured.

## VII.  <u>NEGATIVE COVENANTS</u>

Client covenants and agrees that, until termination of this Agreement and performance by Client of all of the Obligations hereunder, unless Purchaser shall otherwise consent in writing, it will <u>not</u> directly or indirectly:

7.01    **No Liens**.  Create, incur, assume or suffer to exist any pledge, lien, charge or other

encumbrance of any nature whatsoever on any of its Accounts or inventory, now owned or hereafter acquired, including, without limitation, in connection with merchant advances, or its other assets, except in favor of Purchaser.

7.02    **No Sale of Assets; Etc**.  Except with respect to the Accounts purchased by Purchaser pursuant to this Agreement, sell, lease, transfer or otherwise dispose of any of its assets, except in the ordinary course of its business.

7.03    **No Interference With Purchaser's Rights**.  Interfere in any way or fashion or under any circumstances with any of Purchaser's right under this Agreement or undertake any action or omit to undertake any action that would adversely affect the collectability of any of the Accounts purchased by Purchaser.

7.04    **No Other Sale of Accounts**.  Finance or sell its Accounts except to Purchaser during the Term.

7.05    **No Change of Account Terms**.  Change or modify the terms of the original Account with a Customer.

7.06    **No Pledge of Purchaser's Credit**.  Pledge the credit of Purchaser to any person or entity for any purpose whatsoever.

7.07    **No Alternations of Payment Schedule**.  Alter any Customer payment schedule.

## VIII.  SECURITY INTEREST

8.01    **Grant of Security Interest**.  As a further inducement for Purchaser to enter into this Agreement, Client hereby grants to Purchaser, as security for the repayment of any and all Obligations (whether arising under this Agreement or any other agreement by and between Purchaser and Client, including without limitation the EZ Assumption and Guaranty Agreement, a security interest in all assets of Client now owned or hereafter acquired or arising and wherever located, including, without limitation, all of Client's accounts (including the Accounts), the EZ Assumed Obligations/Rights. inventory, equipment, goods, instruments, documents, contract rights, chattel paper, instruments, general intangibles, payment intangibles, deposit accounts, all other personal property and the proceeds thereof (including any insurance proceeds) and all supporting obligations now or hereafter owned by Client, or in which Client now or hereafter may have any rights, wherever situated and whenever acquired (as such terms are defined in the UCC). Client agrees to execute, from time to time, and authorizes Purchaser to execute and file such UCC financing statements (including, without limitation, an "all assets" filing), assignments, and other documents covering the Collateral, including proceeds, to create, evidence, perfect, maintain or continue its security interest in the Collateral (including additional Collateral acquired by Client after the date hereof).  Client will pay the cost of filing the same in all public offices in which Purchaser may deem filing to be appropriate and will notify Purchaser promptly upon acquiring any additional Collateral that may require an additional filing.  Upon the occurrence of and during the continuance of an Event of Default, Client appoints Purchaser irrevocably as Client's agent

and attorney-in-fact to perform such tasks as Purchaser in the sole exercise of its discretion determines to undertake to recover and/or enforce its rights to recover all sums due under the Agreement including, without limitation, notifying the United States Postal Service to change the address for delivery of Client's mail to any address designated by Purchaser, otherwise intercept Client's mail, and receive, open and dispose of Client's mail.  Upon request, Client will deliver to Purchaser all Client's documents, chattel paper and instruments constituting part of the Collateral.

## IX.  **EVENTS OF DEFAULT**

9.01    **Events of Default**.  Upon the occurrence of any of the following events (each of which is herein sometimes called an **"Event of Default"**):

(a)    If Client shall fail to pay any Obligations to Purchaser when due;

(b)    If Client confesses inability to continue performance in accordance with this Agreement and/or the EZ Assumption and Guaranty Agreement;

(c)    If any representation or warranty made herein or in any report, assignment, certificate, financial statement or other instrument furnished in connection with this Agreement and/or the EZ Assumption and Guaranty Agreement, shall prove to be false or misleading in any material respect;

(d)    If Client shall fail to perform any covenant, condition or agreement contained in this Agreement and/or the EZ Assumption and Guaranty Agreement;

(e)    If an Insolvency Proceeding is commenced by Client or any other person liable in whole or in part for payment or performance of any Obligations in this Agreement and/or the EZ Assumption and Guaranty Agreement, or if an Insolvency Proceeding is commenced against Client or any other person liable in whole or in part for payment or performance of any Obligations in this Agreement and/or the EZ Assumption and Guaranty Agreement;

(f)    If any order, judgment or decree shall be entered, without the application, approval or consent of Client by any court or competent jurisdiction, approving a petition seeking reorganization of Client or appointing a receiver trustee, custodian or liquidator of Client, or of all or a substantial part of the assets of Client;

(g)    If there occurs any attachment on any deposits or other property of Client in the hands or possession of Purchaser;

(h)    If any "default" (however defined) shall occur under any guaranty of any Obligations hereunder or if any guarantor terminates said guarantor's guaranty; or

(i)    If there is a default in any material agreement to which Client or any guarantor is a party or by which binds Client or any guarantor of their respective assets, including, without limitation, the EZ Assumption and Guaranty Agreement and the EZ

Assumed Obligations Note, as any of the same may be amended from time to time;

then, and upon every such Event of Default and at any time thereafter during the continuance of such event, Purchaser may take any action permitted at law or in equity including, without limitation, any one or more of the following: (i) charge back to Client all outstanding Accounts and declare all Obligations secured hereby immediately due and payable; (ii) enforce the security interest given hereunder pursuant to the UCC or any other law; (iii) require Client to assemble the Collateral and the records pertaining to the Accounts and make them available to Purchaser at a place designated by Purchaser; (iv) enter the premises of Client and take possession of the Collateral and of the records pertaining to the Accounts and any other Collateral; (v) grant extensions, compromise claims and settle the Accounts for less than the face value, and without prior notice to Client; (vi) to the extent permitted by law, use, in connection with any assembly or disposition of the Collateral, a trademark, trade name, copyright, patent right or technical process used or utilized by Client without payment of any license fee or royalty to Client; (vii) retain any surplus realized to cover any and all Obligations and hold Client liable for any deficiency as provided in the UCC; (viii) offset any funds held by Purchaser in any reserve account for any and all Obligations of Client to Purchaser, including, but not limited to, legal fees or other costs associated with the collection of Accounts, or pursue any other remedy at law or equity which Purchaser may have; (ix) charge an Event of Default fee of Seven Hundred Fifty Dollars ($750.00) per occurrence.

## X.  **MISCELLANEOUS**

10.01  **Survival of Agreement; Etc**.    This Agreement and all covenants, agreements, representations and warranties made herein, shall survive the purchase by Purchaser of the Accounts hereunder, and shall continue in full force and effect, so long as there shall be any Obligations owing to Purchaser hereunder and/or under the EZ Assumption and Guaranty Agreement and the Assumed EZ Obligations Note.  Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the heirs, personal representatives, legal representatives, successors and assigns of such parties; and all covenants, promises and agreements in this Agreement contained, by or on behalf of Client, shall inure to the benefit of the successors and assigns of Purchaser.

10.02  **Purchaser's Property**.  Any payment or payment(s) due as to any Account purchased by or assigned to Purchaser is/are the sole property of Purchaser.

10.03  **Appointment of Attorney-in-Fact**.  In order to carry out this Agreement and avoid unnecessary notification to Customers, Client irrevocably appoints Purchaser, or any person designated by Purchaser, its special attorney in fact or agent, with power to:

(a)    Delete Client's address on all invoices and statements mailed to Customers and to substitute in its place Purchaser's address;

(b)     Notify the post office authorities to change the address for delivery of Client's mail to an address designated by Purchaser or otherwise intercept Client's mail, and receive, open and dispose of all mail addressed to Client or to Client's trade name at Purchaser's address;

(c)     Endorse the name of Client or Client's trade name on any checks or other evidences of payment that may come into the possession of Purchaser with respect to any Collateral;

(d)     In Client's name, or otherwise, to demand, sue for, collect, receive and give acquittance for any and all monies due or to become due on Accounts purchased by Purchaser;

(e)     Settle, compromise, compound, prosecute or defend any action or proceeding with respect to said Accounts;

(f)     Extend the time of payment of any or all of the Accounts purchased by Purchaser and to make any allowances and other adjustments with reference thereto;

(g)     Offer discounts to Client's Customer exclusive of Client's normal business custom with said Customer where necessary to affect collection; and

(h)     Do any and all things necessary and proper to carry out the purpose of this Agreement. The authority granted pursuant to this power of attorney shall continue in full force and effect until all Accounts purchased by Purchaser have been paid in full.

10.04  **Open Items**. Should Purchaser receive a double payment on an Account or other payment which is not identified, Purchaser shall carry such sums as open items and shall return such sum to Client or the Customer, as appropriate, upon written request for payment actually received by Purchaser.

10.05  **Indemnifications of Purchaser**. Client agrees to indemnify and hold Purchaser and its officers, directors, investors, bank group members, attorneys, agents and employees or participants harmless from any loss, damage, judgment, liability or expense (including attorneys' fees) suffered by or rendered against Purchaser or any of them on account of any claims arising out of or relating to the Obligations, the Accounts or the other Collateral (unless caused by the gross negligence or willful misconduct of Purchaser and any of the other indemnified parties).

10.06  **Term of Agreement**. This Agreement shall continue in full force and effect through the Initial Term. Purchaser may terminate this Agreement at any time. Absent termination of this Agreement by Purchaser, or as provided elsewhere in this Agreement, this Agreement shall automatically and continually renew for successive periods of twelve (12) months (each such period referred to as a **"Renewal Period"**) from the Initial Termination Date or the end of a Renewal Period unless, Client, no less than thirty (30) days prior to the Initial Termination Date or the expiration of a Renewal Period (a) gives Purchaser written notice to terminate this

15

Agreement and (b) pays Purchaser as liquidated damages the Termination Fee and an amount equal to the Monthly Minimum, as set forth in Section 10.07 below, for each month or part of a month between the stated termination date and the Initial Termination Date, or end of a Renewal Period, whichever is applicable.

10.07    **Monthly Minimum**.  Client agrees to generate a minimum of fees, i.e. the Processing Fees plus Purchaser's Discount to Purchaser in the amount of Three Thousand Dollars ($3,000.00) per month during the Term (said dollar amount being the "**Monthly Minimum**").  Should Purchaser not receive the Monthly Minimum for any month during the Term, Client agrees to remit immediately to Purchaser the difference between the Monthly Minimum and the fees actually earned for such month. Remittance of the difference to Purchaser shall be made as follows:  by Purchaser's deducting the difference from Client's Assignment and Schedule of Accounts, the Collected Reserve and/or any Collateral securing Obligations to Purchaser, or by Client's direct payment to Purchaser of such difference.

10.08    **Survival of Security Interest; Etc**.  After termination of this Agreement and/or the EZ Assumed Obligations Agreement, Client shall remain fully responsible to Purchaser for any Accounts purchased before such termination, and Purchaser's security interest shall survive such termination until any and all Obligations shall have been fully paid and/or satisfied.

10.09    **Binding Effect; Etc**.  This Agreement shall inure to the benefit of and be binding upon the heirs, executors, administrators, successors and assigns of the parties hereto.

10.10    **Entire Agreement.** This Agreement together with the EZ Assumption and Guaranty Agreement, the Assumed EZ Obligations Note and the documents and agreements identified or contemplated in any of the same, constitute the entre agreement between Purchaser and Client and may not be altered or amended except by written agreement signed by both Purchaser and Client. No provision hereof or thereof may be waived except upon written waiver executed by Purchaser. This Agreement together with the EZ Assumption and Guaranty Agreement, the Assumed EZ Obligations Note and the documents identified or contemplated in either, shall be read and construed together as one agreement.

10.11    **Rights and Remedies**.  No failure on the part of Purchaser to exercise, and no delay in exercising, and no course of dealing with respect to, any right, power or remedy under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise by Purchaser of any right, power or remedy under this Agreement preclude any other right, power or remedy. The remedies in this Agreement are cumulative and are not exclusive of any other remedies provided by law.

10.12    **Governing Law**.  This Agreement shall be construed in accordance with and governed by the laws of the State of New Jersey without regard to conflict of law principles.  Unless otherwise defined herein, or unless the context otherwise requires, all terms used herein which are defined in the UCC have the meanings therein stated.

10.13    **Consent to Jurisdiction; Etc**.  Client hereby consents to the jurisdiction of the federal and state courts of the State of New Jersey, located in Mercer County for the purpose of any suit, action

or other proceeding arising out of any of the Obligations hereunder or with respect to the transactions contemplated hereby, and expressly waives any and all objections it may have as to venue in any of such courts.  **EACH OF CLIENT AND PURCHASER ALSO WAIVES TRIAL BY JURY IN ANY ACTION BROUGHT ON OR WITH RESPECT TO THIS AGREEMENT.**

10.14  **Purchaser's Customer Notification Rights; Etc**.  Purchaser may in its sole discretion give notice of assignment to any and all Customers of Client and collect Accounts directly from such Customers.

10.15  **Notices**.  All notices and communications hereunder shall be given or made to the parties at their respective addresses set forth in the first paragraph of this Agreement, or at such other address as the addressee may hereafter specify for the purpose by written notice to the other party hereto.  Such notices and other communications will be effectively given only if and when given in writing and delivered to the parties' addresses set forth herein and (except for financial statements and other informational documents which may be duly deposited in the mails with first-class postage prepaid) sent by registered or certified mail, postage prepaid, return receipt requested, personally delivered or by receipted overnight delivery service or sent by telecopy/facsimile or other electronic transmission for which confirmation is received (followed up by a mailing or overnight mail).

10.16  **Severability**.  If any provision hereof is held invalid, illegal or unenforceable in any jurisdiction, for any reason whatsoever, the other provisions hereof shall remain in full force and effect in such jurisdiction and to that end, provisions hereof are declared to be severable and the remaining provisions shall be liberally construed in favor of Purchaser.

10.17  **Headings**.  The various headings of this Agreement are inserted for convenience only and shall not affect the meaning or interpretation of this Agreement or any provision hereof.

10.18  **Joint and Several Obligations; Dealings with Multiple Clients**.  If more than one person or entity is named as Client in this Agreement and in all other related documents executed and delivered pursuant to the terms of this Agreement or otherwise required by Purchaser, all Obligations, representations, warranties, covenants and indemnities set forth in the Loan Documents to which such person or entity is a party shall be joint and several.  Purchaser shall have the right to deal with any authorized officer of any Client with regard to all matters concerning the rights and obligations of Purchaser and Client hereunder and pursuant to applicable law with regard to the transactions contemplated under this Agreement.  All actions or inactions of the officers, managers, members and/or agents of any Client with regard to the transactions contemplated under this Agreement shall be deemed with full authority and binding upon all Clients hereunder.  Each Client hereby appoints each other Client as its true and lawful attorney-in-fact, with full right and power, for purposes of exercising all rights of such person hereunder and under applicable law with regard to the transactions contemplated under this Agreement.  The foregoing is a material inducement to the agreement of Purchaser to enter into this Agreement and to consummate the transactions contemplated hereby.  Each Client represents that it and each other Client together, are operated as part of one consolidated business entity and are directly dependent upon each other for and in connection with each of their respective business activities and financial

17

resources.  Each Client will receive a direct economic and financial benefit from the Obligations incurred under this Agreement and the incurrence of such Obligations is in the best interests of each Client.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, intending to be legally bound, this Agreement has been executed by the parties hereto all as of the day and year first above written.

**QX LOGISTIX LLC**


Witness:_____

     Name:

By:_____

Name:_____

Its _____

**NORTH MILL CAPITAL LLC**

By:_____

Name:_____

Its:_____

## SCHEDULE 3.03

## Existing Liens

**[TBD]**

# EXHIBIT C

## AMENDMENT NO. 2 TO ACCOUNTS RECEIVABLE AGREEMENT WITH RECOURSE

**THIS AMENDMENT NO. 2 TO ACCOUNTS RECEIVABLE AGREEMENT WITH RECOURSE** (this "**Amendment No. 2**") is dated May \_\_\_\_\_, 2019, by and between **E Z MAILING SERVICES INC.**, a New Jersey corporation, d/b/a E Z Worldwide Express and United Business Xpress, and **UNITED BUSINESS FREIGHT FORWARDERS LIMITED LIABILITY COMPANY**, a New Jersey limited liability company, (individually and collectively, "**Client**" or "**EZ**"), with an office located at 669 Division Street, Elizabeth, New Jersey 07201, and NORTH MILL CAPITAL LLC, a Delaware limited liability company ("**Purchaser**" or "**NMC**"), with an office located at 821 Alexander Road, Suite 130, Princeton, New Jersey 08540.

## RECITALS

**WHEREAS**, Client and Purchaser are the parties to that certain Accounts Receivable Agreement with Recourse dated December 30, 2016 (as amended, modified, supplemented, substituted, extended or renewed from time to time, including but not limited to that certain Amendment No. 1 to Accounts Receivable Agreement with Recourse dated November 3, 2017 and this Amendment No. 2, and as may be further amended, modified, supplemented, substituted, extended or renewed from time to time, the "**EZ AR Agreement**"); and

**WHEREAS**, pursuant to orders (together, the "**Orders for Relief**") of the United States Bankruptcy Court for the District of New Jersey ("**Bankruptcy Court**") dated May 17, 2019, EZ consented to the entry of orders for relief in connection with involuntary chapter 11 petitions filed by certain alleged creditors of EZ, in the chapter 11 cases styled: (a) *In re E Z Mailing Services, Inc. d/b/a EZ Worldwide Express and United Business Express*, 19-17900 (SLM) ("**EZ Mailing Chapter 11 Case**"), and (b) *In re United Business Freight Forwarders, LLC*, 19-17906 (SLM) ("**UBFF Chapter 11 Case**", and together with the EZ Mailing Chapter 11 Case, the "**Chapter 11 Cases**"); and

**WHEREAS**, prior to the entry of the Orders for Relief, certain Events of Default occurred and are continuing under the EZ AR Agreement, which Events of Default have and continue to result in the accrual of additional expenses, fees and costs thereunder; and

**WHEREAS**, pursuant to orders dated April 24, 2019 [Docket Nos. 7 (19-17900) and 7 (19-17906)] and May 22, 2019 [Docket Nos. 82 (19-17900) and 64 (19-17906)],  entered by the Bankruptcy Court in the Chapter 11 Cases, the Bankruptcy Court approved the continued performance under the EZ AR Agreement (together, the "**Chapter 11 Financing Orders**"); and

**WHEREAS**, pursuant to the entry of final, non-appealable orders of the Bankruptcy Court in the Chapter 11 Cases dated May \_\_\_\_\_, 2019 [Docket Nos. _____ (19-17900) and \_\_\_\_\_ (19-17906)] (together, the "**Sale Orders**"), the Bankruptcy Court approved that certain Asset Purchase Agreement dated May \_\_\_\_, 2019, by and between EZ and QX Logistix LLC, a New York limited liability company ("**QX**"), with respect to certain California-based operations and related assets owned by EZ (the "**QX Sale Transaction**"); and

**WHEREAS**, in connection with the QX Sale Transaction, QX agreed to assume joint and several liability with EZ for EZ's Obligations (as defined in the EZ AR Agreement), arising from or relating to those Accounts (as defined in the EZ AR Agreement), sold and assigned by EZ to NMC under the EZ AR Agreement that arose on account of or related to EZ's California-based business operations and related assets (collectively, as specifically identified on Schedule 1 hereto, the "**Sold/Assigned California Accounts**"); and

**WHEREAS**, in order to effectuate QX's assumption of joint and several liability with EZ for EZ's Obligations under the EZ AR Agreement on account of the Sold/Assigned California Accounts, QX and NMC entered into that certain Assumption and Guaranty Agreement dated May _____, 2019 (the "**Assumption and Guaranty Agreement**"), and, in connection, QX executed and delivered to NMC that certain Assumed EZ Obligations Note (as defined in the Assumption and Guaranty Agreement); and

**WHEREAS**, also in connection with the QX Sale Transaction, QX entered into that certain Accounts Receivable Agreement with Recourse, dated as of May _____, 2019, with NMC (as the same may be amended from time to time, the "**QX AR Agreement**"), which QX AR Agreement provides, *inter alia*, that QX's Obligations (as defined in the QX AR Agreement) include but are in no way limited to QX's obligations to NMC arising under the Assumption and Guaranty Agreement and under the Assumed EZ Obligations Note (as defined in the QX AR Agreement); and

**WHEREAS**, Client and Purchaser desire to further amend the EZ AR Agreement, so as to, among other things, provide for Client's acknowledgement and, to the fullest extent necessary, approval of the Assumption and Guaranty Agreement, the Assumed EZ Obligations Note, and the QX AR Agreement and, in connection, Client's acknowledgement and reaffirmation of Client's Obligations (as defined under the EZ AR Agreement), which Obligations Client hereby acknowledges and agrees are unaffected by QX's assumption of joint and several liability for such Obligations.

**NOW, THEREFORE**, in consideration of the foregoing and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged by the parties hereto, it is agreed as follows:

1.      **Incorporation of Recitals.**  The above Recitals are hereby incorporated into and shall constitute a part of this Assumption and Guaranty Agreement.

2.      **Acknowledgement of Existing and Continuing Events of Default and Obligations.**  As of the date of this Amendment No. 2, Client acknowledges and agrees: (a) that certain Events of Default have occurred and are continuing under the EZ AR Agreement and that Purchaser's agreement to continue to perform under the EZ AR Agreement has not and shall not be deemed to have resulted in a waiver of Purchaser's rights on account of the occurrence and continuance of such Events of Default; and (b) Client's Obligations to Purchaser total not less than [$_____], exclusive of Purchaser's fees, legal fees and expenses, which have been and are continuing to accrue, which Obligations are absolutely and unconditionally owed by Client to Purchaser, without defense, set off, counterclaim, discount or charge of any kind (all as more fully set forth in the EZ AR Agreement).

2

3.    **Specific Amendments to the EZ AR Agreement**:    Effective the date hereof, the EZ AR Agreement is hereby amended in the following particulars:

a.    **Article 1 (Definitions).**

(i)    The following definitions set forth in Article I (Definitions) of the EZ AR Agreement are hereby deleted in their entirety and are replaced with the following:

"**Initial Termination Date**" means July _____, 2019.

"**Termination Date**" means (i) the Initial Termination Date of July _____, 2019, unless such date is further extended pursuant to Section 9.06, and if so extended on one or more occasions, the last date of the last such extension, or (ii) if earlier terminated by Purchaser pursuant to Section 9.06, the date of such termination.

b.    **Article II (Purchase of Accounts Receivable).**

(i)    The following sections set forth in Article II (Purchase of Accounts Receivable) of the EZ AR Agreement are hereby deleted in its entirety and replaced with:

"**2.02    Purchaser's Discretion**.    Purchaser shall not, on or after the date of this Amendment No. 2, purchase any additional Accounts relating to the California-based business and operations that have been sold to QX pursuant to the QX Sale Transaction.  Purchaser shall purchase only such Accounts as Purchaser may select and approve in its sole and absolute discretion.  Purchaser shall not have any liability to Client or any of Client's Customers for any failure or refusal by Purchaser to purchase any Account.

"**2.10    Return of Collected Reserve**.  Purchaser shall not be required to return all or any part of the Collected Reserve to Client unless and until all Obligations of Client due and owing under the Agreement are paid in full to Purchaser."

4.    **Payment of Costs and Expenses; Reaffirmations**.  Subject to the terms and provisions of the Chapter 11 Financing Orders to the extent applicable:

a.    Client agrees to pay all costs and expenses, including reasonable attorney's fees, including allocated fees of in-house counsel, incurred by Purchaser in connection with the preparation of this Amendment No. 2.

b.    Client's execution of this Amendment No. 2 shall also act as its certification that: (a) the execution of this Amendment No. 2 has been duly authorized by all required corporate and limited liability company action so that it constitutes the legal, valid and binding obligation of Client enforceable in accordance with its terms; and (b) no consent, approval, order or authorization of, or registration or filing with, any third party is required in connection with the execution, delivery and carrying out of this Amendment No. 2, or if required, has been obtained.

3

c.    Client further certifies to Purchaser that all of the representations and warranties in the EZ AR Agreement, as amended hereby, are, except as may otherwise be stated in this Amendment No. 2, true, complete and correct as of the date hereof.

d.    Client confirms that the Obligations remain outstanding without defense, set off, counterclaim, discount or charge of any kind as of the date of this Amendment No. 2.

e.    This Amendment No 2 shall also act as Client's reaffirmation of its grant to Purchaser of a lien on the Collateral and that such Collateral and all liens and security interests shall continue unimpaired and in full force and effect and shall cover and secure all of Client's existing and future Obligations to Purchaser, as modified by this Amendment No. 2.

f.    Client reaffirms all of the covenants set forth in the EZ AR Agreement, as amended hereby.

**5.    Release and Indemnification**.  Subject to the terms and provisions of the Chapter 11 Financing Orders to the extent applicable:

a.    To induce Purchaser to enter into this Amendment No, 2, Client waives and releases and forever discharges Purchaser and its officers, directors, investors, bank group members, attorneys, agents, and employees or participants from any liability, damage, claim, loss or expense of any kind that it may have against Purchaser or any of them arising out of or relating to the Obligations.

b.    Client further agrees to indemnify and hold Purchaser and its officers, directors, investors, bank group members, attorneys, agents and employees or participants harmless from any loss, damage, judgment, liability or expense (including attorneys' fees) suffered by or rendered against Purchaser or any of them on account of any claims arising out of or relating to the Obligations.  Client further states that it has carefully read the foregoing release and indemnity, knows the contents thereof and grants the same as its own free act and deed.

**6.    Effectiveness of Amendment No. 2**.  Subject to the terms and provisions of the Chapter 11 Financing Orders to the extent applicable, this Amendment No. 2 shall be effective as of the date hereof, so long as the documentation listed below is received by Purchaser on or before the date hereof:

a.    This Amendment No. 2; and

b.    A Guarantor Acknowledgement executed by Ajay K. Aggarwal and Vijay K. Aggarwal.

Except as herein set forth, the EZ AR Agreement and the other documents executed in connection therewith shall remain in full force and effect and are hereby ratified and confirmed.

**7.    Miscellaneous**.

a.    **Counterparts**.        This Amendment No. 2 may be signed in any number of counterpart copies and by the parties to this Amendment No. 2 on separate counterparts, but all such copies shall constitute one and the same instrument.  Delivery of an executed counterpart of a signature page to this Amendment No. 2 by facsimile or other electronic transmission shall be effective as delivery of a manually executed counterpart.

4

b.      **Binding Effect**.       This Amendment No. 2 will be binding upon and inure to the benefit of Client and Purchaser and their respective heirs, executors, administrators, successors and assigns.

c.      **Governing Law**,       This Amendment No. 2 will be interpreted, and the rights and liabilities of the parties hereto determined in accordance with the laws of the State of New Jersey, excluding its conflict of laws rules.

d.      **No Waivers, Etc**.       Except as expressly provided herein, this Amendment No. 1 shall not constitute an amendment, waiver, consent or release with respect to any provision of the EZ AR Agreement, a waiver of any default or Event of Default under the EZ AR Agreement or a waiver or release of any of Purchaser's rights and remedies (all of which are hereby reserved). Client ratifies and confirms the indemnification and waiver of jury trial provisions contained in the EZ AR Agreement.

**IN WITNESS WHEREOF**, the partiers hereto have executed this Amendment No. 2 by their duly authorized representatives.

**NORTH MILL CAPITAL LLC**                      **E Z MAILING SERVICES INC.**

By: _____          By: _____

Name: _____          Name: _____

Title: _____          Title: _____


**UNITED BUSINESS FREIGHT
FORWARDERS LIMITED LIABILITY
COMPANY**

By: _____

Name: _____

Title: _____

## Guarantor Acknowledgment and Agreement

The undersigned has guaranteed the payment and performance of the Obligations (as defined in his Guaranty, defined below) of Client (as referred to as the "**Company**" in the Guaranty) to Purchaser pursuant to the terms of the undersigned's Continuing Individual Guaranty and Waiver dated December 30, 2016 (as amended, modified, supplemented, substituted, extended or renewed from time to time, the "**Guaranty**"), which Obligations include the obligations of Client to Purchaser under the Agreement.

The undersigned hereby agrees with Purchaser that the Obligations described in the Guaranty shall be deemed to include all debts, liabilities and obligations incurred by Client to Purchaser without affecting any of Purchaser's rights under the Guaranty.

The undersigned: (a) consents to the terms and conditions of the above Amendment No. 2 and acknowledges that Amendment No. 2 shall not in any way impair or limit the rights of Purchaser under the Guaranty or the other documents to which the undersigned is a party; and (b) confirms that: (i) the Guaranty and the other documents to which the undersigned is a party remain in full force and effect, enforceable against the undersigned in accordance with their respective terms; and (ii) by the undersigned's Guaranty, the undersigned continues to guaranty the payment and performance of the Obligations including, without limitation, Client's obligations to Purchaser under the Agreement, as modified by Amendment No. 2.

The undersigned: (a) represents and warrants to Purchaser that no events have taken place and no circumstances exist at the date hereof which would give the undersigned the right to assert a defense, offset or counterclaim to any claim by Purchaser for enforcement of the Guaranty or any other document to which the undersigned is a party; and (b) hereby releases and forever discharges Purchaser and its officers, directors, investors, bank group members, attorneys, agents, and employees or participant from any and all actions, causes of action, suits, proceedings, debts, sums of money, covenants, contracts, controversies, claims and demands, at law or in equity, which the undersigned ever had or now has against Purchaser or its officers, directors, investors, bank group members, attorneys, agents, and employees or participants by virtue of their relationship to Client or the undersigned in connection with the Agreement and the transactions related thereto.

**The undersigned ratifies and confirms the indemnification and waiver of jury trial provisions contained in the Guaranty.**

**WITNESS:**                                            **GUARANTOR:**

By:   _____         _____

Name: _____         Vijay K. Aggarwal, an individual

Date:  _____

## Guarantor Acknowledgment and Agreement

The undersigned has guaranteed the payment and performance of the Obligations (as defined in his Guaranty, defined below) of Client (as referred to as the "**Company**" in the Guaranty) to Purchaser pursuant to the terms of the undersigned's Continuing Individual Guaranty and Waiver dated December 30, 2016 (as amended, modified, supplemented, substituted, extended or renewed from time to time, the "**Guaranty**"), which Obligations include the obligations of Client to Purchaser under the Agreement.

The undersigned hereby agrees with Purchaser that the Obligations described in the Guaranty shall be deemed to include all debts, liabilities and obligations incurred by Client to Purchaser without affecting any of Purchaser's rights under the Guaranty.

The undersigned: (a) consents to the terms and conditions of the above Amendment No. 2 and acknowledges that Amendment No. 2 shall not in any way impair or limit the rights of Purchaser under the Guaranty or the other documents to which the undersigned is a party; and (b) confirms that: (i) the Guaranty and the other documents to which the undersigned is a party remain in full force and effect, enforceable against the undersigned in accordance with their respective terms; and (ii) by the undersigned's Guaranty, the undersigned continues to guaranty the payment and performance of the Obligations including, without limitation, Client's obligations to Purchaser under the Agreement, as modified by Amendment No. 2.

The undersigned: (a) represents and warrants to Purchaser that no events have taken place and no circumstances exist at the date hereof which would give the undersigned the right to assert a defense, offset or counterclaim to any claim by Purchaser for enforcement of the Guaranty or any other document to which the undersigned is a party; and (b) hereby releases and forever discharges Purchaser and its officers, directors, investors, bank group members, attorneys, agents, and employees or participant from any and all actions, causes of action, suits, proceedings, debts, sums of money, covenants, contracts, controversies, claims and demands, at law or in equity, which the undersigned ever had or now has against Purchaser or its officers, directors, investors, bank group members, attorneys, agents, and employees or participants by virtue of their relationship to Client or the undersigned in connection with the Agreement and the transactions related thereto.

**The undersigned ratifies and confirms the indemnification and waiver of jury trial provisions contained in the Guaranty.**

**WITNESS:**                                    **GUARANTOR:**

By: _____        _____

Name: _____        Ajay K. Aggarwal, an individual

Date: _____

# EXHIBIT D

**ASSET PURCHASE AGREEMENT**

between

E Z MAILING SERVICES, INC.

UNITED BUSINESS FREIGHT FORWARDERS, LLC

and

QX LOGISTIX LLC

dated as of

May [        ], 2019

4126936v.1

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "**Agreement**"), dated as of May [      ], 2019, is entered into between E Z Mailing Services Inc., a [_____] ("**EZ**"), and United Business Freight Forwarders, LLC, a [_____] limited liability company ("**UBFF**", and together with EZ, collectively, "**Seller**"), and QX Logistix LLC a Delaware limited liability company ("**Buyer**").

## RECITALS

**WHEREAS**, on or about May 17, 2019, Seller consented to the entry of orders for relief commencing voluntary cases (the "**Bankruptcy Cases**") under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532 (as amended, the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of New Jersey (the "**Bankruptcy Court**");

**WHEREAS**, Seller wishes to sell and assign to Buyer, and Buyer wishes to purchase and assume from Seller, the rights and obligations of Seller to the Purchased Assets and the Assumed Liabilities (as defined herein), subject to the terms and conditions set forth herein, and in accordance with an Order of the Bankruptcy Court pursuant to Sections 105, 363 and 365 of the Bankruptcy Code;

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

The following terms have the meanings specified or referred to in this ARTICLE I:

"**Action**" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

"**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" has the meaning set forth in the preamble.

"**Ancillary Documents**" means the Bill of Sale, the Assignment and Assumption Agreement, [Assignment and Assumption of Leases], and the other agreements, instruments and documents required to be delivered at the Closing.

"**Assumed Liabilities**" has the meaning set forth in Section 2.02.

"**Assumption and Guaranty Agreement**" means that certain agreement of the same name executed by and between Buyer and North Mill and dated on or about the date hereof, which shall be the sole and exclusive agreement governing the assumption by Buyer of joint and several liability for the obligations delineated therein, including but not limited to the face amount of the Sold/Assigned California Accounts (as defined in the Assumption and Guaranty Agreement).

"**Azadian Group**" has the meaning set forth in Section 2.01.

"**Business**" has the meaning set forth in Section 6.01.

"**Business Day**" means any day except Saturday, Sunday or any other day on which commercial banks located in Philadelphia, Pennsylvania are authorized or required by Law to be closed for business.

"**Buyer**" has the meaning set forth in the preamble.

"**Change Capital**" has the meaning set forth in Section 2.01.

"**Closing**" has the meaning set forth in Section 3.01

"**Closing Date**" has the meaning set forth in Section 3.01.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Contracts**" means all contracts, leases, deeds, mortgages, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures and all other agreements, commitments and legally binding arrangements, whether written or oral, other than any and all of the foregoing by and between Seller and North Mill.

"**Disclosure Schedules**" means the Disclosure Schedules delivered by Seller and Buyer concurrently with the execution and delivery of this Agreement.

"**Dollars or $**" means the lawful currency of the United States.

"**Encumbrance**" has the meaning set forth in Section 2.01.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"**ERISA Affiliate**" means all employers (whether or not incorporated) that would be treated together with the Seller or any of its Affiliates as a "single employer" within the meaning of Section 414 of the Code or Section 4001 of ERISA.

"**Excluded Liabilities**" has the meaning set forth in Section 2.03.

"**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political

subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

"**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"**Hard Deposit**" has the meaning set forth in Section 2.04.

"**Knowledge of Seller or Seller's Knowledge**" or any other similar knowledge qualification, means the actual or constructive knowledge of any director or officer of Seller, after due inquiry.

"**Law**" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority.

"**Liabilities**" means liabilities, obligations or commitments of any nature whatsoever, asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured or otherwise.

"**Material Adverse Effect**" means any event, occurrence, fact, condition or change that is, or could reasonably be expected to become, individually or in the aggregate, materially adverse to (a) the business, results of operations, condition (financial or otherwise) or assets of the Business, (b) the value of the Purchased Assets, or (c) the ability of Seller to consummate the transactions contemplated hereby on a timely basis.

"**North Mill**" has the meaning set forth in Section 2.01.

"**Permitted Encumbrance**" has the meaning set forth in Section 2.01.

"**Permits**" means all permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances and similar rights obtained, or required to be obtained, from Governmental Authorities.

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"**Pre-Closing Tax Period**" means any taxable period ending on or before the Closing Date and, with respect to any taxable period beginning before and ending after the Closing Date, the portion of such taxable period ending on and including the Closing Date.

"**Purchase Price**" has the meaning set forth in Section 2.04.

"**Purchased Assets**" has the meaning set forth in Section 2.01.

3

"**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"**Sale Order**" has the meaning set forth in Section 2.07(b).

"**Seller**" has the meaning set forth in the preamble.

"**Seller** ~~Principles" has~~**Principles**" has the meaning set forth in Section 6.02.

"**Taxes**" means all federal, state, local, foreign and other income, gross receipts, sales, use, production, ad valorem, transfer, documentary, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"**Tax Return**" means any return, declaration, report, claim for refund, information return or statement or other document relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**WARN Act**" means the federal Worker Adjustment and Retraining Notification Act of 1988, and similar state, local and foreign laws related to plant closings, relocations, mass layoffs and employment losses.

## ARTICLE II
## PURCHASE AND SALE

**Section 2.01    Purchase and Sale of Assets** Subject to the terms and conditions set forth herein and pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Seller, all of Seller's right, title and interest in the assets relating to Seller's Vernon, California facility and business operations with Amazon as set forth on Section 2.01 of the disclosure schedules ("**Disclosure Schedules**") attached hereto (the "**Purchased Assets**"), free and clear of any mortgage, pledge, lien, charge, security interest, claim or other encumbrance ("**Encumbrance**"), **provided,** **however,** that the foregoing shall not refer to any agreement by and between Seller and North Mill or any related obligations, including but in no way limited to that certain the Assumption and Guaranty Agreement and the Assumed EZ Obligations Note (as defined in the Assumption and Guaranty Agreement) ~~California Accounts Receivable, as identified on Section 2.01 of the Disclosure Schedules~~ shall govern the assumption, on a joint and several basis, with Seller of those obligations defined therein, including but not limited to the face amount of the Sold/Assigned California Accounts~~be subject to the existing liens of North Mill Capital ("~~**North Mill**"), ~~Azadian Group, LLC ("~~**Azadian Group**"~~) and Change Capital Holdings I, LLC~~ ("**Change Capital**") ("**Permitted Encumbrances**").

**Section 2.02    Assumed Liabilities.** Subject to the terms and conditions set forth herein, Buyer shall assume and agree to pay, perform and discharge (a) the liabilities and obligations

4

4126936v.1

arising after the Closing (as defined herein) under the Purchased Assets, but only to the extent that such liabilities and obligations do not relate to any breach, default or violation by Seller on or prior to the Closing, (b) existing monetary defaults under the lease for the Vernon, California facility in an amount not to exceed $185,000, ~~and~~ (c) Seller's payroll obligations for the Vernon, California facility and business operations with Amazon in an amount not to exceed $125,000, and (d) those liabilities and obligations that are the subject of Contracts executed by Buyer in connection with the transaction that is the subject of this Agreement (collectively, the "**Assumed Liabilities**"). Other than the Assumed Liabilities, Buyer shall not assume any liabilities or obligations of Seller of any kind, whether known or unknown, contingent, matured or otherwise, whether currently existing or hereinafter created.

**Section 2.03   Excluded Liabilities.** Notwithstanding the provisions of Section 2.02 or any other provision in this Agreement to the contrary, Buyer shall not assume and shall not be responsible to pay, perform or discharge any Liabilities of Seller or any of its Affiliates of any kind or nature whatsoever other than the Assumed Liabilities (the "**Excluded Liabilities**"). Seller shall, and shall cause each of its Affiliates to, pay and satisfy in due course all Excluded Liabilities which they are obligated to pay and satisfy. Without limiting the generality of the foregoing, the Excluded Liabilities shall include, but not be limited to, the following:

(a)    any Liabilities of Seller arising or incurred in connection with the negotiation, preparation, investigation and performance of this Agreement, the Ancillary Documents and the transactions contemplated hereby and thereby, including, without limitation, fees and expenses of counsel, accountants, consultants, advisers and others;

(b)    any Liability for (i) Taxes of Seller (or any stockholder or Affiliate of Seller) or relating to the Business, the Purchased Assets or the Assumed Liabilities for any Pre-Closing Tax Period; (ii) Taxes that arise out of the consummation of the transactions contemplated hereby or that are the responsibility of Seller pursuant to Section 6.10; or (iii) other Taxes of Seller (or any stockholder or Affiliate of Seller) of any kind or description (including any Liability for Taxes of Seller (or any stockholder or Affiliate of Seller) that becomes a Liability of Buyer under any common law doctrine of de facto merger or transferee or successor liability or otherwise by operation of contract or Law);

(c)    any Liabilities in respect of any pending or threatened Action arising out of, relating to or otherwise in respect of the operation of the Business or the Purchased Assets to the extent such Action relates to such operation on or prior to the Closing Date;

(d)    any Liabilities of Seller arising under or in connection with any benefit plan providing benefits to any present or former employee of Seller;

(e)    any Liabilities of Seller for any present or former employees, officers, directors, retirees, independent contractors or consultants of Seller, including, without limitation, any Liabilities associated with any claims for wages or other benefits, bonuses, accrued vacation, workers' compensation, severance, retention, termination or other payments;

(f)     Liabilities under environmental Laws, to the extent arising out of or relating to facts, circumstances or conditions existing on or prior to the Closing or otherwise to the extent arising out of any actions or omissions of Seller;

(g)     any trade accounts payable of Seller (i) which constitute intercompany payables owing to Affiliates of Seller; (ii) which constitute debt, loans or credit facilities to financial institutions; or (iii) which did not arise in the ordinary course of business;

(h)     any Liabilities of the Business relating or arising from unfulfilled commitments, quotations, purchase orders, customer orders or work orders, other than any of the foregoing to relate in any way to the Sold/Assigned California Accounts, which shall be governed solely by the terms and conditions of the Assumption and Guaranty Agreement and the Assumed EZ Obligations Note (as defined in the Assumption and Guaranty Agreement), that (i) do not constitute part of the Purchased Assets issued by the Business' customers to Seller on or before the Closing; (ii) did not arise in the ordinary course of business; or (iii) are not validly and effectively assigned to Buyer pursuant to this Agreement;

(i)     any Liabilities to indemnify, reimburse or advance amounts to any present or former officer, director, professional, member, employee or agent of Seller (including with respect to any breach of fiduciary obligations by same);

(j)     any Liabilities under any Contracts (i) which are not validly and effectively assigned to Buyer pursuant to this Agreement; (ii) which do not conform to the representations and warranties with respect thereto contained in this Agreement; or (iii) to the extent such Liabilities arise out of or relate to a breach by Seller of such Contracts prior to Closing;

(k)     any Liabilities associated with debt, loans or credit facilities of Seller and/or the Business owing to financial institutions other than those Liabilities of Seller that are expressly assumed by Buyer pursuant to ancillary agreements with North Mill, the terms and conditions of which control; and

(l)     any Liabilities arising out of, in respect of or in connection with the failure by Seller or any of its Affiliates to comply with any Law or Governmental Order.

**Section 2.04  Purchase Price.** The aggregate purchase price for the Purchased Assets shall be (a) $125,000, which amount has been previously deposited into Seller's counsel escrow account (the "**Hard Deposit**"), (b) an additional $125,000, which amount has been funded by Buyer to North Mill and previously delivered to Seller in the form of an overadvance by North Mill accordance with the terms and conditions of that certain Junior Subordinate Participation Agreement dated May ___, 2019, by and between North Mill and Azadian Group, LLC ("**Azadian Group**"), (c) a credit bid in the amount of $100,000 made by Azadian Group and Change Capital Holdings I, LLC ("**Change Capital**"), and (d) an amount equal to the first $100,000 received by Azadian Group and Change Capital on account of their second priority lien and security interest in certain of Seller's accounts receivable that were previously sold and assigned to North Mill pursuant to that certain Accounts Receivable Agreement with Recourse

dated December 30, 2016 ("**Seller AR Agreement**"), and in which accounts receivable North Mill is the owner and has and maintains a validly perfected, first priority security interest~~the Seller's accounts receivable~~ (the "**A/R Payment**," and collectively with the Hard Deposit, the "**Purchase Price**"), plus the assumption of the Assumed Liabilities. ~~Solely to the extent actually received by Buyer, Buyer shall cause the payment of the A/R Payment to Seller in cash, by wire transfer of immediately available funds in accordance with the~~ As all amounts paid with respect to Seller's accounts receivable must be remitted to North Mill pursuant to the Seller AR Agreement (and, to the extent received by Seller must be held in trust solely for the benefit of North Mill and immediately remitted to North Mill), if and only if any amounts remain after the payment in full of all Obligations (as defined in the Seller AR Agreement) due and owing to North Mill under the Seller AR Agreement and if North Mill delivers such amounts to Buyer rather than Seller, then Buyer shall remit any such amounts received (up to the total amount of the A/R Payment) to be transmitted to Seller in cash, by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in Section 2.04 of the Disclosure Schedules. The obligation to pay the A/R Payment shall survive Closing. In connection with and subject to the Bidding Procedures Order and applicable law, Buyer reserves the right to increase the Purchase Price.

**Section 2.05    [Reserved].**

**Section 2.06    Third Party Consents.** To the extent that Seller's rights under any Contract or Permit constituting a Purchased Asset, or any other Purchased Asset, may not be assigned to Buyer without the consent of another Person which has not been obtained, this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be unlawful, and Seller, at its expense, shall use its reasonable best efforts to obtain any such required consent(s) as promptly as possible. If any such consent shall not be obtained or if any attempted assignment would be ineffective or would impair Buyer's rights under the Purchased Asset in question so that Buyer would not in effect acquire the benefit of all such rights, Seller, to the maximum extent permitted by law and the Purchased Asset, shall act after the Closing as Buyer's agent in order to obtain for it the benefits thereunder and shall cooperate, to the maximum extent permitted by Law and the Purchased Asset, with Buyer in any other reasonable arrangement designed to provide such benefits to Buyer. Notwithstanding any provision in this Section 2.06 to the contrary, Buyer shall not be deemed to have waived its rights under Section 7.02(d) hereof unless and until Buyer either provides written waivers thereof or elects to proceed to consummate the transactions contemplated by this Agreement at Closing.

**Section 2.07    Bankruptcy Court Approval**.

(a)      Seller and Buyer acknowledge that this Agreement and the purchase of the Purchased Assets are subject to Bankruptcy Court approval. Seller and Buyer acknowledge that to obtain such approval, Seller must demonstrate that it has taken reasonable steps to obtain the highest or otherwise best offer possible for the Purchased Assets, including, but not limited to, giving notice of the transactions contemplated by this Agreement to creditors and certain other interested parties as ordered by the Bankruptcy Court, and conducting an auction in respect of the Purchased Assets (the "**Auction**")

(b)     In the event an appeal is taken or a stay pending appeal is requested with respect to the order of the Bankruptcy Court approving, *inter alia*, bidding and auction procedures (the **"Bidding Procedures Order"**) or the order of the Bankruptcy Court authorizing and approving, *inter alia*, the sale of the Purchased Assets to Buyer on the terms and conditions set forth herein and pursuant to Sections 105, 363 and 365 of the Bankruptcy Code (the **"Sale Order"**).  Seller shall promptly notify Buyer of such appeal or stay request and shall promptly provide to Buyer a copy of the related notice of appeal or order of stay.  Seller shall also provide Buyer with written notice of any motion or application filed in connection with any appeal from either of such orders.

(c)     From and after the date of execution of this Agreement, provided that Buyer is the successful bidder at the Auction and has not defaulted in any material respect in the performance of any of its obligations under this Agreement, Seller shall not take any action that is intended to result in, or fail to take any action the intent of which failure to act would result in, the reversal, voiding, modification or staying of the Bidding Procedures Order or the Sale Order.

(d)     Anything contained in this Agreement to the contrary notwithstanding, this Agreement may be terminated at any time prior to the Closing Date by Buyer if (i) the Bankruptcy Court has not entered the Sale Order by close of business on May 30, 2019, (ii) the Closing Date has not occurred on or before May 31, 2019 (unless the failure is due to material breach by Buyer), or (iii) Seller withdraws or seeks authority to withdraw the motion seeking approval of the transactions contemplated by this Agreement and the bidding and auction procedures set forth in the Bidding Procedures Order, or announces any stand-alone plan of reorganization or liquidation (or supports any such plan filed by any other party that is inconsistent with the transaction contemplated by this Agreement and the bidding and auction procedures).

(e)     If Buyer is not the successful bidder at the Auction, Buyer will be reimbursed for the amount of the Hard Deposit by the successful bidder.  Such successful bidder shall pay such amount directly to Buyer at the closing of the alternative transaction for the Purchased Assets that is approved by the Bankruptcy Court.

## ARTICLE III
## CLOSING

**Section 3.01   Closing.** Subject to the terms and conditions of this Agreement, the closing of the transactions contemplated by this Agreement (the "**Closing**") shall take place at 10:00 am, New York time at the offices of Stradley Ronon Stevens & Young LLP, 100 Park Avenue, Suite 2000, New York, NY, on the Business Day in which all of the conditions to Closing set forth in ARTICLE VII are either satisfied or waived (other than conditions which, by their nature, are to be satisfied on the Closing Date), or at such other time, date or place as Seller and Buyer may mutually agree upon in writing.  The date on which the Closing is to occur is herein referred to as the "**Closing Date**".  The consummation of the transactions contemplated by this Agreement shall be deemed to occur at 12:01 a.m. on the Closing Date.

**Section 3.02**   Closing Deliverables.

(a)      At the Closing, Seller shall deliver to Buyer the following:

(i)      a bill of sale in form and substance satisfactory to Buyer (the "**Bill of Sale**") and duly executed by Seller, transferring the Purchased Assets to Buyer;

(ii)      a copy of the Assumption and Guaranty Agreement and Assumed EZ Obligations Note (as defined in the Assumption and Guaranty Agreement);

(ii)(iii) an assignment and assumption agreement in form and substance satisfactory to Buyer (the "**Assignment and Assumption Agreement**") and duly executed by Seller, effecting the assignment to and assumption by Buyer of the Purchased Assets and the Assumed Liabilities;

(iii)(iv)an Assignment and Assumption of Lease in form and substance satisfactory to Buyer (the "**Assignment and Assumption of Lease**") and duly executed by Seller;[1]

(iv)(v) copies of all consents, approvals, waivers and authorizations referred to in **Section 4.02** of the Disclosure Schedules;

(v)(vi) a certificate of the Secretary or Assistant Secretary (or equivalent officer) of Seller certifying as to (A) the resolutions of the board of directors (or other governing body) of Seller, duly adopted and in effect, which authorize the execution, delivery and performance of this Agreement and the transactions contemplated hereby, and (B) the names and signatures of the officers of Seller authorized to sign this Agreement and the documents to be delivered hereunder;

(vi)(vii)      such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Buyer, as may be required to give effect to this Agreement;

(vii)(viii)      a copy of the Sale Approval Order, in form and substance satisfactory to Buyer; and

(viii)(ix)      a Mutual Release among Seller, Buyer and their respective principals (the "**Mutual Release**"), including, without limitation, the release by Buyer of all claims against the guarantors (including Vijay Aggarwal and Ajay Aggarwal) of the existing indebtedness of Seller to Buyer; which Mutual Release shall contain a provision, in a form acceptable to North Mill, providing that such Mutual Release shall not in any way be deemed to affect the obligations and liabilities of either Seller or Buyer to North Mill.[2]

(b)      At the Closing, Buyer shall deliver to Seller the following:

---

[1]TBD.

[2]Any others TBD.

4126936v.1

(i)     The Purchase Price, as set forth in Section 2.04;

(ii)     the Assignment and Assumption Agreement duly executed by Buyer;

(iii)     [the Assignment and Assumption of Lease duly executed by Buyer]; and

(iv)     a certificate of the Secretary or Assistant Secretary (or equivalent officer) of Buyer certifying as to (A) the resolutions of the board of directors (or other governing body) of Buyer, duly adopted and in effect, which authorize the execution, delivery and performance of this Agreement and the transactions contemplated hereby, and (B) the names and signatures of the officers of Buyer authorized to sign this Agreement and the documents to be delivered hereunder; and

(v)     the Mutual Release duly executed by Buyer.[3]

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the correspondingly numbered Section of the Disclosure Schedules, Seller represents and warrants to Buyer that the statements contained in this ARTICLE IV are true and correct as of the date hereof.

**Section 4.01   Organization and Authority of Seller; Enforceability.**   EZ is a corporation duly incorporated, validly existing and in good standing under the laws of the State of New Jersey, and has full corporate power and authority to enter into this Agreement and the documents to be delivered hereunder, to carry out its obligations hereunder and to consummate the transactions contemplated hereby.  UBFF is a limited liability company duly formed, validly existing and in good standing under the laws of the State of New Jersey, and has full limited liability company power and authority to enter into this Agreement and the documents to be delivered hereunder, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery and performance by Seller of this Agreement and the documents to be delivered hereunder and the consummation of the transactions contemplated hereby have been duly authorized by all requisite corporate/limited liability company action on the part of Seller. This Agreement and the documents to be delivered hereunder have been duly executed and delivered by Seller, and (assuming due authorization, execution and delivery by Buyer) this Agreement and the documents to be delivered hereunder constitute legal, valid and binding obligations of Seller enforceable against Seller in accordance with their respective terms.

**Section 4.02   No Conflicts; Consents.** Upon entry of the Sale Order, the execution, delivery and performance by Seller of this Agreement and the Ancillary Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision

---

[3] Any others TBD.

10

of the certificate of incorporation, by-laws or other organizational documents of Seller; (b) conflict with or result in a violation or breach of any provision of any Law or Governmental Order applicable to Seller, the Business or the Purchased Assets; (c) except as set forth in Section 4.02 of the Disclosure Schedules, require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, result in the acceleration of or create in any party the right to accelerate, terminate, modify or cancel any Contract or Permit to which Seller is a party or by which Seller or the Business is bound or to which any of the Purchased Assets are subject (including any Assigned Contract); or (d) result in the creation or imposition of any Encumbrance. No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Seller in connection with the execution and delivery of this Agreement or any of the Ancillary Documents and the consummation of the transactions contemplated hereby and thereby.

**Section 4.03  Title to Purchased Assets.** Seller owns and has good title to the Purchased Assets, free and clear of Encumbrances, other than Permitted Encumbrances.

**Section 4.04  Condition of Assets.** The tangible personal property included in the Purchased Assets is in good condition and is adequate for the uses to which it is being put, and none of such tangible personal property is in need of maintenance or repairs except for ordinary, routine maintenance and repairs that are not material in nature or cost.

**Section 4.05  Inventory.** All inventory, finished goods, raw materials, work in progress, packaging, supplies, parts and other inventories included in the Purchased Assets consist of a quality and quantity usable and salable in the ordinary course of business.

**Section 4.06**  Intellectual Property.

(a)  **"Intellectual Property"** means any and all of the following in any jurisdiction throughout the world: (i) trademarks and service marks, including all applications and registrations and the goodwill connected with the use of and symbolized by the foregoing; (ii) copyrights, including all applications and registrations related to the foregoing; (iii) trade secrets and confidential know-how; (iv) patents and patent applications; (v) computer software programs and information technology systems; (vi) websites and internet domain name registrations; and (vii) other intellectual property and related proprietary rights, interests and protections (including all rights to sue and recover and retain damages, costs and attorneys' fees for past, present and future infringement and any other rights relating to any of the foregoing).

(b)  **Section 4.06(b)** of the Disclosure Schedules lists all Intellectual Property included in the Purchased Assets ("**Purchased IP**"). Seller owns or has adequate, valid and enforceable rights to use all the Purchased IP, free and clear of all Encumbrances. Seller is not bound by any outstanding judgment, injunction, order or decree restricting the use of the Purchased IP, or restricting the licensing thereof to any person or entity.

11

(c)    Seller's prior and current use of the Purchased IP has not and does not infringe, violate, dilute or misappropriate the Intellectual Property of any person or entity and there are no claims pending or threatened by any person or entity with respect to the ownership, validity, enforceability, effectiveness or use of the Purchased IP. No person or entity is infringing, misappropriating, diluting or otherwise violating any of the Purchased IP, and neither Seller nor any affiliate of Seller has made or asserted any claim, demand or notice against any person or entity alleging any such infringement, misappropriation, dilution or other violation.

**Section 4.07   Assigned Contracts. Section 4.07** of the Disclosure Schedules includes each contract included in the Purchased Assets and being assigned to and assumed by Buyer (the "**Assigned Contracts**"). Each Assigned Contract is valid and binding on Seller in accordance with its terms and is in full force and effect.

**Section 4.08   Cure Costs; Verification of Costs and Expenses.**  Seller shall assume and assign all Assigned Contracts to Buyer as of the Closing Date pursuant to Section 365 of the Bankruptcy Code and the Sale Order.   In connection with such assignment and assumption, Buyer shall cure all monetary defaults under the Assigned Contracts to the extent required by Section 365(b) of the Bankruptcy Code (such amounts, the "**Cure Costs**").   Seller shall be responsible for the verification of all Cure Costs including all administrative responsibilities associated therewith, and shall use their reasonable efforts to establish the proper cure amount, if any, for each Assigned Contract, including taking all reasonable actions with respect to the filing and prosecution of any pleadings and proceedings in Bankruptcy Court and the service and delivery of any related notices and pleadings.

**Section 4.09   Permits.**   **Section 4.08** of the Disclosure Schedules lists all permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances and similar rights obtained from governmental authorities included in the Purchased Assets (the "**Transferred Permits**"). The Transferred Permits are valid and in full force and effect. All fees and charges with respect to such Transferred Permits as of the date hereof have been paid in full. No event has occurred that, with or without notice or lapse of time or both, would reasonably be expected to result in the revocation, suspension, lapse or limitation of any Transferred Permit.

**Section 4.10   Non-foreign Status.** Seller is not a "foreign person" as that term is used in Treasury Regulations Section 1.1445-2.

**Section 4.11   Compliance With Laws** Seller has complied, and is now complying, with all applicable federal, state and local laws and regulations applicable to ownership and use of the Purchased Assets.

**Section 4.12   Legal Proceedings.** There is no claim, action, suit, proceeding or governmental investigation ("**Action**") of any nature pending or, to Seller's knowledge, threatened against or by Seller (a) relating to or affecting the Purchased Assets or the Assumed Liabilities; or (b) that challenges or seeks to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

**Section 4.13  Brokers.** No broker, finder, auctioneer, appraiser or investment banker is entitled to any brokerage, auctioneer, appraiser, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Seller.

**Section 4.14  Full Disclosure.** No representation or warranty by Seller in this Agreement and no statement contained in the Disclosure Schedules to this Agreement or any certificate or other document furnished or to be furnished to Buyer pursuant to this Agreement contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

**ARTICLE V**
**REPRESENTATIONS AND WARRANTIES OF BUYER**

Buyer represents and warrants to Seller that the statements contained in this ARTICLE V are true and correct as of the date hereof.

**Section 5.01  Organization and Authority of Buyer; Enforceability.** Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware. Buyer has full limited liability company power and authority to enter into this Agreement and the documents to be delivered hereunder, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery and performance by Buyer of this Agreement and the documents to be delivered hereunder and the consummation of the transactions contemplated hereby have been duly authorized by all requisite limited liability company action on the part of Buyer. This Agreement and the documents to be delivered hereunder have been duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by Seller) this Agreement and the documents to be delivered hereunder constitute legal, valid and binding obligations of Buyer enforceable against Buyer in accordance with their respective terms.

**Section 5.02  No Conflicts; Consents.** The execution, delivery and performance by Buyer of this Agreement and the documents to be delivered hereunder, and the consummation of the transactions contemplated hereby, do not and will not: (a) violate or conflict with the certificate of formation, operating agreement or other organizational documents of Buyer; or (b) violate or conflict with any judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Buyer. No consent, approval, waiver or authorization is required to be obtained by Buyer from any person or entity (including any governmental authority) in connection with the execution, delivery and performance by Buyer of this Agreement and the consummation of the transactions contemplated hereby.

**Section 5.03  Brokers.** No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer.

**Section 5.04  Legal Proceedings.** There are no Actions pending or, to Buyer's knowledge, threatened against or by Buyer or any Affiliate of Buyer that challenge or seek to

13

prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise or serve as a basis for any such Action.

**ARTICLE VI**
**COVENANTS**

**Section 6.01    Conduct of Business Prior to the Closing.** From the date hereof until the Closing, except as otherwise provided in this Agreement or consented to in writing by Buyer (which consent shall not be unreasonably withheld or delayed), Seller shall (x) conduct the its West Coast and Amazon business ("**Business**") in the ordinary course of business consistent with past practice; and (y) use reasonable best efforts to maintain and preserve intact its current Business organization, operations and franchise and to preserve the rights, franchises, goodwill and relationships of its employees, customers, lenders, suppliers, regulators and others having relationships with the Business. Without limiting the foregoing, from the date hereof until the Closing Date, Seller shall:

> (a)    preserve and maintain all Permits required for the conduct of the Business as currently conducted or the ownership and use of the Purchased Assets;

> (b)    pay the debts, Taxes and other obligations of the Business when due;

> (c)    continue to collect Accounts Receivable in a manner consistent with past practice, without discounting such Accounts Receivable;

> (d)    maintain the properties and assets included in the Purchased Assets in the same condition as they were on the date of this Agreement, subject to reasonable wear and tear;

> (e)    continue in full force and effect without modification all Insurance Policies, except as required by applicable Law;

> (f)    defend and protect the properties and assets included in the Purchased Assets from infringement or usurpation;

> (g)    perform all of its obligations under all Assigned Contracts;

> (h)    maintain the books and records in accordance with past practice; and

> (i)    comply in all material respects with all Laws applicable to the conduct of the Business or the ownership and use of the Purchased Assets.

**Section 6.02    Access to Information.** From the date hereof until the Closing, Seller shall (a) afford Buyer and its Representatives full and free access to and the right to inspect all of Sellers' real property, properties, assets, premises, Books and Records, Contracts and other documents and data related to the Business; (b) furnish Buyer and its Representatives with such financial, operating and other data and information related to the Business as Buyer or any of its Representatives may reasonably request; and (c) instruct the Representatives of Seller to cooperate with Buyer in its investigation of the Business; provided North Mill shall have equal

14

rights of access and inspection and Buyer shall not alter, amend, destroy or remove any of the foregoing. Notwithstanding the foregoing, any calls to 32 Degrees, Zara and Amazon shall include either Robert Walsh or John Kokozos as an authorized representative of Seller and a representative of Change Capital and Azadian Group.  No investigation by Buyer or other information received by Buyer shall operate as a waiver or otherwise affect any representation, warranty or agreement given or made by Seller in this Agreement.  For a period not to exceed 180 days after the Closing, Seller and Vijay Aggarwal and Ajay Aggarwal (collectively, the "**Seller Principals**") shall reasonably cooperate with Buyer in connection of the transfer of the Business and the Purchased Assets to Buyer.

**Section 6.03**    Notice of Certain Events.

(a)    From the date hereof until the Closing, Seller shall promptly notify Buyer in writing of:

(i)    any fact, circumstance, event or action the existence, occurrence or taking of which (A) has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (B) has resulted in, or could reasonably be expected to result in, any representation or warranty made by Seller hereunder not being true and correct or (C) has resulted in, or could reasonably be expected to result in, the failure of any of the conditions set forth in Section 7.02 to be satisfied;

(ii)    any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement;

(iii)    any notice or other communication from any Governmental Authority in connection with the transactions contemplated by this Agreement; and

(iv)    any Actions commenced or, to Seller's Knowledge, threatened against, relating to or involving or otherwise affecting the Business, the Purchased Assets or the Assumed Liabilities that relates to the consummation of the transactions contemplated by this Agreement.

(b)    Buyer's receipt of information pursuant to this Section 6.03 shall not operate as a waiver or otherwise affect any representation, warranty or agreement given or made by Seller in this Agreement  andAgreement and shall not be deemed to amend or supplement the Disclosure Schedules.

**Section 6.04**    Employees and Employee Benefits.

(a)    Commencing on the Closing Date, Seller shall terminate all employees of the Business who are actively at work on the Closing Date, and, at Buyer's sole discretion, Buyer offer employment, on an "at will" basis, to any or all of such employees, including those identified on Disclosure Schedule 6.4(a). Seller shall bear any

15

and all obligations and liability under the WARN Act resulting from employment losses pursuant to this Section 6.04.

(b)    Seller shall be solely responsible, and Buyer shall have no obligations whatsoever for, any compensation or other amounts payable to any current or former employee, officer, director, independent contractor or consultant of the Business, including, without limitation, hourly pay, commission, bonus, salary, accrued vacation, fringe, pension or profit sharing benefits or severance pay for any period relating to the service with Seller at any time on or prior to the Closing Date and Seller shall pay all such amounts to all entitled persons on or prior to the Closing Date.

(c)    Seller shall remain solely responsible for the satisfaction of all claims for medical, dental, life insurance, health accident or disability benefits brought by or in respect of current or former employees, officers, directors, independent contractors or consultants of the Business or the spouses, dependents or beneficiaries thereof, which claims relate to events occurring on or prior to the Closing Date. Seller also shall remain solely responsible for all worker's compensation claims of any current or former employees, officers, directors, independent contractors or consultants of the Business which relate to events occurring on or prior to the Closing Date. Seller shall pay, or cause to be paid, all such amounts to the appropriate persons as and when due.

(d)    Each employee of the Business who becomes employed by Buyer in connection with the transactions contemplated by this Agreement shall be eligible to receive the salary and benefits maintained for employees of Buyer on substantially similar terms and conditions in the aggregate as are provided to similarly situated employees of Buyer.

(e)    Each employee of the Business who becomes employed by Buyer in connection with the transaction shall be given service credit for the purpose of eligibility under the group health plan and eligibility and vesting only under the defined contribution retirement plan for his or her period of service with the Seller prior to the Closing Date; *provided, however,* that (i) such credit shall be given pursuant to payroll or plan records, at the election of Buyer, in its sole and absolute discretion; and (ii) such service crediting shall be permitted and consistent with Buyer's defined contribution retirement plan.

**Section 6.05  Confidentiality; Non-Competition; Non-Solicitation.** (a)    From and after the Closing, Seller and the Seller Principals, shall, and shall cause its Affiliates  to, hold, and shall use their respective reasonable best efforts to cause its or their respective Representatives to hold, in confidence any and all information, whether written or oral, concerning the Business, except to the extent that Seller is obligated under any existing agreement to disclose such information to a third party upon demand (as is the case with Seller's obligations to North Mill) or to the extent that Seller can show that such information (i) is generally available to and known by the public through no fault of Seller, any of its Affiliates or their respective Representatives; or (ii) is lawfully acquired by Seller, any of its Affiliates or their respective Representatives from and after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation. If Seller or any

16

of its Affiliates or their respective Representatives are compelled to disclose any information by judicial or administrative process or by other requirements of law, Seller shall promptly notify Buyer in writing and shall disclose only that portion of such information which Seller is advised by its counsel in writing is legally required to be disclosed, *provided that* Seller shall use reasonable best efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

(a)     For a period of three years commencing on the Closing Date (the "**Restricted Period**"), the Seller and the Seller Principals shall not, and shall not permit any of their respective Affiliates to, directly or indirectly, (i) engage in or assist others in engaging in any business venture competitive with the Business ("**Restricted Business**") in the territory in which the business operates ("**Territory**"); (ii) have an interest in any Person that engages directly or indirectly in the Restricted Business in the Territory in any capacity, including as a partner, shareholder, member, employee, principal, agent, trustee or consultant; or (iii) cause, induce or encourage any material actual or prospective client, customer, supplier or licensor of the Business (including any existing or former client or customer of Seller and any Person that becomes a client or customer of the Business after the Closing), or any other Person who has a material business relationship with the Business, to terminate or modify any such actual or prospective relationship.

(b)     During the Restricted Period, Seller and the Seller Principals shall not, and shall not permit any of its Affiliates to, directly or indirectly, hire or solicit any person who is offered employment by Buyer in connection with this transaction or is or was employed in the Business during the Restricted Period, or encourage any such employee to leave such employment or hire any such employee who has left such employment, except pursuant to a general solicitation which is not directed specifically to any such employees.

(c)     Each of Seller and the Seller Principals acknowledges that a breach or threatened breach of this Section 6.05 would give rise to irreparable harm to Buyer, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by Seller or either of the Seller Principals of any such obligations, Buyer shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

(d)     Each of Seller and the Seller Principals acknowledges that the restrictions contained in this Section 6.05 are reasonable and necessary to protect the legitimate interests of Buyer and constitute a material inducement to Buyer to enter into this Agreement and consummate the transactions contemplated by this Agreement. In the event that any covenant contained in this Section 6.05 should ever be adjudicated to exceed the time, geographic, product or service or other limitations permitted by applicable Law in any jurisdiction, then any court is expressly empowered to reform such covenant, and such covenant shall be deemed reformed, in such jurisdiction to the

17

maximum time, geographic, product or service or other limitations permitted by applicable Law. The covenants contained in this Section 6.05 and each provision hereof are severable and distinct covenants and provisions. The invalidity or unenforceability of any such covenant or provision as written shall not invalidate or render unenforceable the remaining covenants or provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such covenant or provision in any other jurisdiction.

**Section 6.06**   [Reserved].

**Section 6.07**   **Closing Conditions** From the date hereof until the Closing, each party hereto shall use reasonable best efforts to take such actions as are necessary to expeditiously satisfy the closing conditions set forth in ARTICLE VII hereof.

**Section 6.08**   **Public Announcements.** Unless otherwise required by applicable Law (based upon the reasonable advice of counsel), prior to Closing, no party to this Agreement shall make any public announcements in respect of this Agreement or the transactions contemplated hereby or otherwise communicate with any news media without the prior written consent of the other party (which consent shall not be unreasonably withheld or delayed), and the parties shall cooperate as to the timing and contents of any such announcement.

**Section 6.09**   **Bulk Sales Laws.** Buyer, at its option, may comply with the provision of the New Jersey Bulk Sales Act and Seller will fully cooperate with Buyer upon its election to so comply.  Buyer shall have obtained a response to the Bulk Sale Notice from the New Jersey Division of Taxation either (i) confirming that Seller owes no taxes, or (ii) stating that an identified portion of the Purchase Price must be held back at Closing and placed into escrow with Buyer's attorney until Seller files and pays outstanding taxes and/or tax filings.

**Section 6.10**   **Receivables.** From and after the Closing, if Seller or any of its Affiliates receives or collects any funds relating to any Accounts Receivable or any other Purchased Asset, Seller or its Affiliate shall remit such funds to Buyer within five Business Days after its receipt thereof.

**Section 6.11**   **Transfer Taxes.** All transfer, documentary, sales, use, stamp, registration, value added and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the Ancillary Documents (including any real property transfer Tax and any other similar Tax) shall be borne and paid by Seller when due. Seller shall, at its own expense, timely file any Tax Return or other document with respect to such Taxes or fees (and Buyer shall cooperate with respect thereto as necessary).

**Section 6.12**   **Non-Suit Covenant**.  In the event this Agreement is approved by the Court and the sale of the Assets provided herein under is consummated, Seller hereby covenants it will not sue any person or entity to an agreement, obligation or lease assumed by Buyer in conjunction with this Agreement, irrespective of the cause of action or theory of recovery that could be asserted in connection with the Company's estate, including but not limited to preferential transfer or breach of contract.

4126936v.1

**Section 6.13   Further Assurances.** Following the Closing, each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the Ancillary Documents.

## ARTICLE VII
## CONDITIONS TO CLOSING

**Section 7.01   Conditions to Obligations of All Parties.** The obligations of each party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions:

(a)     No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Governmental Order which is in effect and has the effect of making the transactions contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of such transactions or causing any of the transactions contemplated hereunder to be rescinded following completion thereof.

(b)     The Sale Order shall have been entered, providing that the Purchased Assets will be sold free and clear or any and all liens, claims, encumbrances and interests, other than Permitted Encumbrances.

(c)     The Sale Order shall contain (i) a waiver of the fourteen (14) days stay of effectiveness of such Sale Order pursuant to Rule 6004(h) of the Federal Rules of Bankruptcy Procedure, and (ii) provide Buyer with the protections of Section 363(m) of the Bankruptcy Code.

~~(c)~~(d)   The Assumption and Guaranty Agreement, the Assumed EZ Obligations Note (as defined in the Assumption and Guaranty Agreement), the Accounts Receivable Agreement with Recourse and any and all other agreements and documents required to be delivered to North Mill under any of the foregoing, shall have been duly executed and delivered to North Mill.

**Section 7.02   Conditions to Obligations of Buyer.** The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Buyer's waiver, at or prior to the Closing, of each of the following conditions:

(a)     Other than the representations and warranties of Seller contained in Section 4.01, the representations and warranties of Seller contained in this Agreement, the Ancillary Documents and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Material Adverse Effect) or in all material respects (in the case of any representation or warranty not qualified by materiality or Material Adverse Effect) on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as

19

of that specified date in all respects). The representations and warranties of Seller contained in Section 4.01 shall be true and correct in all respects on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects).

(b)     Seller shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the Ancillary Documents to be performed or complied with by it prior to or on the Closing Date.

(c)     No Action shall have been commenced against Buyer or Seller, which would prevent the Closing. No injunction or restraining order shall have been issued by any Governmental Authority, and be in effect, which restrains or prohibits any transaction contemplated hereby.

(d)     All approvals, consents and waivers that are listed on Section 4.02 of the Disclosure Schedules shall have been received, and executed counterparts thereof shall have been delivered to Buyer at or prior to the Closing.

(e)     From the date of this Agreement, there shall not have occurred any Material Adverse Effect, nor shall any event or events have occurred that, individually or in the aggregate, with or without the lapse of time, could reasonably be expected to result in a Material Adverse Effect.

(f)     Seller shall have delivered to Buyer duly executed counterparts to the Ancillary Documents and such other documents and deliveries set forth in Section 3.02(a).

(g)     Buyer shall have received all Permits that are necessary for it to conduct the Business as conducted by Seller as of the Closing Date.

(h)     Each employee identified on Disclosure Schedule 6.04(a) shall have accepted Buyer's offer of employment.

(i)     North Mill shall have consented to the transactions contemplated by this Agreement and the sale of the Purchased Assets to Buyer, subject only to the Permitted Encumbrances, such consent to be in form and substance reasonably satisfactory to Buyer.

(j)     The Bankruptcy Court shall have entered an order approving the assignment and assumption of the Vernon, California lease by Seller to Buyer, which order shall contain a waiver of the 14-day stay of effectiveness of such order pursuant to Rule 6004(h) of the Federal Rules of Bankruptcy Procedure.

4126936v.1

(k)     Seller shall have delivered to Buyer such other documents or instruments as Buyer reasonably requests and are reasonably necessary to consummate the transactions contemplated by this Agreement.

**Section 7.03   Conditions to Obligations of Seller.** The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Seller's waiver, at or prior to the Closing, of each of the following conditions:

(a)     Other than the representations and warranties of Buyer contained in Section 5.01 and Section 5.03, the representations and warranties of Buyer contained in this Agreement, the Ancillary Documents and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Material Adverse Effect) or in all material respects (in the case of any representation or warranty not qualified by materiality or Material Adverse Effect) on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects). The representations and warranties of Buyer contained in Section 5.01 and Section 5.03 shall be true and correct in all respects on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date.

(b)     Buyer shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the Ancillary Documents to be performed or complied with by it prior to or on the Closing Date; *provided, that*, with respect to agreements, covenants and conditions that are qualified by materiality, Buyer shall have performed such agreements, covenants and conditions, as so qualified, in all respects.

(c)     No injunction or restraining order shall have been issued by any Governmental Authority, and be in effect, which restrains or prohibits any material transaction contemplated hereby.

(d)     Buyer shall have delivered to Seller duly executed counterparts to the Ancillary Documents and such other documents and deliveries set forth in Section 3.02(b).

(e)     Buyer shall have delivered to Seller such other documents or instruments as Seller reasonably requests and are reasonably necessary to consummate the transactions contemplated by this Agreement.

## ARTICLE VIII
## INDEMNIFICATION

**Section 8.01   Survival.** All representations, warranties, covenants and agreements contained herein and all related rights to indemnification shall survive the Closing.

21

**Section 8.02    Indemnification By Seller.**    Seller shall defend, indemnify and hold harmless Buyer, its affiliates and their respective stockholders, directors, officers and employees from and against all claims, judgments, damages, liabilities, settlements, losses, costs and expenses, including attorneys' fees and disbursements, arising from or relating to:

(a)    any inaccuracy in or breach of any of the representations or warranties of Seller contained in this Agreement or any document to be delivered hereunder; or

(b)    any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Seller pursuant to this Agreement or any document to be delivered hereunder.

**Section 8.03    Indemnification Procedures.**    Whenever any claim shall arise for indemnification hereunder, the party entitled to indemnification (the "**Indemnified Party**") shall promptly provide written notice of such claim to the other party (the "**Indemnifying Party**"). In connection with any claim giving rise to indemnity hereunder resulting from or arising out of any Action by a person or entity who is not a party to this Agreement, the Indemnifying Party, at its sole cost and expense and upon written notice to the Indemnified Party, may assume the defense of any such Action with counsel reasonably satisfactory to the Indemnified Party. The Indemnified Party shall be entitled to participate in the defense of any such Action, with its counsel and at its own cost and expense. If the Indemnifying Party does not assume the defense of any such Action, the Indemnified Party may, but shall not be obligated to, defend against such Action in such manner as it may deem appropriate, including, but not limited to, settling such Action, after giving notice of it to the Indemnifying Party, on such terms as the Indemnified Party may deem appropriate and no action taken by the Indemnified Party in accordance with such defense and settlement shall relieve the Indemnifying Party of its indemnification obligations herein provided with respect to any damages resulting therefrom. The Indemnifying Party shall not settle any Action without the Indemnified Party's prior written consent (which consent shall not be unreasonably withheld or delayed).

**Section 8.04    Tax Treatment of Indemnification Payments.**    All indemnification payments made by Seller under this Agreement shall be treated by the parties as an adjustment to the Purchase Price for tax purposes, unless otherwise required by law.

**Section 8.05    Effect of Investigation.**    Buyer's right to indemnification or other remedy based on the representations, warranties, covenants and agreements of Seller contained herein will not be affected by any investigation conducted by Buyer with respect to, or any knowledge acquired by Buyer at any time, with respect to the accuracy or inaccuracy of or compliance with, any such representation, warranty, covenant or agreement.

**Section 8.06    Cumulative Remedies.**    The rights and remedies provided in this Article VIII are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise.

**ARTICLE IX
TERMINATION**

22

**Section 9.01    Termination.** This Agreement may be terminated at any time prior to the Closing:

(a)    by the mutual written consent of Seller and Buyer;

(b)    by Buyer by written notice to Seller if:

(i)    Buyer is not then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Seller pursuant to this Agreement that would give rise to the failure of any of the conditions specified in ARTICLE VII and such breach, inaccuracy or failure has not been cured by Seller within ten days of Seller's receipt of written notice of such breach from Buyer; or

(ii)    any of the conditions set forth in Section 2.0(d). Section 7.01 or Section 7.02 shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by May 31, 2019, unless such failure shall be due to the failure of Buyer to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing; or

(iii)    an alternative transaction for the Purchased Assets is approved by the Bankruptcy Court; or

(iv)    a Material Adverse Effect occurs with respect to the Business or Purchased Assets.

(c)    by Seller by written notice to Buyer if:

(i)    Seller is not then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Buyer pursuant to this Agreement that would give rise to the failure of any of the conditions specified in ARTICLE VII and such breach, inaccuracy or failure has not been cured by Buyer within ten days of Buyer's receipt of written notice of such breach from Seller; or

(ii)    any of the conditions set forth in Section 7.01 or Section 7.03 shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by June  28, 2019, unless such failure shall be due to the failure of Seller to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing; or

(d)    by Buyer or Seller in the event that (i) there shall be any Law that makes consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited or (ii) any Governmental Authority shall have issued a Governmental Order restraining or enjoining the transactions contemplated by this Agreement, and such Governmental Order shall have become final and non-appealable.

**Section 9.02   Effect of Termination.** In the event of the termination of this Agreement in accordance with this Article, this Agreement shall forthwith become void and there shall be no liability on the part of any party hereto except:

(a)    as set forth in this ARTICLE X and Section 6.05 and ARTICLE XI hereof; and

(b)    that nothing herein shall relieve any party hereto from liability for any willful breach of any provision hereof.

**ARTICLE X**
**MISCELLANEOUS**

**Section 10.01 Expenses.** Except as otherwise expressly provided herein, all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses, whether or not the Closing shall have occurred.

**Section 10.02 Notices.** All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 10.02):

If to Seller:              E Z Worldwide Express
                           49 Old Turnpike Road
                           Oldwick, New Jersey 08858
                           Email:
                           Fax:
                           Attention:

with a copy to:            Law Offices of Kenneth L. Baum LLC
                           167 Main Street
                           Hackensack, NJ  07601
                           Facsimile: (201) 584-0297
                           E-mail: kbaum@kenbaumdebtsolutions.com
                           Attention: Kenneth L. Baum, Esquire

If to Buyer:               QX Logistix, LLC
                           2 North 6th Place, Unit 30E
                           Brooklyn, NY 11249

24

E-mail: ccarey@chriscareyadvisors.com
Attention: Christopher Carey, Chief Executive
Officer

with copies to:                    Stradley Ronon Stevens & Young LLP
2600 One Commerce Square
Philadelphia, PA  19103
Facsimile: (215) 564-8120
E-mail: cconnell@stradley.com
Attention: Christopher S. Connell, Esquire

-and-

Azadian Group LLC
Attn:  Raffi Azadian
600 Madison Ave., 18th Fl.
New York, NY 10022
Email:  raffi@azadiangroup.com

**Section 10.03  Interpretation.** For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (x) to Articles, Sections, Disclosure Schedules and Exhibits mean the Articles and Sections of, and Disclosure Schedules and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Disclosure Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

**Section 10.04  Headings.** The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 10.05  Severability.** If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

25

**Section 10.06 Entire Agreement.** This Agreement and the Ancillary Documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and those in the Ancillary Documents, the Exhibits and Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

**Section 10.07 Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed; *provided, however,* that prior to the Closing Date, Buyer may, without the prior written consent of Seller, assign all or any portion of its rights under this Agreement to one or more of its direct or indirect wholly-owned subsidiaries. No assignment shall relieve the assigning party of any of its obligations hereunder.

**Section 10.08 No Third-party Beneficiaries.** Except as provided in ARTICLE IX, this Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 10.09 Amendment and Modification; Waiver.** This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**Section 10.10** Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.

(a)    This Agreement shall be governed by and construed in accordance with the internal laws of the State of New Jersey without giving effect to any choice or conflict of law provision or rule (whether of the State of New Jersey or any other jurisdiction).

(b)    ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE ANCILLARY DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY MAY BE INSTITUTED IN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA OR THE COURTS OF THE STATE OF NEW JERSEY IN EACH CASE LOCATED IN THE CITY OF ELIZABETH AND COUNTY OF UNION, AND EACH

PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING. SERVICE OF PROCESS, SUMMONS, NOTICE OR OTHER DOCUMENT BY MAIL TO SUCH PARTY'S ADDRESS SET FORTH HEREIN SHALL BE EFFECTIVE SERVICE OF PROCESS FOR ANY SUIT, ACTION OR OTHER PROCEEDING BROUGHT IN ANY SUCH COURT. THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c)     EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT OR THE ANCILLARY DOCUMENTS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE ANCILLARY DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.10(c).

**Section 10.11 Specific Performance.** The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

**Section 10.12 Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[SIGNATURE PAGE FOLLOWS]

4126936v.1

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

SELLER:

E Z MAILING SERVICES, INC.

By: _____
Name:
Title:

UNITED BUSINESS FREIGHT
FORWARDERS, LLC

By: _____
Name:
Title:

BUYER:

QX LOGISTIX LLC

By: _____
Name: Raffi Azzadian
Title:

Each of the undersigned hereby executes this
Agreement solely for purposes of being
bound by the provisions set forth in Sections
6.02 and 6.05.

_____
Vijay Aggarwal

_____
Ajay Aggarwal

28