# EXHIBIT A

## ASSET PURCHASE AGREEMENT

between

E Z MAILING SERVICES, INC.

UNITED BUSINESS FREIGHT FORWARDERS, LLC

and

QX LOGISTIX LLC

dated as of

June [      ], 2019

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "**Agreement**"), dated as of June [    ], 2019, is entered into between E Z Mailing Services Inc., a New Jersey corporation ("**EZ**"), and United Business Freight Forwarders, LLC, a New Jersey limited liability company ("**UBFF**", and together with EZ, collectively, "**Seller**"), and QX Logistix LLC a New York limited liability company ("**Buyer**").

## RECITALS

**WHEREAS**, on or about May 17, 2019, Seller consented to the entry of orders for relief commencing voluntary cases (the "**Bankruptcy Cases**") under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532 (as amended, the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of New Jersey (the "**Bankruptcy Court**");

**WHEREAS**, Seller wishes to sell and assign to Buyer, and Buyer wishes to purchase and assume from Seller, the rights and obligations of Seller to the Purchased Assets and the Assumed Liabilities (as defined herein), subject to the terms and conditions set forth herein, and in accordance with an Order of the Bankruptcy Court pursuant to Sections 105, 363 and 365 of the Bankruptcy Code;

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

The following terms have the meanings specified or referred to in this ARTICLE I:

"**Action**" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

"**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" has the meaning set forth in the preamble.

"**Ancillary Documents**" means the Bill of Sale, the Assignment and Assumption Agreement, Assignment and Assumption of Leases, and the other agreements, instruments and documents required to be delivered at the Closing.

"**Assumed EZ Obligations Note**" has the meaning set forth in the Assumption and Guaranty Agreement.

"**Assumed Liabilities**" has the meaning set forth in Section 2.02.

"**Assumption and Guaranty Agreement**" means that certain agreement of the same name executed by and between Buyer and North Mill and dated on or about the date hereof, which shall be the sole and exclusive agreement governing the assumption by Buyer of joint and several liability for the obligations delineated therein, including but not limited to the face amount of the Sold/Assigned California Accounts.

"**Azadian Group**" Azadian Group, LLC, a Delaware limited liability company.

"**Business**" has the meaning set forth in Section 6.01.

"**Business Day**" means any day except Saturday, Sunday or any other day on which commercial banks located in Philadelphia, Pennsylvania are authorized or required by Law to be closed for business.

"**Buyer**" has the meaning set forth in the preamble.

"**Change Capital**" means Change Capital Holdings I, LLC, a Delaware limited liability company.

"**Closing**" has the meaning set forth in Section 3.01

"**Closing Date**" has the meaning set forth in Section 3.01.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Contracts**" means all contracts, leases, deeds, mortgages, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures and all other agreements, commitments and legally binding arrangements, whether written or oral, other than any and all of the foregoing by and between Seller and North Mill.

"**Disclosure Schedules**" means the Disclosure Schedules delivered by Seller and Buyer concurrently with the execution and delivery of this Agreement.

"**Dollars or $**"  means the lawful currency of the United States.

"**Encumbrance**" has the meaning set forth in Section 2.01.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"**ERISA Affiliate**" means all employers (whether or not incorporated) that would be treated together with the Seller or any of its Affiliates as a "single employer" within the meaning of Section 414 of the Code or Section 4001 of ERISA.

"**Excluded Liabilities**" has the meaning set forth in Section 2.03.

"**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

"**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"**Hard Deposit**" has the meaning set forth in Section 2.04.

"**Knowledge of Seller or Seller's Knowledge**" or any other similar knowledge qualification, means the actual or constructive knowledge of any director or officer of Seller, after due inquiry.

"**Law**" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority.

"**Liabilities**" means liabilities, obligations or commitments of any nature whatsoever, asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured or otherwise.

"**Material Adverse Effect**" means any event, occurrence, fact, condition or change that is, or could reasonably be expected to become, individually or in the aggregate, materially adverse to (a) the business, results of operations, condition (financial or otherwise) or assets of the Business, (b) the value of the Purchased Assets, or (c) the ability of Seller to consummate the transactions contemplated hereby on a timely basis.

"**MRPS Agreements**" means the collective reference to (a) those certain Merchant Receivables Purchase and Security Agreements between Azadian Group and EZ dated April 3, 2018, May 17, 2018 and September 28, 2018, respectively, and (b) that certain Merchant Receivables Purchase and Security Agreement between Change Capital and EZ dated January 23, 2019, each as amended, modified or supplemented from time to time.

"**North Mill**" has the meaning set forth in Section 2.01.

"**Permitted Encumbrance**" has the meaning set forth in Section 2.01.

"**Permits**" means all permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances and similar rights obtained, or required to be obtained, from Governmental Authorities.

3

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"**Pre-Closing Tax Period**" means any taxable period ending on or before the Closing Date and, with respect to any taxable period beginning before and ending after the Closing Date, the portion of such taxable period ending on and including the Closing Date.

"**Purchase Price**" has the meaning set forth in Section 2.04.

"**Purchased Assets**" has the meaning set forth in Section 2.01.

"**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"**Sale Order**" has the meaning set forth in Section 2.07(b).

"**Seller**" has the meaning set forth in the preamble.

"**Seller Principles**" has the meaning set forth in Section 6.02.

"**Sold/Assigned California Accounts**" has the meaning set forth in the Assumption and Guaranty Agreement.

"**Taxes**" means all federal, state, local, foreign and other income, gross receipts, sales, use, production, ad valorem, transfer, documentary, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"**Tax Return**" means any return, declaration, report, claim for refund, information return or statement or other document relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**Transition Services Agreement**" means that certain Transition Services Agreement dated on or about the date hereof between Azadian Group and Seller.

"**Transition Services Termination Date**" means the date that the services provided under the Transition Services Termination Agreement shall be terminated pursuant to the terms thereof.

"**WARN Act**" means the federal Worker Adjustment and Retraining Notification Act of 1988, and similar state, local and foreign laws related to plant closings, relocations, mass layoffs and employment losses.

# 4126936  v. 5

## ARTICLE II
## PURCHASE AND SALE

**Section 2.01   Purchase and Sale of Assets** Subject to the terms and conditions set forth herein and pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Seller, all of Seller's right, title and interest in the assets relating to Seller's Vernon, California facility and business operations with Amazon as set forth on Section 2.01 of the disclosure schedules ("**Disclosure Schedules**") attached hereto (the "**Purchased Assets**"), free and clear of any mortgage, pledge, lien, charge, security interest, claim or other encumbrance ("**Encumbrance**"), provided, however, that the foregoing shall not refer to any agreement by and between Seller and North Mill or any related obligations, including but in no way limited to the Assumption and Guaranty Agreement and the Assumed EZ Obligations Note, which shall govern the assumption, on a joint and several basis, with Seller of those obligations defined therein, including but not limited to the face amount of the Sold/Assigned California Accounts ("**Permitted Encumbrances**").

**Section 2.02   Assumed Liabilities.** Subject to the terms and conditions set forth herein, Buyer shall assume and agree to pay, perform and discharge (a) the liabilities and obligations arising after the Closing (as defined herein) under the Purchased Assets, but only to the extent that such liabilities and obligations do not relate to any breach, default or violation by Seller on or prior to the Closing, (b) existing monetary defaults under the lease for the Vernon, California facility in an amount not to exceed $185,000, (c) Seller's payroll obligations for the Vernon, California facility and business operations with Amazon in an amount not to exceed $125,000, and (d) those liabilities and obligations that are the subject of Contracts executed by Buyer in connection with the transactions that are the subject of this Agreement (collectively, the "**Assumed Liabilities**"). Other than the Assumed Liabilities, Buyer shall not assume any liabilities or obligations of Seller of any kind, whether known or unknown, contingent, matured or otherwise, whether currently existing or hereinafter created.

**Section 2.03   Excluded Liabilities.** Notwithstanding the provisions of Section 2.02 or any other provision in this Agreement to the contrary, Buyer shall not assume and shall not be responsible to pay, perform or discharge any Liabilities of Seller or any of its Affiliates of any kind or nature whatsoever other than the Assumed Liabilities (the "**Excluded Liabilities**"). Seller shall, and shall cause each of its Affiliates to, pay and satisfy in due course all Excluded Liabilities which they are obligated to pay and satisfy. Without limiting the generality of the foregoing, the Excluded Liabilities shall include, but not be limited to, the following:

(a)      any Liabilities of Seller arising or incurred in connection with the negotiation, preparation, investigation and performance of this Agreement, the Ancillary Documents and the transactions contemplated hereby and thereby, including, without limitation, fees and expenses of counsel, accountants, consultants, advisers and others;

(b)      any Liability for (i) Taxes of Seller (or any stockholder or Affiliate of Seller) or relating to the Business, the Purchased Assets or the Assumed Liabilities for any Pre-Closing Tax Period; (ii) Taxes that arise out of the consummation of the transactions contemplated hereby or that are the responsibility of Seller pursuant to

5

Section 6.10; or (iii) other Taxes of Seller (or any stockholder or Affiliate of Seller) of any kind or description (including any Liability for Taxes of Seller (or any stockholder or Affiliate of Seller) that becomes a Liability of Buyer under any common law doctrine of de facto merger or transferee or successor liability or otherwise by operation of contract or Law);

(c)      any Liabilities in respect of any pending or threatened Action arising out of, relating to or otherwise in respect of the operation of the Business or the Purchased Assets to the extent such Action relates to such operation on or prior to the Closing Date;

(d)      any Liabilities of Seller arising under or in connection with any benefit plan providing benefits to any present or former employee of Seller;

(e)      any Liabilities of Seller for any present or former employees, officers, directors, retirees, independent contractors or consultants of Seller, including, without limitation, any Liabilities associated with any claims for wages or other benefits, bonuses, accrued vacation, workers' compensation, severance, retention, termination or other payments;

(f)      Liabilities under environmental Laws, to the extent arising out of or relating to facts, circumstances or conditions existing on or prior to the Closing or otherwise to the extent arising out of any actions or omissions of Seller;

(g)      any trade accounts payable of Seller (i) which constitute intercompany payables owing to Affiliates of Seller; (ii) which constitute debt, loans or credit facilities to financial institutions; or (iii) which did not arise in the ordinary course of business;

(h)      any Liabilities of the Business relating or arising from unfulfilled commitments, quotations, purchase orders, customer orders or work orders, other than any of the foregoing that relate in any way to the Sold/Assigned California Accounts, which shall be governed solely by the terms and conditions of the Assumption and Guaranty Agreement and the Assumed EZ Obligations Note), that (i) do not constitute part of the Purchased Assets issued by the Business' customers to Seller on or before the Closing; (ii) did not arise in the ordinary course of business; or (iii) are not validly and effectively assigned to Buyer pursuant to this Agreement;

(i)      any Liabilities to indemnify, reimburse or advance amounts to any present or former officer, director, professional, member, employee or agent of Seller (including with respect to any breach of fiduciary obligations by same);

(j)      any Liabilities under any Contracts (i) which are not validly and effectively assigned to Buyer pursuant to this Agreement; (ii) which do not conform to the representations and warranties with respect thereto contained in this Agreement; or (iii) to the extent such Liabilities arise out of or relate to a breach by Seller of such Contracts prior to Closing;

# 4126936  v. 5

(k)     any Liabilities associated with debt, loans or credit facilities of Seller and/or the Business owing to financial institutions, other than those Liabilities of Seller that are expressly assumed by Buyer pursuant to ancillary agreements with North Mill, the terms and conditions of which control; and

(l)     any Liabilities arising out of, in respect of or in connection with the failure by Seller or any of its Affiliates to comply with any Law or Governmental Order.

**Section 2.04   Purchase Price.** The aggregate purchase price for the Purchased Assets shall be (a) $125,000, which amount has been previously deposited into Seller's counsel escrow account (the "**Hard Deposit**"), (b) an additional $125,000, which amount has been funded by Buyer to North Mill and delivered to Seller in accordance with the terms and conditions of that certain Junior Subordinate Participation Agreement dated June ____, 2019, by and between North Mill and Azadian Group, (c) a credit bid in the amount of $100,000 made by Azadian Group and Change Capital, (d) the assumption of the Assumed Liabilities, and (e) an amount equal to the first $75,000 received by Azadian Group and Change Capital on account of their second priority lien and security interest in certain of Seller's accounts receivable that were previously sold and assigned to North Mill pursuant to that certain Accounts Receivable Agreement with Recourse dated December 30, 2016 ("**Seller AR Agreement**"), and in which accounts receivable North Mill is the owner and has and maintains a validly perfected, first priority security interest (the "**A/R Payment,**" and collectively with the foregoing, the "**Purchase Price**"); provided, however, that upon closing of this Agreement, Buyer shall pay $25,000 (the "**Additional Retainer**") to Sellers' bankruptcy counsel, Law Offices of Kenneth L. Baum LLC ("**Baum**"); provided, further, however, that  Baum shall hold the Additional Retainer in trust and may only use it to pay Baum's fees and expenses that are allowed by an order of the Bankruptcy Court granting Baum's application for the same.  As all amounts paid with respect to Seller's accounts receivable must be remitted to North Mill pursuant to the Seller AR Agreement (and, to the extent received by Seller must be held in trust solely for the benefit of North Mill and immediately remitted to North Mill), if and only if any amounts remain after the payment in full of all Obligations (as defined in the Seller AR Agreement and which include, for the avoidance of doubt, the amount set forth in clause (b) above) due and owing to North Mill under the Seller AR Agreement and if North Mill delivers such amounts to Buyer rather than Seller, then Buyer shall remit any such amounts received (up to the total amount of the A/R Payment) to be transmitted to Seller in cash, by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in Section 2.04 of the Disclosure Schedules. After the A/R Payment has been made to Seller, North Mill shall use commercially reasonable efforts to assist Azadian Group and Change Capital in collecting the balance of the Obligations subject of the second priority liens and security interests in favor of Azadian Group and Change Capital.  The obligation to pay the A/R Payment shall survive Closing.  In connection with and subject to the Bidding Procedures Order and applicable law, Buyer reserves the right to increase the Purchase Price.

**Section 2.05   [Reserved].**

**Section 2.06   Third Party Consents.** To the extent that Seller's rights under any Contract or Permit constituting a Purchased Asset, or any other Purchased Asset, may not be assigned to Buyer without the consent of another Person which has not been obtained, this

Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be unlawful, and Seller, at its expense, shall use its reasonable best efforts to obtain any such required consent(s) as promptly as possible. If any such consent shall not be obtained or if any attempted assignment would be ineffective or would impair Buyer's rights under the Purchased Asset in question so that Buyer would not in effect acquire the benefit of all such rights, Seller, to the maximum extent permitted by law and the Purchased Asset, shall act after the Closing as Buyer's agent in order to obtain for it the benefits thereunder and shall cooperate, to the maximum extent permitted by Law and the Purchased Asset, with Buyer in any other reasonable arrangement designed to provide such benefits to Buyer. Notwithstanding any provision in this Section 2.06 to the contrary, Buyer shall not be deemed to have waived its rights under Section 7.02(d) hereof unless and until Buyer either provides written waivers thereof or elects to proceed to consummate the transactions contemplated by this Agreement at Closing.

**Section 2.07    Bankruptcy Court Approval**.

(a)    Seller and Buyer acknowledge that this Agreement and the purchase of the Purchased Assets are subject to Bankruptcy Court approval.   Seller and Buyer acknowledge that to obtain such approval, Seller must demonstrate that it has taken reasonable steps to obtain the highest or otherwise best offer possible for the Purchased Assets, including, but not limited to, giving notice of the transactions contemplated by this Agreement to creditors and certain other interested parties as ordered by the Bankruptcy Court, and conducting an auction in respect of the Purchased Assets (the **"Auction"**)

(b)    In the event an appeal is taken or a stay pending appeal is requested with respect to the order of the Bankruptcy Court approving, *inter alia*, bidding and auction procedures (the **"Bidding Procedures Order"**) or the order of the Bankruptcy Court authorizing and approving, *inter alia*, the sale of the Purchased Assets to Buyer on the terms and conditions set forth herein and pursuant to Sections 105, 363 and 365 of the Bankruptcy Code (the **"Sale Order"**).  Seller shall promptly notify Buyer of such appeal or stay request and shall promptly provide to Buyer a copy of the related notice of appeal or order of stay.  Seller shall also provide Buyer with written notice of any motion or application filed in connection with any appeal from either of such orders.

(c)    From and after the date of execution of this Agreement, provided that Buyer is the successful bidder at the Auction and has not defaulted in any material respect in the performance of any of its obligations under this Agreement, Seller shall not take any action that is intended to result in, or fail to take any action the intent of which failure to act would result in, the reversal, voiding, modification or staying of the Bidding Procedures Order or the Sale Order.

(d)    Anything contained in this Agreement to the contrary notwithstanding, this Agreement may be terminated at any time prior to the Closing Date by Buyer if (i) the Bankruptcy Court has not entered the Sale Order by close of business on May 30, 2019, (ii) the Closing Date has not occurred on or before May 31, 2019 (unless the failure is due to material breach by Buyer), or (iii) Seller withdraws or seeks authority to

withdraw the motion seeking approval of the transactions contemplated by this Agreement and the bidding and auction procedures set forth in the Bidding Procedures Order, or announces any stand-alone plan of reorganization or liquidation (or supports any such plan filed by any other party that is inconsistent with the transaction contemplated by this Agreement and the bidding and auction procedures).

(e)      If Buyer is not the successful bidder at the Auction, Buyer will be reimbursed for the amount of the Hard Deposit by the successful bidder.  Such successful bidder shall pay such amount directly to Buyer at the closing of the alternative transaction for the Purchased Assets that is approved by the Bankruptcy Court.

**Section 2.08  MRPS Agreements**. For purposes of clarity, Seller and the Seller Principles acknowledge and agree that the MRPS Agreements, and the liens and security interests granted thereunder, are and shall remain in full force and effect, without modification, after giving effect to the transactions contemplated by this Agreement.

## ARTICLE III
## CLOSING

**Section 3.01   Closing.** Subject to the terms and conditions of this Agreement, the closing of the transactions contemplated by this Agreement (the "**Closing**") shall take place at 10:00 am, New York time at the offices of Stradley Ronon Stevens & Young LLP, 100 Park Avenue, Suite 2000, New York, NY, on the Business Day in which all of the conditions to Closing set forth in ARTICLE VII are either satisfied or waived (other than conditions which, by their nature, are to be satisfied on the Closing Date), or at such other time, date or place as Seller and Buyer may mutually agree upon in writing. The date on which the Closing is to occur is herein referred to as the "**Closing Date**".  The consummation of the transactions contemplated by this Agreement shall be deemed to occur at 12:01 a.m. on the Closing Date.

**Section 3.02**   Closing Deliverables.

(a)      At the Closing, Seller shall deliver to Buyer the following:

(i)      a bill of sale in form and substance satisfactory to Buyer (the "**Bill of Sale**") and duly executed by Seller, transferring the Purchased Assets to Buyer;

(ii)      the Assumption and Guaranty Agreement and Assumed EZ Obligations Note;

(iii)      an assignment and assumption agreement in form and substance satisfactory to Buyer (the "**Assignment and Assumption Agreement**") and duly executed by Seller, effecting the assignment to and assumption by Buyer of the Purchased Assets and the Assumed Liabilities;

(iv)      an Assignment and Assumption of Lease in form and substance satisfactory to Buyer (the "**Assignment and Assumption of Lease**") and duly executed by Seller;

9

(v)    copies of all consents, approvals, waivers and authorizations referred to in **Section 4.02** of the Disclosure Schedules;

(vi)    a certificate of the Secretary or Assistant Secretary (or equivalent officer) of Seller certifying as to (A) the resolutions of the board of directors (or other governing body) of Seller, duly adopted and in effect, which authorize the execution, delivery and performance of this Agreement and the transactions contemplated hereby, and (B) the names and signatures of the officers of Seller authorized to sign this Agreement and the documents to be delivered hereunder;

(vii)    such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Buyer, as may be required to give effect to this Agreement; and

(viii)    a copy of the Sale Approval Order, in form and substance satisfactory to Buyer.

(b)    At the Closing, Buyer shall deliver to Seller the following:

(i)    The Purchase Price, as set forth in Section 2.04;

(ii)    the Assignment and Assumption Agreement duly executed by Buyer;

(iii)    the Assignment and Assumption of Lease duly executed by Buyer; and

(iv)    a certificate of the Secretary or Assistant Secretary (or equivalent officer) of Buyer certifying as to (A) the resolutions of the board of directors (or other governing body) of Buyer, duly adopted and in effect, which authorize the execution, delivery and performance of this Agreement and the transactions contemplated hereby, and (B) the names and signatures of the officers of Buyer authorized to sign this Agreement and the documents to be delivered hereunder.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the correspondingly numbered Section of the Disclosure Schedules, Seller represents and warrants to Buyer that the statements contained in this ARTICLE IV are true and correct as of the date hereof.

**Section 4.01  Organization and Authority of Seller; Enforceability.**    EZ is a corporation duly incorporated, validly existing and in good standing under the laws of the State of New Jersey, and has full corporate power and authority to enter into this Agreement and the documents to be delivered hereunder, to carry out its obligations hereunder and to consummate the transactions contemplated hereby.  UBFF is a limited liability company duly formed, validly existing and in good standing under the laws of the State of New Jersey, and has full limited liability company power and authority to enter into this Agreement and the documents to be

10

delivered hereunder, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery and performance by Seller of this Agreement and the documents to be delivered hereunder and the consummation of the transactions contemplated hereby have been duly authorized by all requisite corporate/limited liability company action on the part of Seller. This Agreement and the documents to be delivered hereunder have been duly executed and delivered by Seller, and (assuming due authorization, execution and delivery by Buyer) this Agreement and the documents to be delivered hereunder constitute legal, valid and binding obligations of Seller enforceable against Seller in accordance with their respective terms.

**Section 4.02   No Conflicts; Consents.** Upon entry of the Sale Order, the execution, delivery and performance by Seller of this Agreement and the Ancillary Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the certificate of incorporation, by-laws or other organizational documents of Seller; (b) conflict with or result in a violation or breach of any provision of any Law or Governmental Order applicable to Seller, the Business or the Purchased Assets; (c) except as set forth in Section 4.02 of the Disclosure Schedules, require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, result in the acceleration of or create in any party the right to accelerate, terminate, modify or cancel any Contract or Permit to which Seller is a party or by which Seller or the Business is bound or to which any of the Purchased Assets are subject (including any Assigned Contract); or (d) result in the creation or imposition of any Encumbrance. No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Seller in connection with the execution and delivery of this Agreement or any of the Ancillary Documents and the consummation of the transactions contemplated hereby and thereby.

**Section 4.03   Title to Purchased Assets.** Seller owns and has good title to the Purchased Assets, free and clear of Encumbrances, other than Permitted Encumbrances.

**Section 4.04   Condition of Assets.** The tangible personal property included in the Purchased Assets is in good condition and is adequate for the uses to which it is being put, and none of such tangible personal property is in need of maintenance or repairs except for ordinary, routine maintenance and repairs that are not material in nature or cost.

**Section 4.05   Inventory.** All inventory, finished goods, raw materials, work in progress, packaging, supplies, parts and other inventories included in the Purchased Assets consist of a quality and quantity usable and salable in the ordinary course of business.

**Section 4.06**   Intellectual Property.

(a)    "**Intellectual Property**" means any and all of the following in any jurisdiction throughout the world: (i) trademarks and service marks, including all applications and registrations and the goodwill connected with the use of and symbolized by the foregoing; (ii) copyrights, including all applications and registrations related to the foregoing; (iii) trade secrets and confidential know-how; (iv) patents and patent

11

applications; (v) computer software programs and information technology systems; (vi) websites and internet domain name registrations; and (vii) other intellectual property and related proprietary rights, interests and protections (including all rights to sue and recover and retain damages, costs and attorneys' fees for past, present and future infringement and any other rights relating to any of the foregoing).

(b)        **Section 4.06(b)** of the Disclosure Schedules lists all Intellectual Property included in the Purchased Assets ("**Purchased IP**"). Seller owns or has adequate, valid and enforceable rights to use all the Purchased IP, free and clear of all Encumbrances. Seller is not bound by any outstanding judgment, injunction, order or decree restricting the use of the Purchased IP, or restricting the licensing thereof to any person or entity.

(c)        Seller's prior and current use of the Purchased IP has not and does not infringe, violate, dilute or misappropriate the Intellectual Property of any person or entity and there are no claims pending or threatened by any person or entity with respect to the ownership, validity, enforceability, effectiveness or use of the Purchased IP. No person or entity is infringing, misappropriating, diluting or otherwise violating any of the Purchased IP, and neither Seller nor any affiliate of Seller has made or asserted any claim, demand or notice against any person or entity alleging any such infringement, misappropriation, dilution or other violation.

**Section 4.07   Assigned Contracts. Section 4.07** of the Disclosure Schedules includes each contract included in the Purchased Assets and being assigned to and assumed by Buyer (the "**Assigned Contracts**"). Each Assigned Contract is valid and binding on Seller in accordance with its terms and is in full force and effect.

**Section 4.08   Cure Costs; Verification of Costs and Expenses.**  Seller shall assume and assign all Assigned Contracts to Buyer as of the Closing Date pursuant to Section 365 of the Bankruptcy Code and the Sale Order.   In connection with such assignment and assumption, Buyer shall cure all monetary defaults under the Assigned Contracts to the extent required by Section 365(b) of the Bankruptcy Code (such amounts, the "**Cure Costs**").   Seller shall be responsible for the verification of all Cure Costs including all administrative responsibilities associated therewith, and shall use their reasonable efforts to establish the proper cure amount, if any, for each Assigned Contract, including taking all reasonable actions with respect to the filing and prosecution of any pleadings and proceedings in Bankruptcy Court and the service and delivery of any related notices and pleadings.

**Section 4.09   Permits.**   **Section 4.08** of the Disclosure Schedules lists all permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances and similar rights obtained from governmental authorities included in the Purchased Assets (the "**Transferred Permits**"). The Transferred Permits are valid and in full force and effect. All fees and charges with respect to such Transferred Permits as of the date hereof have been paid in full. No event has occurred that, with or without notice or lapse of time or both, would reasonably be expected to result in the revocation, suspension, lapse or limitation of any Transferred Permit.

**Section 4.10   Non-foreign Status.** Seller is not a "foreign person" as that term is used in Treasury Regulations Section 1.1445-2.

12

Section 4.11 **Compliance With Laws** Seller has complied, and is now complying, with all applicable federal, state and local laws and regulations applicable to ownership and use of the Purchased Assets.

Section 4.12 **Legal Proceedings.** There is no claim, action, suit, proceeding or governmental investigation ("**Action**") of any nature pending or, to Seller's knowledge, threatened against or by Seller (a) relating to or affecting the Purchased Assets or the Assumed Liabilities; or (b) that challenges or seeks to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

Section 4.13 **Brokers.** No broker, finder, auctioneer, appraiser or investment banker is entitled to any brokerage, auctioneer, appraiser, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Seller.

Section 4.14 **Full Disclosure.** No representation or warranty by Seller in this Agreement and no statement contained in the Disclosure Schedules to this Agreement or any certificate or other document furnished or to be furnished to Buyer pursuant to this Agreement contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller that the statements contained in this ARTICLE V are true and correct as of the date hereof.

Section 5.01 **Organization and Authority of Buyer; Enforceability.** Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware. Buyer has full limited liability company power and authority to enter into this Agreement and the documents to be delivered hereunder, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery and performance by Buyer of this Agreement and the documents to be delivered hereunder and the consummation of the transactions contemplated hereby have been duly authorized by all requisite limited liability company action on the part of Buyer. This Agreement and the documents to be delivered hereunder have been duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by Seller) this Agreement and the documents to be delivered hereunder constitute legal, valid and binding obligations of Buyer enforceable against Buyer in accordance with their respective terms.

Section 5.02 **No Conflicts; Consents.** The execution, delivery and performance by Buyer of this Agreement and the documents to be delivered hereunder, and the consummation of the transactions contemplated hereby, do not and will not: (a) violate or conflict with the certificate of formation, operating agreement or other organizational documents of Buyer; or (b) violate or conflict with any judgment, order, decree, statute, law, ordinance, rule or regulation

13

applicable to Buyer. No consent, approval, waiver or authorization is required to be obtained by Buyer from any person or entity (including any governmental authority) in connection with the execution, delivery and performance by Buyer of this Agreement and the consummation of the transactions contemplated hereby.

**Section 5.03    Brokers.** No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer.

**Section 5.04    Legal Proceedings.** There are no Actions pending or, to Buyer's knowledge, threatened against or by Buyer or any Affiliate of Buyer that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise or serve as a basis for any such Action.

## ARTICLE VI
## COVENANTS

**Section 6.01    Conduct of Business Prior to the Closing.** From the date hereof until the Closing, except as otherwise provided in this Agreement or consented to in writing by Buyer (which consent shall not be unreasonably withheld or delayed), Seller shall (x) conduct the its West Coast and Amazon business ("**Business**") in the ordinary course of business consistent with past practice; and (y) use reasonable best efforts to maintain and preserve intact its current Business organization, operations and franchise and to preserve the rights, franchises, goodwill and relationships of its employees, customers, lenders, suppliers, regulators and others having relationships with the Business. Without limiting the foregoing, from the date hereof until the Closing Date, Seller shall:

(a)    preserve and maintain all Permits required for the conduct of the Business as currently conducted or the ownership and use of the Purchased Assets;

(b)    pay the debts, Taxes and other obligations of the Business when due;

(c)    continue to collect Accounts Receivable in a manner consistent with past practice, without discounting such Accounts Receivable;

(d)    maintain the properties and assets included in the Purchased Assets in the same condition as they were on the date of this Agreement, subject to reasonable wear and tear;

(e)    continue in full force and effect without modification all Insurance Policies, except as required by applicable Law;

(f)    defend and protect the properties and assets included in the Purchased Assets from infringement or usurpation;

(g)    perform all of its obligations under all Assigned Contracts;

(h)    maintain the books and records in accordance with past practice; and

14

(i)    comply in all material respects with all Laws applicable to the conduct of the Business or the ownership and use of the Purchased Assets.

**Section 6.02    Access to Information.** From the date hereof until the Closing, Seller shall (a) afford Buyer and its Representatives full and free access to and the right to inspect all of Sellers' real property, properties, assets, premises, Books and Records, Contracts and other documents and data related to the Business; (b) furnish Buyer and its Representatives with such financial, operating and other data and information related to the Business as Buyer or any of its Representatives may reasonably request; and (c) instruct the Representatives of Seller to cooperate with Buyer in its investigation of the Business; provided North Mill shall have equal rights of access and inspection and Buyer shall not alter, amend, destroy or remove any of the foregoing. Notwithstanding the foregoing, any calls to 32 Degrees, Zara and Amazon shall include either Robert Walsh or John Kokozos as an authorized representative of Seller and a representative of Change Capital and Azadian Group.   No investigation by Buyer or other information received by Buyer shall operate as a waiver or otherwise affect any representation, warranty or agreement given or made by Seller in this Agreement.   For a period not to exceed 180 days after the Closing, Seller and Vijay Aggarwal and Ajay Aggarwal (collectively, the "**Seller Principals**") shall reasonably cooperate with Buyer in connection of the transfer of the Business and the Purchased Assets to Buyer.

**Section 6.03    Notice of Certain Events**.

(a)    From the date hereof until the Closing, Seller shall promptly notify Buyer in writing of:

(i)    any fact, circumstance, event or action the existence, occurrence or taking of which (A) has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (B) has resulted in, or could reasonably be expected to result in, any representation or warranty made by Seller hereunder not being true and correct or (C) has resulted in, or could reasonably be expected to result in, the failure of any of the conditions set forth in Section 7.02 to be satisfied;

(ii)    any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement;

(iii)    any notice or other communication from any Governmental Authority in connection with the transactions contemplated by this Agreement; and

(iv)    any Actions commenced or, to Seller's Knowledge, threatened against, relating to or involving or otherwise affecting the Business, the Purchased Assets or the Assumed Liabilities that relates to the consummation of the transactions contemplated by this Agreement.

15

(b)     Buyer's receipt of information pursuant to this Section 6.03 shall not operate as a waiver or otherwise affect any representation, warranty or agreement given or made by Seller in this Agreement  and shall not be deemed to amend or supplement the Disclosure Schedules.

**Section 6.04    Employees and Employee Benefits**.

(a)     Commencing on the Transition Services Termination Date, Seller shall terminate all employees of the Business who are actively at work on the Transition Services Termination Date, and, at Buyer's sole discretion, Buyer offer employment, on an "at will" basis, to any or all of such employees, including those identified on Disclosure Schedule 6.4(a) (to the extent still employed). Seller shall bear any and all obligations and liability under the WARN Act resulting from employment losses pursuant to this Section 6.04.

(b)     Seller shall be solely responsible, and Buyer shall have no obligations whatsoever for, any compensation or other amounts payable to any current or former employee, officer, director, independent contractor or consultant of the Business, including, without limitation, hourly pay, commission, bonus, salary, accrued vacation, fringe, pension or profit sharing benefits or severance pay for any period relating to the service with Seller at any time on or prior to the Transition Services Termination Date and Seller shall pay all such amounts to all entitled persons on or prior to the Transition Services Termination Date, in each case subject to the terms of the Transition Services Agreement.

(c)     Seller shall remain solely responsible for the satisfaction of all claims for medical, dental, life insurance, health accident or disability benefits brought by or in respect of current or former employees, officers, directors, independent contractors or consultants of the Business or the spouses, dependents or beneficiaries thereof, which claims relate to events occurring on or prior to the Transition Services Termination Date, subject to the terms of the Transition Services Agreement. Seller also shall remain solely responsible for all worker's compensation claims of any current or former employees, officers, directors, independent contractors or consultants of the Business which relate to events occurring on or prior to the Transition Services Termination Date, subject to the terms of the Transition Services Agreement. Seller shall pay, or cause to be paid, all such amounts to the appropriate persons as and when due.

(d)     Each employee of the Business who becomes employed by Buyer in connection with the transactions contemplated by this Agreement shall be eligible to receive the salary and benefits maintained for employees of Buyer on substantially similar terms and conditions in the aggregate as are provided to similarly situated employees of Buyer.

(e)     Each employee of the Business who becomes employed by Buyer in connection with the transaction shall be given service credit for the purpose of eligibility under the group health plan and eligibility and vesting only under the defined contribution retirement plan for his or her period of service with the Seller prior to the

16

Transition Services Termination Date; *provided, however*, that (i) such credit shall be given pursuant to payroll or plan records, at the election of Buyer, in its sole and absolute discretion; and (ii) such service crediting shall be permitted and consistent with Buyer's defined contribution retirement plan.

**Section 6.05  Confidentiality; Non-Competition; Non-Solicitation.** (a)  From and after the Closing, Seller and the Seller Principals, shall, and shall cause its Affiliates  to, hold, and shall use their respective reasonable best efforts to cause its or their respective Representatives to hold, in confidence any and all information, whether written or oral, concerning the Business, except to the extent that Seller is obligated under any existing agreement to disclose such information to a third party upon demand (as is the case with Seller's obligations to North Mill) or to the extent that Seller can show that such information (i) is generally available to and known by the public through no fault of Seller, any of its Affiliates or their respective Representatives; or (ii) is lawfully acquired by Seller, any of its Affiliates or their respective Representatives from and after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation. If Seller or any of its Affiliates or their respective Representatives are compelled to disclose any information by judicial or administrative process or by other requirements of law, Seller shall promptly notify Buyer in writing and shall disclose only that portion of such information which Seller is advised by its counsel in writing is legally required to be disclosed, *provided that* Seller shall use reasonable best efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

(a)  For a period of three years commencing on the Closing Date (the "**Restricted Period**"), the Seller and the Seller Principals shall not, and shall not permit any of their respective Affiliates to, directly or indirectly, (i) engage in or assist others in engaging in any business venture competitive with the Business ("**Restricted Business**") in the territory in which the business operates ("**Territory**"); (ii) have an interest in any Person that engages directly or indirectly in the Restricted Business in the Territory in any capacity, including as a partner, shareholder, member, employee, principal, agent, trustee or consultant; or (iii) cause, induce or encourage any material actual or prospective client, customer, supplier or licensor of the Business (including any existing or former client or customer of Seller and any Person that becomes a client or customer of the Business after the Closing), or any other Person who has a material business relationship with the Business, to terminate or modify any such actual or prospective relationship.

(b)  During the Restricted Period, Seller and the Seller Principals shall not, and shall not permit any of its Affiliates to, directly or indirectly, hire or solicit any person who is offered employment by Buyer in connection with this transaction or is or was employed in the Business during the Restricted Period, or encourage any such employee to leave such employment or hire any such employee who has left such employment, except pursuant to a general solicitation which is not directed specifically to any such employees.

(c)  Each of Seller and the Seller Principals acknowledges that a breach or threatened breach of this Section 6.05 would give rise to irreparable harm to Buyer, for

17

which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by Seller or either of the Seller Principals of any such obligations, Buyer shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

(d)    Each of Seller and the Seller Principals acknowledges that the restrictions contained in this Section 6.05 are reasonable and necessary to protect the legitimate interests of Buyer and constitute a material inducement to Buyer to enter into this Agreement and consummate the transactions contemplated by this Agreement. In the event that any covenant contained in this Section 6.05 should ever be adjudicated to exceed the time, geographic, product or service or other limitations permitted by applicable Law in any jurisdiction, then any court is expressly empowered to reform such covenant, and such covenant shall be deemed reformed, in such jurisdiction to the maximum time, geographic, product or service or other limitations permitted by applicable Law. The covenants contained in this Section 6.05 and each provision hereof are severable and distinct covenants and provisions. The invalidity or unenforceability of any such covenant or provision as written shall not invalidate or render unenforceable the remaining covenants or provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such covenant or provision in any other jurisdiction.

**Section 6.06**   [Reserved].

**Section 6.07   Closing Conditions** From the date hereof until the Closing, each party hereto shall use reasonable best efforts to take such actions as are necessary to expeditiously satisfy the closing conditions set forth in ARTICLE VII hereof.

**Section 6.08   Public Announcements.** Unless otherwise required by applicable Law (based upon the reasonable advice of counsel), prior to Closing, no party to this Agreement shall make any public announcements in respect of this Agreement or the transactions contemplated hereby or otherwise communicate with any news media without the prior written consent of the other party (which consent shall not be unreasonably withheld or delayed), and the parties shall cooperate as to the timing and contents of any such announcement.

**Section 6.09   Bulk Sales Laws.** Buyer, at its option, may comply with the provision of the New Jersey Bulk Sales Act and Seller will fully cooperate with Buyer upon its election to so comply.  Buyer shall have obtained a response to the Bulk Sale Notice from the New Jersey Division of Taxation either (i) confirming that Seller owes no taxes, or (ii) stating that an identified portion of the Purchase Price must be held back at Closing and placed into escrow with Buyer's attorney until Seller files and pays outstanding taxes and/or tax filings.

**Section 6.10   Receivables.** From and after the Closing, if Seller or any of its Affiliates receives or collects any funds relating to any Accounts Receivable or any other Purchased Asset,

18

Seller or its Affiliate shall remit such funds to Buyer within five Business Days after its receipt thereof.

**Section 6.11   Transfer Taxes.** All transfer, documentary, sales, use, stamp, registration, value added and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the Ancillary Documents (including any real property transfer Tax and any other similar Tax) shall be borne and paid by Seller when due. Seller shall, at its own expense, timely file any Tax Return or other document with respect to such Taxes or fees (and Buyer shall cooperate with respect thereto as necessary).

**Section 6.12   Non-Suit Covenant**.   In the event this Agreement is approved by the Court and the sale of the Assets provided herein under is consummated, Seller hereby covenants it will not sue any person or entity to an agreement, obligation or lease assumed by Buyer in conjunction with this Agreement, irrespective of the cause of action or theory of recovery that could be asserted in connection with the Company's estate, including but not limited to preferential transfer or breach of contract.

**Section 6.13   Further Assurances.** Following the Closing, each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the Ancillary Documents.

**Section 6.14   Mutual Release**.   Contemporaneously with the termination of the Transition Services Agreement (provided that such termination is not the result of the failure of Seller to properly provide the services referenced therein in accordance with the terms of the Transition Services Agreement), Seller and Buyer shall sign, and Seller and Buyer shall cause their respective principals to sign, the Mutual Release in the form attached hereto as Exhibit A (the "**Mutual Release**").   The Mutual Release shall include, without limitation, the release by Buyer of all claims against the guarantors (including Vijay Aggarwal and Ajay Aggarwal) of Seller's obligations under the MRPS Agreements; provided however, that Mutual Release shall not in any way be deemed to affect (w) the obligations and liabilities of either Seller or Buyer to North Mill, (x) the obligations and liabilities of Seller to Azadian Group and Change Capital under the MRPS Agreement, (y) the obligations of Seller and the Seller Principles under this Agreement, and (z) any liability of a party based on fraud, malfeasance or willful misconduct.

**ARTICLE VII**
**CONDITIONS TO CLOSING**

**Section 7.01   Conditions to Obligations of All Parties.** The obligations of each party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions:

(a)      No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Governmental Order which is in effect and has the effect of making the transactions contemplated by this Agreement illegal, otherwise restraining or

prohibiting consummation of such transactions or causing any of the transactions contemplated hereunder to be rescinded following completion thereof.

(b)     The Sale Order shall have been entered, providing that the Purchased Assets will be sold free and clear or any and all liens, claims, encumbrances and interests, other than Permitted Encumbrances.

(c)     The Sale Order shall contain (i) a waiver of the fourteen (14) days stay of effectiveness of such Sale Order pursuant to Rule 6004(h) of the Federal Rules of Bankruptcy Procedure, and (ii) provide Buyer with the protections of Section 363(m) of the Bankruptcy Code.

(d)     The Assumption and Guaranty Agreement, the Assumed EZ Obligations Note, the Accounts Receivable Agreement with Recourse and any and all other agreements and documents required to be delivered to North Mill under any of the foregoing, shall have been duly executed and delivered to North Mill.

**Section 7.02   Conditions to Obligations of Buyer.** The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Buyer's waiver, at or prior to the Closing, of each of the following conditions:

(a)     Other than the representations and warranties of Seller contained in Section 4.01, the representations and warranties of Seller contained in this Agreement, the Ancillary Documents and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Material Adverse Effect) or in all material respects (in the case of any representation or warranty not qualified by materiality or Material Adverse Effect) on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects). The representations and warranties of Seller contained in Section 4.01 shall be true and correct in all respects on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects).

(b)     Seller shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the Ancillary Documents to be performed or complied with by it prior to or on the Closing Date.

(c)     No Action shall have been commenced against Buyer or Seller, which would prevent the Closing. No injunction or restraining order shall have been issued by any Governmental Authority, and be in effect, which restrains or prohibits any transaction contemplated hereby.

# 4126936  v. 5

(d)     All approvals, consents and waivers that are listed on Section 4.02 of the Disclosure Schedules shall have been received, and executed counterparts thereof shall have been delivered to Buyer at or prior to the Closing.

(e)     From the date of this Agreement, there shall not have occurred any Material Adverse Effect, nor shall any event or events have occurred that, individually or in the aggregate, with or without the lapse of time, could reasonably be expected to result in a Material Adverse Effect.

(f)     Seller shall have delivered to Buyer duly executed counterparts to the Ancillary Documents and such other documents and deliveries set forth in Section 3.02(a).

(g)     Buyer shall have received all Permits that are necessary for it to conduct the Business as conducted by Seller as of the Closing Date.

(h)     Each employee identified on Disclosure Schedule 6.04(a) shall have accepted Buyer's offer of employment.

(i)     North Mill shall have consented to the transactions contemplated by this Agreement and the sale of the Purchased Assets to Buyer, subject only to the Permitted Encumbrances, such consent to be in form and substance reasonably satisfactory to Buyer.

(j)     The Bankruptcy Court shall have entered an order approving the assignment and assumption of the Vernon, California lease by Seller to Buyer, which order shall contain a waiver of the 14-day stay of effectiveness of such order pursuant to Rule 6004(h) of the Federal Rules of Bankruptcy Procedure.

(k)     Seller shall have delivered to Buyer such other documents or instruments as Buyer reasonably requests and are reasonably necessary to consummate the transactions contemplated by this Agreement.

**Section 7.03  Conditions to Obligations of Seller.** The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Seller's waiver, at or prior to the Closing, of each of the following conditions:

(a)     Other than the representations and warranties of Buyer contained in Section 5.01 and Section 5.03, the representations and warranties of Buyer contained in this Agreement, the Ancillary Documents and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Material Adverse Effect) or in all material respects (in the case of any representation or warranty not qualified by materiality or Material Adverse Effect) on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects). The representations and warranties of

21

Buyer contained in Section 5.01 and Section 5.03 shall be true and correct in all respects on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date.

(b)    Buyer shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the Ancillary Documents to be performed or complied with by it prior to or on the Closing Date; *provided, that*, with respect to agreements, covenants and conditions that are qualified by materiality, Buyer shall have performed such agreements, covenants and conditions, as so qualified, in all respects.

(c)    No injunction or restraining order shall have been issued by any Governmental Authority, and be in effect, which restrains or prohibits any material transaction contemplated hereby.

(d)    Buyer shall have delivered to Seller duly executed counterparts to the Ancillary Documents and such other documents and deliveries set forth in Section 3.02(b).

(e)    Buyer shall have delivered to Seller such other documents or instruments as Seller reasonably requests and are reasonably necessary to consummate the transactions contemplated by this Agreement.

## ARTICLE VIII
## INDEMNIFICATION

**Section 8.01    Survival.** All representations, warranties, covenants and agreements contained herein and all related rights to indemnification shall survive the Closing.

**Section 8.02    Indemnification By Seller.** Seller shall defend, indemnify and hold harmless Buyer, its affiliates and their respective stockholders, directors, officers and employees from and against all claims, judgments, damages, liabilities, settlements, losses, costs and expenses, including attorneys' fees and disbursements, arising from or relating to:

(a)    any inaccuracy in or breach of any of the representations or warranties of Seller contained in this Agreement or any document to be delivered hereunder; or

(b)    any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Seller pursuant to this Agreement or any document to be delivered hereunder.

**Section 8.03    Indemnification Procedures.** Whenever any claim shall arise for indemnification hereunder, the party entitled to indemnification (the "**Indemnified Party**") shall promptly provide written notice of such claim to the other party (the "**Indemnifying Party**"). In connection with any claim giving rise to indemnity hereunder resulting from or arising out of any Action by a person or entity who is not a party to this Agreement, the Indemnifying Party, at its sole cost and expense and upon written notice to the Indemnified Party, may assume the defense of any such Action with counsel reasonably satisfactory to the Indemnified Party. The

# 4126936 v. 5

Indemnified Party shall be entitled to participate in the defense of any such Action, with its counsel and at its own cost and expense. If the Indemnifying Party does not assume the defense of any such Action, the Indemnified Party may, but shall not be obligated to, defend against such Action in such manner as it may deem appropriate, including, but not limited to, settling such Action, after giving notice of it to the Indemnifying Party, on such terms as the Indemnified Party may deem appropriate and no action taken by the Indemnified Party in accordance with such defense and settlement shall relieve the Indemnifying Party of its indemnification obligations herein provided with respect to any damages resulting therefrom. The Indemnifying Party shall not settle any Action without the Indemnified Party's prior written consent (which consent shall not be unreasonably withheld or delayed).

**Section 8.04    Tax Treatment of Indemnification Payments.** All indemnification payments made by Seller under this Agreement shall be treated by the parties as an adjustment to the Purchase Price for tax purposes, unless otherwise required by law.

**Section 8.05    Effect of Investigation.** Buyer's right to indemnification or other remedy based on the representations, warranties, covenants and agreements of Seller contained herein will not be affected by any investigation conducted by Buyer with respect to, or any knowledge acquired by Buyer at any time, with respect to the accuracy or inaccuracy of or compliance with, any such representation, warranty, covenant or agreement.

**Section 8.06    Cumulative Remedies.** The rights and remedies provided in this Article VIII are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise.

## ARTICLE IX
## TERMINATION

**Section 9.01    Termination.** This Agreement may be terminated at any time prior to the Closing:

(a)    by the mutual written consent of Seller and Buyer;

(b)    by Buyer by written notice to Seller if:

(i)    Buyer is not then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Seller pursuant to this Agreement that would give rise to the failure of any of the conditions specified in ARTICLE VII and such breach, inaccuracy or failure has not been cured by Seller within ten days of Seller's receipt of written notice of such breach from Buyer; or

(ii)    any of the conditions set forth in Section 2.0(d). Section 7.01 or Section 7.02 shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by May 31, 2019, unless such failure shall be due to the failure of Buyer to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to

23

the Closing; or

> (iii)    an alternative transaction for the Purchased Assets is approved by the Bankruptcy Court; or

> (iv)    a Material Adverse Effect occurs with respect to the Business or Purchased Assets.

(c)    by Seller by written notice to Buyer if:

> (i)    Seller is not then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Buyer pursuant to this Agreement that would give rise to the failure of any of the conditions specified in ARTICLE VII and such breach, inaccuracy or failure has not been cured by Buyer within ten days of Buyer's receipt of written notice of such breach from Seller; or

> (ii)    any of the conditions set forth in Section 7.01 or Section 7.03 shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by June 28, 2019, unless such failure shall be due to the failure of Seller to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing; or

(d)    by Buyer or Seller in the event that (i) there shall be any Law that makes consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited or (ii) any Governmental Authority shall have issued a Governmental Order restraining or enjoining the transactions contemplated by this Agreement, and such Governmental Order shall have become final and non-appealable.

**Section 9.02    Effect of Termination.** In the event of the termination of this Agreement in accordance with this Article, this Agreement shall forthwith become void and there shall be no liability on the part of any party hereto except:

(a)    as set forth in this ARTICLE X and Section 6.05 and ARTICLE XI hereof; and

(b)    that nothing herein shall relieve any party hereto from liability for any willful breach of any provision hereof.

## ARTICLE X
## MISCELLANEOUS

**Section 10.01 Expenses.** Except as otherwise expressly provided herein, all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses, whether or not the Closing shall have occurred.

24

**Section 10.02 Notices.** All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 10.02):

| | |
|---|---|
| If to Seller: | E Z Worldwide Express<br>49 Old Turnpike Road<br>Oldwick, New Jersey 08858<br>Email:<br>Fax:<br>Attention: |
| with a copy to: | Law Offices of Kenneth L. Baum LLC<br>167 Main Street<br>Hackensack, NJ  07601<br>Facsimile: (201) 584-0297<br>E-mail: kbaum@kenbaumdebtsolutions.com<br>Attention: Kenneth L. Baum, Esquire |
| If to Buyer: | QX Logistix, LLC<br>2 North 6th Place, Unit 30E<br>Brooklyn, NY 11249<br>E-mail: ccarey@chriscareyadvisors.com<br>Attention: Christopher Carey, Chief Executive Officer |
| with copies to: | Stradley Ronon Stevens & Young LLP<br>2600 One Commerce Square<br>Philadelphia, PA  19103<br>Facsimile: (215) 564-8120<br>E-mail: cconnell@stradley.com<br>Attention: Christopher S. Connell, Esquire<br><br>-and-<br><br>Azadian Group LLC<br>Attn:  Raffi Azadian<br>600 Madison Ave., 18th Fl.<br>New York, NY 10022<br>Email:  raffi@azadiangroup.com |

25

# 4126936  v. 5

**Section 10.03 Interpretation.** For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (x) to Articles, Sections, Disclosure Schedules and Exhibits mean the Articles and Sections of, and Disclosure Schedules and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Disclosure Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

**Section 10.04 Headings.** The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 10.05 Severability.** If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**Section 10.06 Entire Agreement.** This Agreement and the Ancillary Documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and those in the Ancillary Documents, the Exhibits and Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

**Section 10.07 Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed; *provided, however,* that prior to the Closing Date, Buyer may, without the prior written consent of Seller, assign all or any portion of its rights under this Agreement to one or more of its direct or indirect wholly-owned subsidiaries. No assignment shall relieve the assigning party of any of its obligations hereunder.

# 4126936 v. 5

Section 10.08 **No Third-party Beneficiaries.** Except as provided in ARTICLE IX, this Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 10.09 **Amendment and Modification; Waiver.** This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

Section 10.10 Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.

(a) This Agreement shall be governed by and construed in accordance with the internal laws of the State of New Jersey without giving effect to any choice or conflict of law provision or rule (whether of the State of New Jersey or any other jurisdiction).

(b) ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE ANCILLARY DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY MAY BE INSTITUTED IN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA OR THE COURTS OF THE STATE OF NEW JERSEY IN EACH CASE LOCATED IN THE CITY OF ELIZABETH AND COUNTY OF UNION, AND EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING. SERVICE OF PROCESS, SUMMONS, NOTICE OR OTHER DOCUMENT BY MAIL TO SUCH PARTY'S ADDRESS SET FORTH HEREIN SHALL BE EFFECTIVE SERVICE OF PROCESS FOR ANY SUIT, ACTION OR OTHER PROCEEDING BROUGHT IN ANY SUCH COURT. THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c) EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT OR THE ANCILLARY DOCUMENTS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR

27

RELATING TO THIS AGREEMENT, THE ANCILLARY DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.10(c).

**Section 10.11 Specific Performance.** The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

**Section 10.12 Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[SIGNATURE PAGE FOLLOWS]

# 4126936  v. 5

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

SELLER:

E Z MAILING SERVICES, INC.

By: _____
Name:
Title:

UNITED BUSINESS FREIGHT
FORWARDERS, LLC

By: _____
Name:
Title:

BUYER:

QX LOGISTIX LLC

By: _____
Name: Raffi Azzadian
Title:

Each of the undersigned hereby executes this
Agreement solely for purposes of being
bound by the provisions set forth in Sections
2.09, 6.02 and 6.05.

_____
Vijay Aggarwal

_____
Ajay Aggarwal

29

# 4126936  v. 5

## DISCLOSURE SCHEDULES

These are the Disclosure Schedules delivered pursuant to that certain Asset Purchase Agreement, dated as of May ___, 2019 (the "**Agreement**"), between E Z Mailing Services Inc., a New Jersey corporation, and United Business Freight Forwarders, LLC, a New Jersey limited liability company, as sellers, and QX Logistix LLC a Delaware limited liability company, as buyer.

The numbered and lettered sections of these Disclosure Schedules correspond to the numbered and lettered sections in the Agreement.  Unless otherwise defined herein, any capitalized terms in these Disclosure Schedules shall have the meanings assigned to such terms in the Agreement.

Nothing in these Disclosure Schedules is intended to broaden the scope of any representation or warranty contained in the Agreement or to create any covenant.

1

**Section 2.01**
**Purchased Assets**

[To be provided]

2

**Section 2.04**
**Wire Transfer Instructions**

[To be provided]

**Section 4.02**
**Consents, Approvals, Waivers and Authorizations**

[To be provided]

# 4131736 v. 1

**Section 4.06(b)**
**Intellectual Property Included in the Purchased Assets**


[To be provided]

# 4131736  v. 1

## Section 4.07
## Assigned Contracts

[To be provided]

# 4131736 v. 1

**Section 4.08**
**Transferred Permits**

[To be provided]

# 4131736  v. 1

**Section 6.04(a)**
**Employees**

[To be provided]

# 4131736 v. 1

SRSY Draft:  6/5/19

# QX LOGISTIX LLC

## Unanimous Written Consent of the Members

THE UNDERSIGNED, being all of the members of QX LOGISTIX LLC, a New York limited liability company (the "**Company**"), do hereby adopt the following resolutions by unanimous written consent pursuant to the provisions of Section 407 of the New York Limited Liability Company Law and do hereby direct that the following resolutions shall be effective as if adopted at a formal meeting of the members of the Company held on June ___, 2019:

RESOLVED, that the Company be, and it hereby is, authorized to enter into an Asset Purchase Agreement (the "**Asset Purchase Agreement**") by and between the Company and E Z Mailing Services Inc., a New Jersey corporation, and United Business Freight Forwarders, LLC, a New Jersey limited liability company (collectively, "**Seller**") pursuant to which the Company will purchase all of Seller's right, title and interest in the assets relating to Seller's Vernon, California facility and its business operations with Amazon;

RESOLVED, that the form, terms and provisions of the Asset Purchase Agreement, a draft of which has been presented to the Members and is directed to be filed with the books and records of the Company, be, and they hereby are, authorized and approved;

RESOLVED, that each of (i) Chris Carey, in his capacity as the Chief Executive Officer of the Company, and (ii) Raffi Azadian, in his capacity as the Managing Member of Azadian Group, LLC, a Delaware limited liability company and the Managing Member of the Company (the "**Authorized Officers**"), be, and each of them hereby is, authorized, empowered and directed in the name and on behalf of the Company to execute and deliver the Asset Purchase Agreement with such modifications as such Authorized Officer may approve, which approval shall be conclusively evidenced by such Authorized Officer's execution and delivery thereof;

RESOLVED, that the Authorized Officers be, and each of them hereby is, authorized, empowered and directed in the name and on behalf of the Company to execute and deliver such other agreements, instruments, certificates and other documents as are contemplated by the Asset Purchase Agreement, in each case in such form and substance (consistent with the Asset Purchase Agreement and these resolutions) as may be approved by the Authorized Officer executing the same,

# 4132235

which approval shall be conclusively evidenced by such Authorized Officer's execution and delivery thereof;

RESOLVED, that the consummation by the Company of the transactions contemplated by the Asset Purchase Agreement be, and it hereby is, authorized and approved;

RESOLVED, that the Authorized Officers be, and each of them hereby is, authorized, empowered and directed to execute and deliver any and all other agreements, instruments, certificates and documents, to pay such fees and taxes, to give such notices, to make such filings, to obtain such governmental and third-party consents, and to take such actions in the name and on behalf of the Company as such Authorized Officer may deem necessary or advisable to effectuate the purposes and intentions of the foregoing resolutions; and

RESOLVED, that the authority and power given under the foregoing resolutions shall be deemed retroactive and any and all acts authorized thereunder performed prior to the passage of the foregoing resolutions be, and they hereby are, ratified and approved.

IN WITNESS WHEREOF, the undersigned have executed this Unanimous Written Consent of the Members of QX Logistix LLC as of the date first set forth above.

AZADIAN GROUP, LLC

By: _____
   Name: Raffi Azadian
   Title:  Managing Member

CHRIS CAREY ADVISORS, LLC

By: _____
   Name: Chris Carey
   Title:

SRSY Draft:  6/5/19

## CERTIFICATE OF THE CHIEF EXECUTIVE OFFICER
## OF
## QX LOGISTIX LLC

The undersigned, Chris Carey, certifies that he is the duly appointed and acting Chief Executive Officer of QX LOGISTIX LLC, a New York limited liability company (the "Company"), and that, as such, he has access to the records of the Company and is authorized to execute and deliver this Certificate on behalf of the Company.  The undersigned further certifies:

1.     This certificate is being executed and delivered pursuant to Section 3.02(b)(iv) of that certain Asset Purchase Agreement, dated as of June ___, 2019, between the Company, E Z Mailing Services Inc., a New Jersey corporation, and United Business Freight Forwarders, LLC, a New Jersey limited liability company (the "Purchase Agreement").  Capitalized terms used but not otherwise defined herein have the meanings given to such terms in the Purchase Agreement.

2.     Attached hereto as Exhibit A is a true, correct and complete copy of a Unanimous Written Consent of the Members of the Company authorizing the execution, delivery and performance by the Company of the Purchase Agreement and the transactions contemplated thereby.

3.     Each person named below is at the date hereof the duly elected, qualified and acting incumbent of the office of the Company set out to the right of such person's name, and the signature at the right of such name is the genuine signature of such person:

| Name | Title | Signature |
|------|-------|-----------|
| Chris Carey | Chief Executive Officer | _____ |
| Raffi Azadian | Managing Member of the Managing Member | _____ |

IN WITNESS WHEREOF, the undersigned has executed this Certificate of the Chief Executive Officer of QX Logistix LLC as of June ___, 2019.

_____
Chris Carey, Chief Executive Officer

# 4132159  v. 1

**EXHIBIT A**
**Unanimous Written Consent of the Members**

See attached.

# 4132159  v. 1

SRSY Draft:  6/5/19

## ASSIGNMENT AND ASSUMPTION OF LEASE

THIS ASSIGNMENT AND ASSUMPTION OF LEASE (this "Agreement"), is made and entered into as of June ___, 2019, by and between E Z MAILING SERVICES INC., a New Jersey corporation ("EZ"), and UNITED BUSINESS FREIGHT FORWARDERS, LLC, a New Jersey limited liability company ("UBFF", and together with EZ, collectively, "Seller"), King EXIM, LLC, a New Jersey limited liability company ("King EXIM"), and QX LOGISTIX LLC, a Delaware limited liability company ("Buyer").

### Recitals

Buyer and Seller are parties to that certain Asset Purchase Agreement dated as of June ___, 2019 (the "Asset Purchase Agreement"), pursuant to which Seller has agreed to sell to Buyer the Purchased Assets, including Seller's rights under that certain Lease, dated as of November 1, 2017, between Metropolitan Life Insurance Company, as landlord ("Landlord"), and EZ, jointly and severally with King EXIM, as tenant, with respect to certain premises located in the 49th Street Industrial Center in Vernon, California (the "Premises"). Capitalized terms used herein and not otherwise defined herein have the respective meanings specified in the Asset Purchase Agreement.

### Assignment

NOW, THEREFORE, in consideration of the agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties hereto agree as follows:

1.      Assignment.  As of the date hereof, each of EZ and King EXIM hereby (i) sells, assigns, transfers, conveys and delivers to Buyer all of its right, title and interest in and to the Lease and (ii) assigns and delegates to Buyer (i) the liabilities and obligations arising after the date hereof under the Lease, but only to the extent that such liabilities and obligations do not relate to any breach, default or violation by Seller or King EXIM on or prior to the Closing, and (b) existing monetary defaults under the Lease in an amount not to exceed $185,000 (collectively, the "Assumed Lease Liabilities").

2.      Assumption.  As of the date hereof, Buyer hereby (i) accepts the sale, assignment, transfer, conveyance and delivery of the Lease and (ii) assumes and agrees to pay, perform, fulfill and discharge when due (in accordance with the Lease), all of the Assumed Lease Liabilities.

3.      Possession.  EZ and King EXIM shall deliver possession of the Premises to Buyer on the date hereof.

4.      Security Deposit.  Buyer shall have the right to retain any security deposit that Landlord may return to Buyer under the Lease.  Any security deposit that Landlord returns to EZ or King EXIM shall be promptly paid over to Buyer by EZ or King EXIM, as applicable.

# 4131812  v. 2

5.    _Further Assurances_.  Each of Seller, King EXIM and Buyer agrees that it will, at any time and from time to time, on or after the Closing Date, execute, acknowledge and deliver, or use all reasonable efforts to cause to be executed, acknowledged and delivered, all such documents and instruments as the other party may reasonably request to more fully consummate the transactions contemplated by this Agreement.

6.    _Conflicts_.  Nothing in this Agreement is intended to provide any rights to Buyer or impose any obligations on Seller beyond those rights expressly provided to Buyer and those obligations expressly imposed on Seller under the Asset Purchase Agreement.  Should any term hereof be in conflict with any term of the Asset Purchase Agreement, the terms of the Asset Purchase Agreement shall control.

7.    _Successors and Assigns_.  This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors, assigns and legal representatives.

8.    _Governing Law_.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of New Jersey without giving effect to any choice or conflict of law provision or rule (whether of the State of New Jersey or any other jurisdiction).

9.    _Counterparts; Electronic Signatures_.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Delivery of an executed counterpart of a signature page to this Agreement by electronic submission shall be as effective as delivery of a manually executed counterpart of this Agreement.  In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the person against whom enforcement is sought.

*[Remainder of Page Intentionally Blank; Signatures Follow]*

# 4131812  v. 2

**Execution**

IN WITNESS WHEREOF, the parties hereto have executed this Assignment and Assumption of Lease as of the date first above written.

E Z MAILING SERVICES, INC.

By: _____

    Name:

    Title:

UNITED BUSINESS FREIGHT
FORWARDERS, LLC

By: _____

    Name:

    Title:

KING EXIM, LLC

By: _____

    Name:

    Title:

QX LOGISTIX LLC

By: _____

    Name:

    Title:

# 4131812 v. 2

SRSY Draft: 6/5/19

## ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is made and entered into as of June ___, 2019, by and between E Z MAILING SERVICES INC., a New Jersey corporation ("EZ"), and UNITED BUSINESS FREIGHT FORWARDERS, LLC, a New Jersey limited liability company ("UBFF", and together with EZ, collectively, "Seller"), and QX LOGISTIX LLC, a Delaware limited liability company ("Buyer").

### Recitals

Buyer and Seller are parties to that certain Asset Purchase Agreement dated as of June ___, 2019 (the "Asset Purchase Agreement"), pursuant to which Seller has agreed to sell to Buyer the Purchased Assets, including Seller's rights under the Assigned Contracts, and Buyer has agreed to assume the Assumed Liabilities. Capitalized terms used herein and not otherwise defined herein have the respective meanings specified in the Asset Purchase Agreement.

### Assignment

NOW, THEREFORE, in consideration of the agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties hereto agree as follows:

1.    Assignment.  As of the date hereof, Seller hereby (i) sells, assigns, transfers, conveys and delivers to Buyer all of Seller's right, title and interest in and to the Assigned Contracts and (ii) assigns and delegates to Buyer all of the Assumed Liabilities.

2.    Assumption.  As of the date hereof, Buyer hereby (i) accepts the sale, assignment, transfer, conveyance and delivery of the Assigned Contracts and (ii) assumes and agrees to pay, perform, fulfill and discharge when due (in accordance with their terms), all of the Assumed Liabilities.

3.    Further Assurances.  Each of Seller and Buyer agrees that it will, at any time and from time to time, on or after the Closing Date, execute, acknowledge and deliver, or use all reasonable efforts to cause to be executed, acknowledged and delivered, all such documents and instruments as the other party may reasonably request to more fully consummate the transactions contemplated by this Agreement.

4.    Conflicts.  Nothing in this Agreement is intended to provide any rights to Buyer or impose any obligations on Seller beyond those rights expressly provided to Buyer and those obligations expressly imposed on Seller under the Asset Purchase Agreement. Should any term hereof be in conflict with any term of the Asset Purchase Agreement, the terms of the Asset Purchase Agreement shall control.

5.    Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors, assigns and legal representatives.

# 4131693  v. 1

6.      <u>Governing Law</u>.   This Agreement shall be governed by and construed in accordance with the internal laws of the State of New Jersey without giving effect to any choice or conflict of law provision or rule (whether of the State of New Jersey or any other jurisdiction).

7.      <u>Counterparts; Electronic Signatures</u>.   This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.   Delivery of an executed counterpart of a signature page to this Agreement by electronic submission shall be as effective as delivery of a manually executed counterpart of this Agreement.   In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the person against whom enforcement is sought.

*[Remainder of Page Intentionally Blank; Signatures Follow]*

# 4131693  v. 1

### Execution

IN WITNESS WHEREOF, the parties hereto have executed this Assignment and Assumption Agreement as of the date first above written.

E Z MAILING SERVICES, INC.

By: _____
    Name:
    Title:

UNITED BUSINESS FREIGHT
FORWARDERS, LLC

By: _____
    Name:
    Title:

QX LOGISTIX LLC

By: _____
    Name:
    Title:

# 4131693  v. 1

SRSY Draft:  6/5//19

## BILL OF SALE

KNOW ALL PERSONS BY THESE PRESENTS:

E Z MAILING SERVICES INC., a New Jersey corporation ("EZ"), and UNITED BUSINESS FREIGHT FORWARDERS, LLC, a New Jersey limited liability company ("UBFF", and together with EZ, collectively, "Seller"), for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, do hereby irrevocably and unconditionally sell, assign, transfer, convey and deliver to QX LOGISTIX LLC, a Delaware limited liability company ("Buyer"), all right, title, and interest of Seller in and to the "Purchased Assets" as such term is defined in that certain Asset Purchase Agreement, dated as of June __, 2019, between Seller and Buyer (the "Asset Purchase Agreement"), TO HAVE AND TO HOLD the Purchased Assets unto Buyer, its successors and assigns, for its and their respective use forever.

Nothing in this Bill of Sale is intended to provide any rights to Buyer or Seller beyond those rights expressly provided to Buyer and Seller in the Asset Purchase Agreement.  Nothing in this Bill of Sale is intended to impose any obligations or liabilities on Buyer or Seller beyond those obligations and liabilities expressly imposed on Buyer or Seller in the Asset Purchase Agreement.  Should any term or provision hereof be in conflict with any term or provision of the Asset Purchase Agreement, the terms and provisions of the Asset Purchase Agreement shall control.

This Bill of Sale shall be governed by and construed in accordance with the laws of the State of New Jersey applicable to instruments made and to be wholly performed in that State.

IN WITNESS WHEREOF, Seller has executed and delivered this Bill of Sale to Buyer as of June ___, 2019.

E Z MAILING SERVICES, INC.

By: _____
    Name:
    Title:

UNITED BUSINESS FREIGHT
FORWARDERS, LLC

By: _____
    Name:
    Title:

# 4137350 v. 1